# EXHIBIT 1

**Conformed through Amendment No. 1 dated April 30, 2013
and Amendment No. 2 dated May 22, 2013
and Amendment No. 3 dated June 21, 2013
and Amendment No. 4 dated December 5, 2013
and Amendment No. 5 dated May 21, 2014
and Amendment No. 6 dated November 17, 2014
and Amendment No. 7 dated March 31, 2015
and Amendment No. 8 dated April 7, 2015
and Amendment No. 9 dated April 17, 2015
and Amendment No. 10 dated April 20, 2015
and Amendment No. 11 dated May 29, 2015
and Amendment No. 12 dated July 8, 2015**

**CREDIT AND SECURITY AGREEMENT**

**by and among**

**ECLIPSE AEROSPACE, INC.,**

**as Borrower**

**and**

**CRYSTAL FINANCIAL SBIC LP**

**as Administrative Agent and Collateral Agent**

**Dated as of July 20, 2012**

# TABLE OF CONTENTS

**Page**

**1.     DEFINITIONS AND CONSTRUCTION.** ...................................................................1
   1.1     Definitions, Code Terms, Accounting Terms and Construction ............................1

**2.     LOANS AND TERMS OF PAYMENT.** .............................................................................1
   2.1     Term Loans .......................................................................................................1
   2.2     Permitted Cure Term Loans ..............................................................................1
   2.3     [Reserved] .........................................................................................................3
   2.4     Prepayments ......................................................................................................3
   2.5     [Reserved] .........................................................................................................4
   2.6     Interest Rates: Rates, Payments, and Calculations ...........................................4
   2.7     Designated Account ..........................................................................................7
   2.8     Maintenance of Loan Account; Statements of Obligations ...............................7
   2.9     Maturity Date ....................................................................................................7
   2.10    [Reserved] .........................................................................................................7
   2.11    Termination by Borrowers .................................................................................8
   2.12    Fees ...................................................................................................................8
   2.13    [Reserved] .........................................................................................................8
   2.14    Illegality; Impracticability; Increased Costs .....................................................8
   2.15    Capital Requirements ........................................................................................8
   2.16    Extent of Each Borrower's Liability, Contribution ...........................................9
   2.17    Appointment of Administrative Borrower ........................................................10

**3.     SECURITY INTEREST** ..................................................................................................11
   3.1     Grant of Security Interest ................................................................................11
   3.2     Borrowers Remain Liable ................................................................................11
   3.3     Assignment of Insurance .................................................................................11
   3.4     Financing Statements ......................................................................................12
   3.5     Release of FAA Registry and Cape Town International Registry Filings ............12

**4.     CONDITIONS.** ...............................................................................................................12
   4.1     Conditions Precedent to the Extensions of Credit ...........................................12

**5.     REPRESENTATIONS AND WARRANTIES.** ................................................................12

**6.     AFFIRMATIVE COVENANTS.** .....................................................................................13
   6.1     Financial Statements, Reports, Certificates .....................................................13
   6.2     Collateral Reporting; Lender Calls ..................................................................13
   6.3     Existence ..........................................................................................................13
   6.4     Maintenance of Properties ...............................................................................13
   6.5     Taxes ................................................................................................................14
   6.6     Insurance ..........................................................................................................14
   6.7     Inspections, Exams, Audits and Appraisals .....................................................15
   6.8     Account Verification ........................................................................................15

6.9    Compliance with Laws .................................................................15
6.10   Environmental ........................................................................16
6.11   Disclosure Updates ..................................................................16
6.12   Collateral Covenants ................................................................17
6.13   Material Contracts ...................................................................22
6.14   Location of Inventory, Equipment and Books ...............................23
6.15   Further Assurances ..................................................................23
6.16   Formation of Subsidiaries .........................................................24
6.17   Post-Closing Obligations ..........................................................25
6.18   ONE Transaction ....................................................................25
6.19   Finance Capacity in Albuquerque, New Mexico ..........................25
6.20   Liquidity Forecast ...................................................................25

**7.     NEGATIVE COVENANTS. ...........................................................26**
7.1    Indebtedness ...........................................................................26
7.2    Liens .....................................................................................26
7.3    Restrictions on Fundamental Changes .........................................26
7.4    Disposal of Assets ...................................................................26
7.5    Change Name .........................................................................27
7.6    Nature of Business ...................................................................27
7.7    Prepayments and Amendments ..................................................27
7.8    Change of Control ...................................................................28
7.9    Restricted Junior Payments .......................................................28
7.10   Accounting Methods; Inventory Reporting ..................................28
7.11   Investments; Controlled Investments ..........................................28
7.12   Transactions with Affiliates ......................................................28
7.13   Use of Proceeds ......................................................................29
7.14   Limitation on Issuance of Stock .................................................29
7.15   Consignments .........................................................................29
7.16   Inventory and Equipment with Bailees ........................................29
7.17   Insider Transactions .................................................................30
7.18   No Additional Capital. ..............................................................30
7.19   Chief Financial Officer. ............................................................30

**8.     FINANCIAL COVENANTS. ..........................................................30**
8.1    [Reserved] ..............................................................................30
8.2    Minimum Liquidity ..................................................................30

**9.     EVENTS OF DEFAULT. ...............................................................31**

**10.    RIGHTS AND REMEDIES; AGENT. ..............................................34**
10.1   Rights and Remedies ................................................................34
10.2   Additional Rights and Remedies .................................................35
10.3   Agent Appointed Attorney in Fact .............................................37
10.4   Remedies Cumulative ..............................................................38
10.5   Crediting of Payments and Proceeds ..........................................38
10.6   Marshaling .............................................................................39

10.7 License ...................................................................................................40
10.8 Agency for Perfection .............................................................................40
10.9 Appointment Powers and Immunities .....................................................40
10.10 Reliance by Agent ...................................................................................41
10.11 Events of Default .....................................................................................41
10.12 Indemnification ........................................................................................42
10.13 Non-Reliance on Agent and Other Lenders ...........................................42
10.14 Failure to Act ...........................................................................................43
10.15 Successor Agent .......................................................................................43
10.16 Exculpatory Provisions ...........................................................................44
10.17 Delegation of Duties ...............................................................................45
10.18 Agent May File Proofs of Claim .............................................................45
10.19 Collateral and Guaranty Matters .............................................................46

**11.   WAIVERS; INDEMNIFICATION. ..................................................................47**
11.1 Demand; Protest; etc. ..............................................................................47
11.2 The Agent's Liability for Collateral .......................................................47
11.3 Indemnification ........................................................................................47

**12.   NOTICES. ..........................................................................................................48**

**13.   CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. ......................50**

**14.   ASSIGNMENTS; SUCCESSORS. ...................................................................51**

**15.   AMENDMENTS; WAIVERS. ...........................................................................53**

**16.   TAXES. ...............................................................................................................54**

**17.   GENERAL PROVISIONS. ................................................................................55**
17.1 Effectiveness ............................................................................................55
17.2 Section Headings ......................................................................................55
17.3 Interpretation ...........................................................................................55
17.4 Severability of Provisions .......................................................................55
17.5 Debtor-Creditor Relationship ..................................................................55
17.6 Counterparts; Electronic Execution ........................................................55
17.7 Revival and Reinstatement of Obligations ..............................................55
17.8 Confidentiality .........................................................................................56
17.9 Expenses ..................................................................................................57
17.10 Setoff  57
17.11 Survival ....................................................................................................57
17.12 Patriot Act ................................................................................................57
17.13 Integration ................................................................................................57
17.14 Reimbursement by Lenders .....................................................................58

## EXHIBITS AND SCHEDULES

Schedule 1.1(a)          Definitions
Schedule 1.1(b)          Loan Percentages
Schedule 5.30(a)         FAA Certificates
Schedule 5.30(b)         Notice of Non-Compliance with any FAA Certificates or Aviation Laws
Schedule 5.30(c)         Registration for Aircraft and Engines
Schedule 6.1             Financial Statement, Reports, Certificates
Schedule 6.2             Collateral Reporting


Exhibit A                Form of Compliance Certificate
Exhibit B                Form of Note
Exhibit C                Conditions Subsequent
Exhibit D                Representations and Warranties
Exhibit E                Information Certificate
Exhibit F                [Reserved]
Exhibit G-1              Form of Permitted Cure Term Note
Exhibit G-2              Form of Subordination Agreement


Schedule D-1             Designated Account
Schedule E-1             Eligible Aircraft
Schedule P-1             Permitted Investments
Schedule P-2             Permitted Liens
Schedule R-1             Real Property Collateral
Schedule U-1             UT Collateral

# CREDIT AND SECURITY AGREEMENT

THIS CREDIT AND SECURITY AGREEMENT (this "Agreement"), is entered into as of July 20, 2012, by and among the lenders party hereto from time to time (the "Lenders"), ECLIPSE AEROSPACE, INC., a Delaware corporation ("Eclipse", and, together with any other Person that hereafter becomes a borrower, each a "Borrower" and collectively, "Borrowers"), the Guarantors party hereto from time to time and Crystal Financial SBIC LP, as Administrative Agent and Collateral Agent for the Lenders ("Agent").

The parties agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION.

**1.1 Definitions, Code Terms, Accounting Terms and Construction**. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1(a). Additionally, matters of (i) interpretation of terms defined in the Code, (ii) interpretation of accounting terms and (iii) construction are set forth in Schedule 1.1(a).

## 2. LOANS AND TERMS OF PAYMENT.

**2.1 Term Loans**.

(a) On the Amendment No. 10 Effective Date:

(i) Lenders converted Existing RC Loans (as defined in Amendment No. 10) and any accrued and unpaid interest and fees thereon and other amounts, including all interest, fees and other amounts which have accrued to but excluding the Effective Date (as defined in the Assignment and Assumption Agreement), into Term Loans such that the outstanding principal amount of Term Loans subject to the RC Loan Conversion (as defined in Amendment No. 10) equals $10,777,751.94 in connection with Section 4(a) of Amendment No. 10; and

(ii) Lenders made New Term Loans to Borrowers in an aggregate principal amount equal to $25,972,248.06 (which were made with $3,675,000.00 of original issue discount) in accordance with Section 4(b) of Amendment No. 10 such that the total outstanding principal amount of Term Loans, after giving effect to the making of such additional New Term Loans, shall be $36,750,000.00 in the aggregate.

(b) Amounts borrowed pursuant to this Section 2.1 or otherwise under this Agreement may be repaid and, once repaid, may not be reborrowed. The outstanding principal amount of the Term Loans, together with interest accrued and unpaid thereon, and any premiums (including the Prepayment Premium) shall be due and payable on the Termination Date.

**2.2 Permitted Cure Term Loans**. In the event of a breach of the covenant set forth in Section 8.2 of this Agreement or, if as of any date, there exists an Overadvance Amount (each, a "Cure Event"), one or more existing direct or indirect shareholders of the Stock of Eclipse (each a "Permitted Cure Party" and collectively, the "Permitted Cure Parties") shall, at their

option, be permitted to make Term Loans to the Borrowers (such Term Loans, the "Permitted Cure Term Loans"), in each case, subject to the terms and conditions set forth in this Section 2.2:

(a)     The Permitted Cure Term Loans shall be in substantially the form of Exhibit G-1 to this Agreement and shall be subject to the subordination agreement in the form of Exhibit G-2 to this agreement.  For the avoidance of doubt, (i) the Permitted Cure Term Loans shall bear interest at the Interest Rate Margin plus two percent (2%) per annum, which interest shall be paid-in-kind and treated as Permitted Cure Term Loan Increased Interest on such Permitted Cure Term Loans, (ii) the Maturity Date of such Permitted Cure Term Loans shall be the Maturity Date, (iii) the Permitted Cure Term Loans shall not be issued with any original issue discount, upfront fees or any other fees and (iv) any Permitted Cure Term Loan shall be (and automatically are) subordinated in right of payment to any other Term Loan held by any Lender hereunder (and shall not be entitled to any cash payment until all Obligations, other than Permitted Cure Term Loans and any other Obligations arising in connection with such Permitted Cure Term Loans and owing to such Permitted Cure Party, shall be been paid in full in cash). All Permitted Cure Term Loans shall be made directly by the Permitted Cure Party; provided that, on the date such Permitted Cure Term Loan is made, the Permitted Cure Term Party and the Borrowers shall provide written notice thereof to the Agent and the Lenders.  Unless and until such notice is delivered, the Agent shall have no duties or obligations hereunder with respect to the applicable Permitted Cure Term Loan or Permitted Cure Party.

(b)     In addition, (i) Permitted Cure Term Loans shall only be permitted to be made by the Permitted Cure Parties in a minimum amount of One Million Dollar ($1,000,000) increments (or such lesser amount as may be permitted by the Required Lenders), (ii) Permitted Cure Term Loans may not be assigned to any other party nor shall a participation in such Permitted Cure Term Loans be permitted to be sold, (iii) a Cure Event exists at the time such Permitted Cure Term Loans are made, (iv) Permitted Cure Term Loans shall only be permitted to be made (A) in the event that Liquidity is less than or equal to One Million Five Hundred Thousand Dollars ($1,500,000) as of the last Testing Date, if an Irrevocable Commitment has been delivered and such Permitted Cure Term Loans are made within five (5) Business Days of the occurrence the applicable Cure Event, (B) in the event that Liquidity is more than One Million Five Hundred Thousand Dollars ($1,500,000) as of the last Testing Date but less than or equal to Four Million Dollars ($4,000,000) as of the last Testing Date, if an Irrevocable Commitment has been delivered within five (5) Business Days of such Cure Event and such Permitted Cure Term Loans are made within five (5) Business Days after the delivery of the Irrevocable Commitment, and (C) in the event that Liquidity is greater than Four Million Dollars ($4,000,000) as of the last Testing Date, if an Irrevocable Commitment has been delivered within five (5) Business Days of such Cure Event and such Permitted Cure Term Loans are made within ten (10) Business Days after the delivery of the Irrevocable Commitment (such periods described in the foregoing subclauses (A), (B) and (C) hereof to make the Permitted Cure Term Loans, each a "Cure Period" and collectively, the "Cure Periods"; provided, that no Cure Period shall exist to the extent any of the other conditions are incapable of satisfaction), (v) Permitted Cure Term Loans may not be made on more than four (4) occasions after the Amendment No. 10 Effective Date, (vi) Permitted Cure Term Loans may not be made more than one time in any calendar quarter (but may, for the avoidance of doubt, be made in consecutive calendar quarters) and (vii) the aggregate principal amount of Permitted Cure Term Loans shall not exceed the

2

difference between $45,000,000 and the aggregate principal amount of Term Loans on the Amendment No. 10 Effective Date (after giving effect to the making of the New Term Loans).

2.3     **[Reserved]**.

2.4     **Prepayments**.

(a)     Voluntary Prepayments. Upon ten (10) Business Days' prior written notice to Agent, Borrowers may, at their option, prepay all or any part of the remaining unpaid payments on the Term Loans at a prepayment price equal to (A) the principal amount of the Term Loans being prepaid, plus (B) accrued and unpaid interest thereon through, but excluding the date of such prepayment, plus (C) the Prepayment Premium, plus (D) any other amounts then due to Agent and Lenders.  The notice of prepayment shall state the principal amount of Term Loans to be prepaid under the Term Loan.  All repayments or prepayments under this <u>Section 2.4(a)</u> shall be subject to any Prepayment Premium set forth in <u>Section 2.4(c)</u>, but shall otherwise be prepaid without premium or penalty.  Interest and the Prepayment Premium on the principal amount prepaid shall be payable on any date that a repayment is made hereunder through the date of repayment.

(b)     Mandatory Prepayments.

(i)     If, at any time, the aggregate principal amount of Term Loans outstanding exceeds the Borrowing Base at such time (such excess amount being referred to as the "<u>Overadvance Amount</u>"), then Borrowers shall promptly, but in any event, within three (3) Business Days (or within the applicable Cure Period, if the Borrower has the right to receive additional Permitted Cure Term Loans), prepay the Obligations in an aggregate amount equal to the Overadvance Amount plus accrued interest thereon, plus the Prepayment Premium and any other amounts then due to Agent and Lenders.  In no event shall the Borrowing Base or Availability on any date be deemed to exceed the amounts shown on the Borrowing Base Certificate last received by Agent and Lenders prior to such date, as the calculation in such Borrowing Base Certificate may be adjusted from time to time by Agent (at the direction of the Required Lenders) as herein authorized.

(ii)     If Agent or any Lender obtains an appraisal of the Aircraft at any time as permitted under this Agreement, and such appraisal shows the aggregate outstanding amount of Term Loans exceeds eighty-five (85%) percent of the Net Liquidation Percentage of Eligible Aircraft, then Agent (at the direction of Required Lenders) may require Borrowers to immediately prepay the outstanding amount of Term Loans in the amount of such excess, plus accrued interest thereon, plus the Prepayment Premium and any other amounts then due to Agent and Lenders.

(iii)     If, at any time, any Loan Party or Subsidiary receives proceeds from a Prepayment Event, (A) 100% of Net Proceeds received from such Prepayment Event (other than any Net Proceeds received from a Prepayment Event that constitutes a Permitted Equity Issuance) and (B) 50% of any Net Proceeds received from a Permitted Equity Issuance, shall be paid over to Agent on the date of receipt by such Loan Party or Subsidiary and shall be utilized to prepay the Term Loans, together with accrued interest thereon and the Prepayment

3

Premium required by Section 2.4(c) in the order of priority set forth in Section 10.5, as applicable.  Agent shall not be required to release its Liens on any Collateral included in such Prepayment Event until such Net Proceeds have been so received. If all Term Loans are paid in full (including the Prepayment Premium required to be paid pursuant to Section 2.4(c)), any excess Net Proceeds shall be remitted to the Borrowers after full payment in cash of all other Obligations then due and payable.

(iv)     All repayments or prepayments under this Section 2.4(b) shall be subject to any Prepayment Premium set forth in Section 2.4(c), but shall otherwise be prepaid without premium or penalty.

(c)     Prepayment Premium.  Notwithstanding anything herein to the contrary, in the event all or any portion of the Term Loans or other Obligations are prepaid, repaid or accelerated for any reason (including, without limitation, an acceleration (whether or not such acceleration occurs automatically) of the Term Loans and the other Obligations (including as a result of any Event of Default, including, without limitation, any Event of Default under Section 9.4 or Section 9.5, but excluding, for the avoidance of doubt, as a result of the prepayment of an Overadvance Amount pursuant to Section 2.4(b)(i) with the proceeds of Permitted Cure Term Loans within the applicable Cure Period described in Section 2.2 hereof), upon the occurrence of any Event of Default (including, without limitation, a Change of Control), or upon any mandatory prepayment or optional prepayment, such prepayments or repayments shall be accompanied by a prepayment premium equal to the Prepayment Premium.  If the Term Loans are accelerated for any reason under this Agreement, the Prepayment Premium shall be calculated as if the date of acceleration of such Term Loans was the date of prepayment of such Term Loans.  The parties hereto acknowledge and agree that, in light of the impracticality and extreme difficulty of ascertaining actual damages, the Prepayment Premium set forth above is intended to be a reasonable calculation of the actual damages that would be suffered by the Agent and the Lenders as a result of any such repayment or prepayment.  The parties hereto further acknowledge and agree that the Prepayment Premium is not intended to act as a penalty or to punish the Borrowers for any such repayment or prepayment.

(d)     Application of Payments. All Collections and all Proceeds of Collateral received by Agent, shall be applied, so long as no Event of Default has occurred and is continuing, first, to pay any amounts owed to Agent under this Agreement, the Agent Fee Letter or any other Loan Documents, and then, subject to Section 2.6(c)(ii), to reduce the outstanding Obligations in such manner as Agent (at the direction of Required Lenders) shall determine. After payment in full in cash of all Obligations (including the Prepayment Premium), any remaining balance shall be transferred to the Designated Account or otherwise to such other Person entitled thereto under applicable law.

**2.5**     **[Reserved]**.

**2.6**     **Interest Rates: Rates, Payments, and Calculations**.

(a)     Interest Rates.

(i)     Except as provided in <u>Section 2.6(b)</u>, all outstanding Obligations as of the Amendment No. 10 effective (including any Prepayment Premium) shall bear interest on the Daily Balance thereof for the period commencing with the Amendment No. 10 Effective Date until paid (whether at stated maturity, on acceleration or otherwise) at a per annum rate equal to the Interest Rate plus the Interest Rate Margin; provided that three (3) percentage points of such Interest Rate Margin shall be paid-in-kind on the first day immediately following each applicable interest period by increasing the outstanding principal amount of the Term Loans by an amount equal to the amount of in-kind interest for the applicable interest period commencing with the first day of a calendar quarter (or if the funding of Term Loans is not made on such day, the date of such funding) through the last day of such calendar quarter (rounded to the nearest cent) (such increased amount, the "<u>Capitalized Interest</u>") such that the new outstanding principal amount of the Term Loans shall include such Capitalized Interest (it being understood that the initial interest period shall run from the Amendment No. 10 Effective Date to the last date of the calendar quarter in which the Amendment No. 10 Effective Date occurs and each subsequent interest period shall begin on the first day of each calendar quarter and end on the last day of each calendar quarter).

(ii)    Except as provided in <u>Section 2.6(b)</u>, all outstanding Permitted Cure Term Loans shall bear interest thereon at the Interest Rate Margin plus two percent (2%) per annum commencing with the date of funding such Permitted Cure Term Loan until paid (whether at stated maturity, on acceleration or otherwise); provided that such Interest Rate Margin plus two percent (2%) per annum shall be paid-in-kind on the first day immediately following each calendar quarter by increasing the outstanding principal amount of the Permitted Cure Term Loans, excluding any Permitted Cure Term Loan Increased Interest, by an amount equal to the amount of in-kind interest for the applicable interest period commencing with the first day of a calendar quarter (or if the funding of Permitted Cure Term Loans is not made on such day, the date of such funding) through the last day of such calendar quarter (rounded to the nearest cent) (such increased amount, the "<u>Permitted Cure Term Loan Increased Interest</u>") such that the new outstanding principal amount of the Permitted Cure Term Loans shall include such Permitted Cure Term Loan Increased Interest.  The interest described in this <u>Section 2.6(a)(ii)</u> shall be payable-in-kind each quarter, using a simple interest calculation on the outstanding principal amount (such interest shall not be computed using a compound interest-based calculation).  The initial interest period shall run from the date of funding of such Permitted Cure Term Loan to the last date of the calendar quarter in which such funding occurs, and each subsequent interest period shall begin on the first day of each calendar quarter and end on the last day of each calendar quarter.

(b)     Default Rate. Upon the occurrence and during the continuation of an Event of Default and at any time following the Termination Date, all Obligations (including, without limitation, any Prepayment Premium) shall bear interest on the Daily Balance thereof at a per annum rate equal to two (2) percentage points above the per annum rate otherwise applicable thereunder.  Interest accrued in accordance with this <u>Section 2.6(b)</u> shall be payable from time to time on demand.

(c)     Payment.

(i)       Except to the extent provided to the contrary in <u>Section 2.12</u>, all fees payable hereunder or under any of the other Loan Documents, all costs and expenses payable hereunder or under any of the other Loan Documents, and all Lender Expenses shall be due and payable, in arrears, on the first (1st) day of each month, and all interest payments (other than Capitalized Interest and Permitted Cure Term Loan Increased Interest) shall be paid in cash on the first (1st) day of each calendar quarter (such payment date, an "<u>Interest Payment Date</u>") and all Capitalized Interest and Permitted Cure Term Loan Increased Interest shall be paid-in kind on such date.

(ii)      Except as otherwise provided herein, each payment (including each prepayment) by the Borrowers on account of principal of and interest on the Term Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Term Loans then held by the Lenders.   The amount of each voluntary or mandatory principal prepayment of the Term Loans in accordance with <u>Section 2.4(a)</u> and <u>Section 2.4(b)</u>, as applicable, shall be applied to reduce the Term Loans on a *pro rata basis* based on the principal amount of such Term Loans held by the Lenders .   Except as otherwise may be agreed by the Borrowers and the Lenders (with notice to Agent), any prepayment of Term Loans shall be applied to the then outstanding Term Loans on a *pro rata* basis.

(iii)     All payments to be made by the Borrowers shall be made without set off, recoupment or counterclaim.   Except as otherwise expressly provided herein, all payments by the Borrowers shall be made to the Agent for the account of the Lenders, at the account designated by the Agent and shall be made in U.S. Dollars and in immediately available funds, no later than 12:00 p.m. (Eastern time) on the date specified herein.   Any payment received by the Agent after such time shall be deemed (for purposes of calculating interest only) to have been received on the following Business Day and any applicable interest shall continue to accrue.   For the avoidance of doubt, notwithstanding any other provision of any Loan Document to the contrary, no payment received directly or indirectly from any Loan Party that is not a Qualified ECP Guarantor shall be applied directly or indirectly by the Agent or otherwise to the payment of any Excluded Swap Obligations.

(d)       Computation. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue. In the event the Interest Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Interest Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Interest Rate.

(e)       Intent to Limit Charges to Maximum Lawful Rate. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers, Agent and Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment

6

received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

(f)     Allocation of Purchase Price.  The Loan Parties hereby agree that the Term Loan and Warrant purchased by each Lender pursuant to this Agreement and the other Transaction Documents constitutes an "investment unit" for purposes of Section 1273(c)(2) of the Code and Treasury Regulations Section 1.1273-2(h).  The Loan Parties mutually agree that the allocation of the issue price of each such investment unit pursuant to Section 1273(c)(2) of the Code and Treasury Regulations Section 1.1273-2(h) between the Term Loan and the Warrant will be set forth in the Warrant or determined after the Amendment No. 10 Effective Date by DW in good faith and the Loan Parties agree to use such allocation for U.S. federal income tax purposes with respect to this transaction and further agree that none of the Loan Parties will take any position inconsistent with such allocation in any tax return or in any judicial or administrative proceeding in respect of taxes.

**2.7     Designated Account**. Borrowers agree to establish and maintain one or more Designated Accounts, each in the name of a single Borrower, for the purpose of receiving the proceeds of the Loans requested by Borrowers and made by Lender hereunder. Unless otherwise agreed by Lender and Borrowers (with notice to the Agent), any Loan (including Permitted Cure Term Loans) requested by Borrowers and made by any Lender hereunder shall be made to the applicable Designated Account.

**2.8     Maintenance of Loan Account; Statements of Obligations**. Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") in which will be recorded all Loans made by Lenders to Borrowers or for Borrowers' account and all other payment Obligations hereunder or under the other Loan Documents, including accrued interest, premiums (including the Prepayment Premium), fees and expenses, and Lender Expenses. In accordance with Section 2.4 and Section 2.5, the Loan Account will be credited with all payments received by Agent or Lenders from Borrowers or for Borrowers' account. All monthly statements delivered by Agent to the Borrowers regarding the Loan Account, if any, including with respect to principal, interest, fees, premiums (including the Prepayment Premium), and including an itemization of all charges and expenses constituting Lender Expenses owing, shall be subject to subsequent adjustment by Agent (at the direction of Required Lenders) but shall, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and Agent (on behalf of Lenders) unless, within thirty (30) days after receipt thereof by Borrowers, Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

**2.9     Maturity Date**. The principal amount of the Term Loans shall be repaid in full on the earliest of (i) April 20, 2017 (the "Maturity Date"), (ii) the date Borrowers terminate the Term Facility pursuant to Section 2.11 or (iii) the date the Term Facility terminates pursuant to Sections 10.1 and 10.2 following an Event of Default (the earliest of these dates, the "Termination Date"). Each Borrower jointly and severally promises to pay the Obligations (including principal, interest, premiums (including the Prepayment Premium), fees, costs, and expenses, including Lender Expenses) in full on the Termination Date.

**2.10     [Reserved]**.

**2.11    Termination by Borrowers**.

(a)    Borrowers may terminate the Term Facility at any time prior to the Maturity Date, if they (i) deliver a notice to Agent and Lenders of their intentions at least ten (10) days prior to the proposed action (or thirty (30) days prior in the case of the proposed termination of the Term Facility following the receipt by Borrowers of a Capital Requirements Notice) and (ii) pay the Obligations in full (including any Prepayment Premium).  Each such termination or prepayment notice shall be irrevocable.

**2.12    Fees**. The Borrowers shall pay to the Agent fees in the amounts and at such times set forth in the Agent Fee Letter.

**2.13    [Reserved]**.

**2.14    Illegality; Impracticability; Increased Costs**. In the event that (i) any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation or application thereof make it unlawful or impractical for Lenders to fund or maintain extensions of credit with interest based upon Daily Three Month LIBOR or to continue such funding or maintaining, or to determine or charge interest rates based upon Daily Three Month LIBOR, (ii) Lenders determine that by reasons affecting the London interbank Eurodollar market, adequate and reasonable means do not exist for ascertaining Daily Three Month LIBOR, or (iii) Lenders determine that the interest rate based on the Daily Three Month LIBOR will not adequately and fairly reflect the cost to Lenders of maintaining or funding Term Loans at the interest rate based upon Daily Three Month LIBOR, Lenders shall give notice of such changed circumstances to Borrowers (with a copy to the Agent) and (i) interest on the principal amount of such extensions of credit thereafter shall accrue interest at a rate equal to the Prime Rate plus the Interest Rate Margin, and (ii) Borrowers shall not be entitled to elect Daily Three Month LIBOR until Lenders determine that it would no longer be unlawful or impractical to do so or that such increased costs would no longer be applicable.

**2.15    Capital Requirements**. If, after the Closing Date, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital or reserve requirements for banks or bank holding companies, or any change in the interpretation, implementation, or application thereof by any Governmental Authority charged with the administration thereof, including those changes resulting from the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act and Basel III, regardless of the date enacted, adopted or issued, or (ii) compliance by any Lender or its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's loan commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Borrowers thereof in writing (a "Capital Requirements Notice") (with a copy to the Agent). Following receipt of such Capital Requirements Notice, Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such

reduction is determined, payable within thirty (30) days after presentation by such Lender of a statement of the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of a Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that, Borrowers shall not be required to compensate a Lender pursuant to this Section for any reductions in return incurred more than one hundred eighty (180) days prior to the date that such Lender notifies Borrowers of such law, rule, regulation or guideline giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided, further, that, if such claim arises by reason of the adoption of or change in any law, rule, regulation or guideline that is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

**2.16    Extent of Each Borrower's Liability, Contribution**.

(a)    Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Agent, for the benefit of Lenders, the prompt payment and performance of, all Obligations under this Agreement and the other Loan Documents. Each Borrower agrees that its guaranty obligations hereunder constitute a continuing guaranty of payment and not of collection, that such obligations shall not be discharged until cash payment in full of the Obligations, and that such obligations are absolute and unconditional, irrespective of (i) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Borrower is or may become a party or be bound; (ii) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Agent or Lenders with respect thereto; (iii) the existence, value or condition of, or failure to perfect any of Agent's Liens or to preserve rights against, any security or guaranty for the Obligations or any action, or the absence of any action, by Agent or Lenders in respect thereof (including the release of any security or guaranty); (iv) the insolvency of any Borrower; (v) any election by Lenders in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (vi) any borrowing or grant of a Lien by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (vii) the disallowance of any claims of Lenders against any Borrower for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (viii) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except cash payment in full of all Obligations.

(b)    Notwithstanding anything herein to the contrary, each Borrower's liability under this Section 2.16 shall be limited to the greater of (i) all amounts for which such Borrower is primarily liable, as described below, and (ii) such Borrower's Allocable Amount.

(c)    If any Borrower makes a payment under this Section 2.16 of any Obligations (other than amounts for which such Borrower is primarily liable) (a "Guarantor Payment") that, taking into account all other Guarantor Payments previously or concurrently

9

made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payments in the same proportion that such Borrower's Allocable Amount bore to the total Allocable Amounts of all Borrowers, then such Borrower shall be entitled to receive contribution and indemnification payments from, and to be reimbursed by, each other Borrower for the amount of such excess, *pro rata* based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment. The "Allocable Amount" for any Borrower shall be the maximum amount that could then be recovered from such Borrower under this Section 2.16 without rendering such payment voidable under Section 548 of the Bankruptcy Code or under any applicable state fraudulent transfer or conveyance act, or similar statute or common law.

(d)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any Collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to Agent or Lenders hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(e)    Nothing contained in this Section 2.16 shall limit the liability of any Borrower to pay extensions of credit made directly or indirectly to that Borrower (including Term Loans advanced to any other Borrower and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower) and all accrued interest, fees, expenses and other related Obligations with respect thereto, for which such Borrower shall be primarily liable for all purposes hereunder.

**2.17    Appointment of Administrative Borrower**. Each Borrower hereby irrevocably appoints Eclipse as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Lender shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (a) to provide Agent and Lenders with all notices and instructions under this Agreement, and (b) to take such action as the Administrative Borrower deems appropriate on its behalf to carry out the purposes of this Agreement. It is understood that the handling of the Loan Account and the Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Agent shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful

performance of the integrated group. To induce Agent to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify Agent and hold Agent harmless against any and all liability, expense, loss or claim of damage or injury, made against Agent by any Borrower or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan Account and the Collateral of Borrowers as herein provided, or (b) Agent's relying on any instructions of the Administrative Borrower; except, that Borrowers will have no liability to Agent under this <u>Section 2.17</u> with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of Agent.

## 3. SECURITY INTEREST.

**3.1     Grant of Security Interest**. Each Loan Party hereby unconditionally grants, assigns, and pledges to Agent, for the benefit of Agent and each Lender, as security for the payment and performance of the Obligations, a continuing security interest (hereinafter referred to as the "<u>Security Interest</u>") in all of such Loan Party's right, title, and interest in and to the Collateral. Following request by Agent, each Loan Party shall grant Agent, for the benefit of Agent and each Lender, a Lien and security interest in all Commercial Tort Claims that it may have against any Person. The Security Interest created hereby secures the payment and performance of the Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Obligations and would be owed by any Loan Party to Agent or Lenders, but for the fact that they are unenforceable or not allowable (in whole or in part) as a claim in an Insolvency Proceeding involving any Borrower due to the existence of such Insolvency Proceeding.

**3.2     Borrowers Remain Liable**. Anything herein to the contrary notwithstanding, (a) each Loan Party shall remain liable under the contracts and agreements included in the Collateral to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Agent or any Lender of any of the rights hereunder shall not release any Loan Party from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) Agent and Lenders shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall Agent or any Lender be obligated to perform any of the obligations or duties of any Loan Party thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**3.3     Assignment of Insurance**. As additional security for the Obligations, each Loan Party hereby assigns to Agent, for the benefit of Agent and each Lender, all rights of such Loan Party under every policy of insurance covering the Collateral and all other assets and property of each Loan Party (including, without limitation business interruption insurance and proceeds thereof) and all business records and other documents relating to it, and all monies (including proceeds and refunds) that may be payable under any policy, and each Loan Party hereby directs the issuer of each policy to pay all such monies directly and solely to Agent, for the benefit of Lenders. At any time, whether or not a Default or Event of Default shall have occurred, Agent may (but need not), in Agent's or any Loan Party's name, execute and deliver proofs of claim, receive payment of proceeds and endorse checks and other instruments representing payment of the policy of insurance, and adjust, litigate, compromise or release claims against the issuer of

any policy. Any monies received under any insurance policy assigned to Agent, other than liability insurance policies, or received as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid to Agent and, as determined by the Required Lenders in their sole discretion, either be applied to prepayment of the Obligations or disbursed to Borrowers under payment terms reasonably satisfactory to the Required Lenders for application to the cost of repairs, replacements, or restorations of the affected Collateral which shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed.

**3.4    Financing Statements**. Each Loan Party authorizes Agent to file financing statements describing Collateral to perfect Agent's Security Interest in the Collateral, and Agent may describe the Collateral as "all personal property" or "all assets" or describe specific items of Collateral including without limitation any Commercial Tort Claims. All financing statements filed before the date of this Agreement to perfect the Security Interest were authorized by such Loan Party and are hereby ratified.

**3.5    Release of FAA Registry and Cape Town International Registry Filings**. With respect to the sale or other disposition by any Loan Party to a buyer of an Aircraft or a buyer of Engines registered with the Cape Town International Registry pursuant to and in accordance with the terms of this Agreement, upon written notice by Administrative Borrower to Agent and Lenders of such sale or disposition, at Borrowers' expense, (a) Agent (at the direction of Required Lenders) will execute a release of Agent's lien and security interest on such Aircraft pursuant to an Aircraft Mortgage Recordation or Engine Mortgage Recordation suitable for recordation with the FAA Registry, in form and substance satisfactory to the Required Lenders, and (b) such Loan Party shall have obtained the consent of Agent (at the direction of Required Lenders) to effect the release of the international interest of Agent in such Aircraft or such Engine with the Cape Town International Registry. Nothing contained in this <u>Section 3.5</u> shall relieve Loan Parties in any respect from their respective obligations under this Agreement to remit to Agent, for its benefit and the benefit of Lenders, all proceeds from the sale of such Aircraft or any other Aircraft or any other Collateral.

## 4.    CONDITIONS.

**4.1    Conditions Precedent to the Extensions of Credit**. The obligation of Lenders to make the extensions of credit provided for hereunder is subject to the fulfillment, to the satisfaction of Lenders, of each of the conditions precedent set forth in Section 6 of Amendment No. 10.

## 5.    REPRESENTATIONS AND WARRANTIES.

In order to induce Agent and Lenders to enter into this Agreement, each Loan Party makes the representations and warranties to Agent and Lenders set forth on Exhibit D. Each of such representations and warranties shall be true, correct, and complete, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Amendment No. 10 Effective Date and such representations and warranties shall survive the execution and delivery of this Agreement.

36669659.2

6.     **AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of this Agreement and payment in full of the Obligations, each Loan Party shall, and shall cause their respective Subsidiaries to, comply with each of the following:

**6.1     Financial Statements, Reports, Certificates**. Deliver to Agent and Lenders copies of each of the financial statements, reports, and other items set forth on Schedule 6.1 no later than the times specified therein. In addition, each Loan Party agrees that no Subsidiary of a Loan Party will have a fiscal year different from that of the Loan Parties. Each Loan Party agrees to maintain a system of accounting that enables such Borrower to produce financial statements in accordance with GAAP. Each Loan Party shall also (a) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to its and its Subsidiaries' sales, and (b) maintain its billing systems/practices substantially as in effect as of the Amendment No. 10 Effective Date and shall only make material modifications following prior notice to Agent and Lenders.

**6.2     Collateral Reporting; Lender Calls**.

(a)     Provide Agent and Lenders with each of the reports set forth on Schedule 6.2 at the times specified therein.

(b)     Borrowers shall hold progress conference calls for Lenders two (2) times per month, initially on the fifteenth (15th) and thirtieth (30th) day of each month (which date may be changed by the Required Lenders in their sole discretion), until the Maturity Date. During such conference calls the president, the chief executive officer, the chief financial officer or other executive member of each Borrower's management acceptable to the Required Lenders, which may include the Chairman of the Board of Directors, shall provide Lenders with a reasonably comprehensive update relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of any of the Loan Parties and any other information that may be reasonably requested by any Lender; provided, however, that unless invited by the Required Lenders, Agent shall not attend such conference calls.

**6.3     Existence**. Except as otherwise permitted under <u>Section 7.3</u> or <u>Section 7.4</u>, at all times maintain and preserve in full force and effect (a) its existence (including being in good standing in its jurisdiction of organization) and (b) all rights and franchises, licenses and permits material to its business; provided, however, that, no Loan Party or any of its Subsidiaries shall be required to preserve any such right or franchise, licenses or permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Agent or Lenders; provided, that Borrowers deliver at least ten (10) days prior written notice to Agent and Lenders of such Loan Party's election not to preserve any such right or franchise, license or permit.

**6.4     Maintenance of Properties**. Maintain and preserve all of its assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear and casualty excepted and Permitted Dispositions excepted (and except

13

where the failure to so maintain and preserve such assets could not reasonably be expected to result in a Material Adverse Change), and comply with the material provisions of all material leases to which it is a party as lessee, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest.

**6.5    Taxes**.

(a)    Cause all assessments and taxes imposed, levied, or assessed against any Loan Party or its Subsidiaries, or any of their respective assets or in respect of any of its income, businesses, or franchises to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest and so long as, in the case of an assessment or tax that has or may become a Lien against any of the Collateral, (i) such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such assessment or tax, and (ii) any such other Lien is at all times subordinate to Agent's Liens.

(b)    Each Loan Party will and will cause each of its Subsidiaries to make timely payment or deposit of all tax payments and withholding taxes required of it and them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Lender with proof reasonably satisfactory to the Required Lenders indicating that such Loan Party and its Subsidiaries have made such payments or deposits.

**6.6    Insurance**. At Borrowers' expense, maintain insurance respecting each of the Loan Parties' and their Subsidiaries' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. Borrowers also shall maintain (with respect to each of the Loan Parties and their Subsidiaries) business interruption, general liability, flood insurance, for Collateral located in a flood plain, product liability insurance, director's and officer's liability insurance, fiduciary liability insurance, and employment practices liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be with responsible and reputable insurance companies acceptable to Lenders and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to the Required Lenders. All property insurance policies covering the Collateral are to be made payable to Agent, for the benefit of Lenders, as its interests may appear, in case of loss, pursuant to a lender loss payable endorsement reasonably acceptable to Lenders and are to contain such other provisions as Agent or Lenders may reasonably require to fully protect the Agent's and Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance shall be delivered to Agent and Lenders, with the lender loss payable endorsement (but only in respect of Collateral) and additional insured endorsements (with respect to general liability coverage) in favor of Agent, for the benefit of Lenders, and shall provide for not less than thirty (30) days (ten (10) days in the case of nonpayment) prior written notice to Agent of the exercise of any right of cancellation. If Borrowers fail to maintain such insurance, Agent or Lenders may arrange for such insurance, but at Borrowers' expense and without any responsibility on Agent's or Lenders' part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the

14

coverage, or the collection of claims. Borrowers shall give Agent and Lenders prompt notice of any loss exceeding $100,000 covered by their casualty or business interruption insurance. Upon the occurrence of an Event of Default, Agent and Lenders shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

6.7    **Inspections, Exams, Audits and Appraisals**. Permit Agent and Lenders and each of their respective duly authorized representatives or professionals to visit any of its properties and inspect any of its assets or books and records, to conduct inspections, exams, audits, appraisals and valuations of the Collateral, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Agent and Lenders may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Borrowers.  The Borrowers shall pay the fees and expenses of the Agent, Lenders and any such representatives or professionals engaged by Agent or Lenders with respect to such appraisals, including fees or expenses for at least one (1) inventory appraisal per Fiscal Year and one (1) annual appraisal of Intellectual Property (including the Type certificate) per Fiscal Year. Notwithstanding the foregoing, the Agent (acting at the direction of the Required Lenders) may cause additional appraisals to be undertaken (i) as the Required Lenders deem necessary or appropriate, at their own expense or, (ii) if required by the Required Lenders in their Permitted Discretion or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

6.8    **Account Verification**. Permit Agent and Lenders, in Agent's or Lenders' name or in the name of a nominee of Agent or Lenders, to verify the validity, amount or any other matter relating to any Account, by mail, telephone, facsimile transmission or otherwise. Further, at the request of Agent or Lenders, Borrowers shall send requests for verification of Accounts or send notices of assignment of Accounts to Account Debtors and other obligors.

6.9    **Compliance with Laws**.

(a)    Comply with the requirements of all applicable laws, rules, regulations, licenses, approvals, orders and permits applicable to it and duly observe all requirements of any foreign, federal, state or local Governmental Authority, including, without limitation, any Type Certificate(s), Production Certificate(s), Dealer's Aircraft Registration Certificate(s) and Airworthiness Certificate(s), other than laws, rules, regulations, licenses, approvals, orders and permits the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change. Each Loan Party shall promptly apply for the issuance by the FAA to such Loan Party of Production Certificates that are required for such Loan Party to directly design, manufacture, test and produce the Aircraft subject to the Type Certificates and such Loan Party shall, in any event, obtain such Production Certificates on or before one hundred eighty (180) days following the Amendment No. 10 Effective Date.

15

36669659.2

(b)      Establish and maintain, at Loan Parties' expense, a system to assure and monitor their and their subcontractors', suppliers', and vendors' continued compliance in all material respects with all Aviation Laws and all FAA Certificates in all aspects of designing, manufacturing, testing, selling and operating any Aircraft, which system shall include periodic reviews of such compliance by employees or Lenders of Loan Parties who are familiar with the requirements of the Aviation Laws and all FAA Certificates. At Agent's or a Lender's request, copies of all manuals, compliance surveys and results of investigations conducted by the FAA or notices received by any Loan Party from the FAA shall be promptly furnished, or caused to be furnished, by such Loan Party to Agent and Lenders. Loan Parties shall promptly notify Agent and Lenders of, and shall take prompt and appropriate action to respond to, any non-compliance with any of the Aviation Laws or the FAA Certificates.

**6.10    Environmental**.

(a)      Keep any property either owned or operated by any Loan Party or its Subsidiaries free of any Environmental Liens or post bonds or other financial assurances satisfactory to the Required Lenders and in an amount sufficient to satisfy the obligations or liability evidenced by such Environmental Liens;

(b)      Comply, in all material respects, with Environmental Laws and provide to Agent and Lenders documentation of such compliance which Agent or Lenders reasonably request;

(c)      Promptly notify Agent and Lenders of any release of which any Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party or its Subsidiaries and take any Remedial Actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law; and

(d)      Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Agent and Lenders with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Loan Party or its Subsidiaries, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party or its Subsidiaries, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

**6.11    Disclosure Updates**.

(a)      Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof or after the occurrence thereof, whichever is earlier, notify Agent and Lenders:

(i)      if any written information, exhibit, or report furnished to Agent or Lenders contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of

16

any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto;

(ii)     of all actions, suits, or proceedings brought by or against any Loan Party or any of its Subsidiaries before any court or Governmental Authority which reasonably could be expected to result in a Material Adverse Change; provided, that, in any event, such notification shall not be later than five (5) days after service of process with respect thereto on any Loan Party or any of its Subsidiaries;

(iii)    of (i) any disputes or claims by any Borrower's customers exceeding $100,000 individually or $200,000 in the aggregate during any fiscal year; or (ii) Goods returned to or recovered by any Borrower outside of the ordinary course of business;

(iv)    of any material loss or damage to any Collateral or any substantial adverse change in the Collateral;

(v)     of a violation of any law, rule or regulation, the non-compliance with which reasonably could be expected to result in a Material Adverse Change;

(vi)    of any notice of violation of Aviation Laws which would result in a requirement that any Loan Party pay any fees, penalties, fines or other amounts or alter any Loan Party's business practices in an adverse manner;

(vii)   of the occurrence of any ERISA Event; or

(viii)  of the death or resignation, termination or other cessation of employment (which shall include the provision of management services) or a material change in the compensation or employee benefit arrangements of any Key Person.

(b)     Immediately upon obtaining knowledge thereof or after the occurrence thereof, notify Agent and Lenders of any event or condition which constitutes a Default or an Event of Default and provide a statement of the action that such Borrower proposes to take with respect to such Default or Event of Default.

Upon request of Agent or any Lender, each Loan Party shall deliver to Agent and Lenders any other materials, reports, records or information reasonably requested relating to the operations, business affairs, financial condition of any Loan Party or its Subsidiaries or the Collateral.

**6.12    Collateral Covenants**.

(a)     Possession of Collateral. In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, Investment Related Property, or Chattel Paper, in each case, having an aggregate value or face amount of $100,000 or more for all such Negotiable Collateral, Investment Related Property, or Chattel Paper, the Loan Parties shall promptly (and in any event within two (2) Business Days after receipt thereof), notify Agent and Lenders thereof, and if and to the extent that perfection or priority of Agent's Liens is dependent on or enhanced by possession, the applicable Loan Party, promptly (and in any event within two (2) Business Days) after request by Agent (at the direction of the Required Lenders),

17

shall execute such other documents and instruments as shall be requested by Agent or such Lender or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Related Property, or Chattel Paper to Agent, together with such undated powers (or other relevant document of assignment or transfer acceptable to Lender) endorsed in blank as shall be requested by Agent (at the direction of the Required Lenders), and shall do such other acts or things deemed necessary or desirable by Agent (at the direction of the Required Lenders) to enhance, perfect and protect Agent's Liens therein.

(b)     Chattel Paper.

(i)      Promptly (and in any event within two (2) Business Days) after request by Agent or any Lender, each Loan Party shall take all steps reasonably necessary to grant Agent, for the benefit of Lenders, control of all electronic Chattel Paper of any Loan Party in accordance with the Code and all "transferable records" as that term is defined in Section 16 of the Uniform Electronic Transaction Act and Section 201 of the federal Electronic Signatures in Global and National Commerce Act as in effect in any relevant jurisdiction, to the extent that the individual or aggregate value or face amount of such electronic Chattel Paper equals or exceeds $100,000; and

(ii)      If any Loan Party retains possession of any Chattel Paper or instruments (which retention of possession shall be subject to the extent permitted hereby), promptly upon the request of Agent (at the direction of the Required Lenders), such Chattel Paper and instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the Security Interest of Crystal Financial SBIC LP, as Administrative Agent and Collateral Agent for the benefit of Lenders".

(c)     Control Agreements.

(i)      Except to the extent otherwise provided by Section 7.11, each Loan Party shall obtain a Control Agreement (covering each Deposit Account), from each bank maintaining a Deposit Account for such Loan Party;

(ii)      Except to the extent otherwise provided by Section 7.11, each Loan Party shall obtain a Control Agreement, from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for any Loan Party; and

(iii)      Except to the extent otherwise provided by Section 7.11, each Loan Party shall cause Agent, for its benefit and the benefit of Lenders, to obtain "control", as such term is defined in the Code, with respect to all of such Loan Party's investment property.

(d)     Letter-of-Credit Rights. If the Loan Parties (or any of them) are or become the beneficiary of letters of credit having a face amount or value of $100,000 or more in the aggregate, then the applicable Loan Party or Loan Parties shall promptly (and in any event within two (2) Business Days after becoming a beneficiary), notify Agent and Lenders thereof and, promptly (and in any event within two (2) Business Days) after request by Agent (at the direction of the Required Lenders), enter into a tri-party agreement with Agent and the issuer or confirming bank with respect to letter-of-credit rights assigning such letter-of-credit rights to

Agent, for its benefit and the benefit of Lenders, and directing all payments thereunder to such account as specified by Agent unless otherwise directed by Agent, all in form and substance satisfactory to the Required Lenders.

(e)     Commercial Tort Claims. If the Loan Parties (or any of them) obtain Commercial Tort Claims having a value, or involving an asserted claim, in the amount of $100,000 or more in the aggregate for all Commercial Tort Claims, then the applicable Loan Party or Loan Parties shall promptly (and in any event within two (2) Business Days of obtaining such Commercial Tort Claim), notify Agent and Lenders upon incurring or otherwise obtaining such Commercial Tort Claims and, promptly (and in any event within two (2) Business Days) after request by Agent (at the direction of the Required Lenders), amend Schedule 5.6(d) to the Information Certificate to describe such Commercial Tort Claims in a manner that reasonably identifies such Commercial Tort Claims and which is otherwise reasonably satisfactory to the Required Lenders, and hereby authorizes the filing of additional financing statements or amendments to existing financing statements describing such Commercial Tort Claims, and agrees to do such other acts or things deemed necessary or desirable by Agent (at the direction of the Required Lenders) to give Agent a first priority, perfected security interest in any such Commercial Tort Claim, which Commercial Tort Claim shall not be subject to any other Liens.

(f)     Government Contracts. Other than Accounts and Chattel Paper the aggregate value of which does not at any one time exceed $100,000, if any Account or Chattel Paper of any Loan Party arises out of a contract or contracts with the United States of America or any State or any department, agency, or instrumentality thereof, Loan Parties shall promptly (and in any event within two (2) Business Days of the creation thereof) notify Agent and Lenders thereof and, promptly (and in any event within two (2) Business Days) after request by Agent (at the direction of the Required Lenders), execute any instruments or take any steps reasonably required by Agent or Lenders in order that all moneys due or to become due under such contract or contracts shall be assigned to Agent, for its benefit and the benefit of Lenders, and shall provide written notice thereof under the Assignment of Claims Act or other applicable law.

(g)     Intellectual Property.

(i)     Upon the request of Agent (at the direction of the Required Lenders), in order to facilitate filings with the PTO and the United States Copyright Office, each Loan Party shall execute and deliver to Agent one or more Copyright Security Agreements or Patent and Trademark Security Agreements to further evidence Agent's Lien on such Loan Party's Patents, Trademarks, or Copyrights, and the General Intangibles of such Loan Party relating thereto or represented thereby;

(ii)     Each Loan Party shall have the duty, with respect to Intellectual Property that is necessary in the conduct of such Loan Party's business, to protect and diligently enforce and defend at such Loan Party's expense its Intellectual Property, including (A) to diligently enforce and defend, including promptly suing for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, and filing for opposition, interference, and cancellation against conflicting Intellectual Property rights of any Person, (B) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the Closing Date or hereafter until the

19

termination of this Agreement, (C) to prosecute diligently any patent application that is part of the Patents pending as of the Closing Date or hereafter until the termination of this Agreement, (D) to take all reasonable and necessary action to preserve and maintain all of such Loan Party's Trademarks, Patents, Copyrights, Intellectual Property Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of non-contestability, and (E) to require all employees, consultants, and contractors of each Loan Party who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment to such Loan Party of Intellectual Property rights created or developed and obligations of confidentiality. No Loan Party shall abandon any Intellectual Property or Intellectual Property License that is necessary in the conduct of such Loan Party's business. Each Loan Party shall take the steps described in this <u>Section 6.12(g)(ii)</u> with respect to all new or acquired Intellectual Property to which it or any of its Subsidiaries is now or later becomes entitled that is necessary in the conduct of such Loan Party's business;

(iii)   Each Loan Party acknowledges and agrees that neither Agent nor any Lender shall have any duties with respect to any Intellectual Property or Intellectual Property Licenses of any Loan Party. Without limiting the generality of this <u>Section 6.12(g)(iii)</u>, each Loan Party acknowledges and agrees that neither Agent nor any Lender shall be under any obligation to take any steps necessary to preserve rights in the Collateral consisting of Intellectual Property or Intellectual Property Licenses against any other Person, but Agent (at the direction of the Required Lenders) may do so at its option from and after the occurrence and during the continuance of an Event of Default, and all expenses incurred in connection therewith (including reasonable fees and expenses of attorneys and other professionals) shall be for the sole account of Loan Parties;

(iv)   Each Loan Party shall promptly file an application with the United States Copyright Office for any Copyright that has not been registered with the United States Copyright Office if such Copyright is necessary in connection with the conduct of such Loan Party's business. Any expenses incurred in connection with the foregoing shall be borne by the Loan Parties; and

(v)   No Loan Party shall enter into any Intellectual Property License to receive any license or rights in any Intellectual Property of any other Person unless such Loan Party has used commercially reasonable efforts to permit the assignment of or grant of a Security Interest in such Intellectual Property License (and all rights of such Loan Party thereunder) to Lender (and any transferees of Lender).

(h)   <u>Investment Related Property</u>.

(i)   Upon the occurrence and during the continuance of an Event of Default, following the request of Agent or any Lender, all sums of money and property paid or distributed in respect of the Investment Related Property that are received by any Loan Party shall be held by the Loan Parties in trust for the benefit of Agent segregated from such Loan Party's other property, and such Loan Party shall deliver it promptly to Agent in the exact form received; and

20

(ii)     Each Loan Party shall cooperate with Agent and Lenders in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law to effect the perfection of the Security Interest on the Investment Related Property or to effect any sale or transfer thereof.

(i)     Real Property; Fixtures. Upon the acquisition by any Loan Party of any fee interest in Real Property with a value in excess of $250,000 ("Acquired Real Property"), such Loan Party will promptly (and in any event within two (2) Business Days of acquisition) notify Agent and Lenders of the acquisition of such Acquired Real Property and will grant to Agent, for the benefit of Agent and Lenders, a first priority Mortgage on such Acquired Real Property, which Acquired Real Property shall not be subject to any other Liens except Permitted Liens, and shall deliver such other documentation and opinions, in form and substance satisfactory to the Required Lenders, in connection with the grant of such Mortgage as Agent (acting at the direction of the Required Lenders) or Lenders shall request in their Permitted Discretion, including title insurance policies and endorsements, surveys, financing statements, fixture filings, flood insurance, flood insurance certifications and environmental audits and such Loan Party shall pay all recording costs, intangible taxes and other fees and costs (including reasonable attorneys' fees and expenses) incurred in connection therewith. All such appraisals, title insurance policies and endorsements, environmental audits and surveys shall be prepared or issued by parties reasonably acceptable to Lenders. To the extent permitted by applicable law, all of the Collateral shall remain personal property regardless of the manner of its attachment or affixation to real property.

(j)     Controlled Accounts.

(i)     Until the Cash Management Transition Date, each Loan Party shall establish and maintain at Agent, in its capacity as a depository bank, an account containing such Loan Party's cash and Cash Equivalents, including cash and Cash Equivalents meeting the requirements set forth in clause (a) of the definition of Liquidity, other than seven hundred fifty thousand dollars ($750,000).

(ii)     Each Loan Party shall (A) maintain Cash Management Services of a type and on terms reasonably satisfactory to the Required Lenders at one or more of the banks set forth on Schedule 6.12(j) to the Information Certificate (each a "Controlled Account Bank"), and shall take reasonable steps to ensure that all of its Account Debtors forward payment of the amounts owed by them directly to such Controlled Account Bank, and (B) deposit or cause to be deposited promptly, and in any event no later than the first (1st) Business Day after the date of receipt thereof, all of its Collections (including those sent directly by their Account Debtors to a Loan Party) into a bank account of such Loan Party (each, a "Controlled Account") at one of the Controlled Account Banks, which is used by such Loan Party solely for the purpose of receiving Collections and other proceeds of Collateral; and

(iii)     Within thirty (30) days of the Amendment No. 10 Effective Date (or such later date as agreed to by the Required Lenders in writing with a copy to the Agent), each Loan Party shall enter into Control Agreements with the applicable Controlled Account Bank, in each case in form and substance reasonably acceptable to Agent (acting at the direction of the Required Lenders). Each such Control Agreement shall provide, among other things, that

21

(A) following notice from the Agent that it is exercising exclusive control over the Controlled Account, the Controlled Account Bank will comply with any instructions originated by Agent directing the disposition of the collected funds in such Controlled Account without further consent by the applicable Loan Party, (B) the Controlled Account Bank waives, subordinates, or agrees not to exercise any rights of setoff or recoupment or any other claim against the applicable Controlled Account other than for payment of its service fees and other charges directly related to the administration of such Controlled Account and for returned checks or other items of payment, and (C) following notice from the Agent that it is exercising exclusive control over the Controlled Account, the Controlled Account Bank will forward, by daily standing wire transfer, all amounts in the applicable Controlled Account upon the instruction of Agent.

(k)     <u>Motor Vehicles</u>. Promptly (and in any event within two (2) Business Days) after (i) the value of all motor vehicles owned by Loan Parties exceeds $250,000 in the aggregate or (ii) the occurrence of a Default or an Event of Default, each Loan Party shall deliver to Agent and Lenders, an original certificate of title for each such motor vehicle together with a signed motor vehicle title application naming Agent, for the benefit of Agent and Lenders, as first lien holder with respect to such motor vehicle and will cause such title certificates to be filed (with the Agent's Lien noted thereon) in the appropriate state motor vehicle filing office.

(l)     <u>Aircraft and Engines</u>. (i) Loan Parties shall (A) promptly notify Agent and Lenders of (1) the use by any Loan Party in its business of any Aircraft for demonstration, personnel transportation or other purposes and the acquisition by any Loan Party of any Aircraft whether as a result of a trade-in or otherwise, or (2) the recording of, or any Loan Party's intention to record, an Aircraft Registration in the name of any Loan Party for any Aircraft, and (B) at Agent's request (acting at the direction of Required Lenders), at the sole expense of Loan Parties, obtain and furnish to Agent and Lenders a written report of a search of the appropriate FAA recordation records by an attorney or recognized aircraft title service as to the title, liens, security interests, orders and other interests recorded with the FAA with respect to such Aircraft, execute an Aircraft Mortgage with respect to such Aircraft and duly effect an Aircraft Mortgage Recordation with respect to such Aircraft Mortgage promptly after such Aircraft Registration; (ii) Loan Parties shall not sell, lease or dispose of any Aircraft, except as expressly permitted herein; (iii) except with the express prior written consent of Agent (acting at the direction of the Required Lenders), (A) Loan Parties shall not permit any Aircraft or Engine to be located outside of or removed from the United States of America, (B) Loan Parties shall not effect any Aircraft Registration with respect to any Aircraft unless promptly thereafter an Aircraft Mortgage Recordation is made with respect to such Aircraft and (C) Loan Parties shall not effect any Engine Registration with respect to any Engine unless promptly thereafter an Engine Mortgage Recordation is made with respect to such Engine; (iv) to the extent applicable, Loan Parties shall design, manufacture, test, maintain and operate all Aircraft in accordance with any Type Certificate(s), Production Certificate(s) and the Dealer's Aircraft Registration Certificate applicable thereto and in conformity with all other FAA Certificates issued to any Loan Party and all Aviation Laws and all other applicable laws; and (v) Loan Parties assumes all responsibility and liability arising from or relating to the production, use, sale or other disposition of the Aircraft or Engines.

**6.13     Material Contracts**. Contemporaneously with the delivery of each Compliance Certificate pursuant to <u>Section 6.1</u>, provide Agent and Lenders with copies of (a) each Material

Contract entered into since the delivery of the previous Compliance Certificate, and (b) each material amendment or modification of any Material Contract entered into since the delivery of the previous Compliance Certificate. Borrowers shall maintain all Material Contracts in full force and effect and shall not default in the payment or performance of any obligations thereunder.

**6.14    Location of Inventory, Equipment and Books**. Keep each Loan Party's and its Subsidiaries' Inventory and Equipment (other than vehicles and Equipment out for repair) and Books only at the locations identified on Schedule 5.29 to the Information Certificate and keep their chief executive offices only at the locations identified on Schedule 5.6(b) to the Information Certificate; provided, however, that Borrowers may amend Schedule 5.29 to the Information Certificate so long as such amendment occurs by written notice to Agent and Lenders not less than ten (10) days prior to the date on which such Inventory, Equipment or Books are moved to such new location.

**6.15    Further Assurances**.

(a)    At any time upon the reasonable request of Agent (acting at the direction of Required Lenders), execute or deliver to Agent and Lenders any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, collateral reviews, opinions of counsel, and all other documents (the "Additional Documents") that Agent (acting at the direction of Required Lenders) may reasonably request and in form and substance reasonably satisfactory to the Required Lenders, to create, perfect, and continue perfection or to better perfect Agent's Liens in all of the Collateral of each Loan Party (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents; provided, that, the foregoing shall not apply to any Loan Party that is a CFC if providing such documents would result in adverse tax consequences or the costs to the Loan Parties of providing such documents are unreasonably excessive (as determined by Required Lenders) in relation to the benefits to Agent and Lenders afforded thereby. To the maximum extent permitted by applicable law, if a Loan Party refuses or fails to execute or deliver any reasonably requested Additional Documents within a reasonable period of time, not to exceed thirty (30) days following the request to do so, such Loan Party hereby authorizes Agent (acting on behalf of the Lenders) to execute any such Additional Documents in the applicable Loan Party's name, as applicable, and authorizes Agent to file such executed Additional Documents in any appropriate filing office. In furtherance and not in limitation of the foregoing, each Loan Party shall take such actions as Agent (acting at the direction of Required Lenders) may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of each Borrower and each other Loan Party, and all of the outstanding capital Stock of each Loan Party (subject to exceptions and limitations contained in the Loan Documents with respect to CFCs and non-operating Subsidiaries of Borrowers with nominal assets and nominal liabilities).

(b)    Each Loan Party authorizes the filing by Agent (on behalf of the Lenders) of financing or continuation statements, or amendments thereto, and such Loan Party will execute and deliver to Agent and Lenders such other instruments or notices, as Agent (acting at

23

the direction of Required Lenders) may reasonably request, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

(c)      Each Loan Party authorizes Agent (on behalf of the Lenders) at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments (i) describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, (ii) describing the Collateral as being of equal or lesser scope or with greater detail, or (iii) that contain any information required by Part 5 of Article 9 of the Code for the sufficiency or filing office acceptance of such financing statement. Each Loan Party also hereby ratifies any and all financing statements or amendments previously filed by Agent in any jurisdiction.

(d)      Each Loan Party acknowledges that no Loan Party is authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Agent (acting at the direction of Required Lenders), subject to such Loan Party's rights under Section 9-509(d)(2) of the Code.

**6.16    Formation of Subsidiaries**. If at any time any Loan Party forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary or any Subsidiary ceases to be an Inactive Subsidiary, such Loan Party shall (a) within ten (10) days of such formation or acquisition (or such later date as permitted by the Required Lenders in their sole discretion) cause any such new Subsidiary to become a Borrower (if it has assets to be included in the Borrowing Base) or a Guarantor (if it does not have assets to be included in the Borrowing Base), and to provide to Agent and Lenders a joinder to this Agreement and a joinder to the Guaranty, together with such other security documents, as well as appropriate financing statements (and with respect to all property subject to a mortgage, fixture filings), all in form and substance reasonably satisfactory to the Required Lenders (including being sufficient to grant Agent, for the benefit of Agent and Lenders, a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary); provided, that, the Guaranty and such other security documents shall not be required to be provided to Agent and Lenders with respect to (i) Inactive Subsidiaries or (ii) any Subsidiary of Borrower that is a CFC if providing such documents would result in adverse tax consequences or (ii) if the costs to the Loan Parties of executing any security documents or perfecting the security interests created thereby are unreasonably excessive (as determined by Required Lenders ) in relation to the benefits of Agent and Lenders of the security or guarantee afforded thereby, (b) within ten (10) days of such formation or acquisition (or such later date as permitted by the Required Lenders in their sole discretion) provide to Agent and Lenders a pledge agreement and appropriate certificates and powers or financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary reasonably satisfactory to the Required Lenders; provided, that, (i) a pledge agreement shall not be required to be provided to Agent and Lenders with respect to Inactive Subsidiaries and (ii) only sixty-five (65%) percent of the total outstanding voting Stock of any first tier Subsidiary of a Borrower that is a CFC shall be required to be pledged if pledging a greater amount would result in material adverse tax consequences or the costs to the Loan Parties of providing such pledge or perfecting the security interests created thereby are unreasonably excessive (as determined by Required Lenders) in relation to the benefits of Agent and Lenders of the security or guarantee afforded thereby (which pledge, if reasonably requested by Agent

(acting at the direction of Required Lenders), shall be governed by the laws of the jurisdiction of such Subsidiary), and (c) within ten (10) days of such formation or acquisition (or such later date as permitted by the Required Lenders in their sole discretion) provide to Agent and Lenders all other documentation, including one or more opinions of counsel reasonably satisfactory to the Required Lenders, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance or other documentation with respect to all Real Property owned in fee and subject to a mortgage). Any document, agreement, or instrument executed or issued pursuant to this <u>Section 6.16</u> shall be a Loan Document.

**6.17    Post-Closing Obligations**. Borrowers shall, and shall cause each Loan Party and each of their respective Subsidiaries to, complete each of the post-closing obligations and/or deliver to Agent and the Lenders each of the documents, instruments, agreements and information listed on <u>Exhibit C</u> hereto on or before the date set forth for each such item thereon (as the same may be extended by the Required Lenders in writing in their sole discretion, with a copy to the Agent), each of which shall be completed or provided in form and substance satisfactory to Agent (acting at the direction of the Required Lenders).

**6.18    ONE Transaction**.  Within ten (10) days (or such longer period as agreed to by the Required Lenders) of consummation of the ONE Transaction, Eclipse shall cause the direct holders of the Stock of Eclipse to execute and deliver to the Agent, for the benefit of itself and the Lenders, a Pledge Agreement with respect to 100% of the issued and outstanding Stock of Eclipse.

**6.19    Finance Capacity in Albuquerque, New Mexico**.  By December 31, 2015 (or such later date as agreed to by the Required Lenders) (with notice to the Agent), the Borrower shall move and consolidate all financing operations of the Loan Parties to Albuquerque, New Mexico, including any finance executives and other personnel of the Loan Parties.

**6.20    Liquidity Forecast**.  No later than 14 days prior to the, 6, 12 and 18 month anniversaries of the Amendment No. 10 Effective Date, Administrative Borrower shall deliver to the Lenders an updated Liquidity forecast (the "<u>Updated Liquidity Forecast</u>"), which shall (i) be prepared in good faith and use a methodology consistent with the Initial Approved Liquidity Forecast, (ii) provide weekly forecasts for the first three months of the applicable six month period and monthly projections for the last three months of such six month period, (iii) include all of the information set forth in the Compliance Certificate delivered on the Amendment No. 10 Effective Date, including the Borrowing Base Certificate, an updated 13-week cash flow, a calculation of Liquidity and a calculation of Excess Availability, among other things, (iv) set forth projected Liquidity as of each Friday for the 6 month period immediately succeeding the most recent 6 month period in respect of which such Updated Liquidity Forecast is required to have been delivered (and, for the avoidance of doubt, the Updated Liquidity Forecast in respect of the period from the 6 month anniversary of the Amendment No. 10 Effective Date to and including the 12 month anniversary of the Amendment No. 10 Effective Date, shall begin with Friday, October 23, 2013).  If the Required Lenders, after good faith consultation with the Administrative Borrower, do not accept the projected Liquidity amounts set forth in the Updated Liquidity Forecast, then the Required Lenders may, in their sole discretion deliver a written notice to the Administrative Borrower no later than the 6, 12 or 18 month anniversary of the

Amendment No. 10 Effective Date, as applicable, indicating that the Required Lenders reject the proposed Updated Liquidity Forecast (such Updated Liquidity Forecast, a "Rejected Liquidity Forecast"). If the Required Lenders do not reject an Updated Liquidity Forecast in accordance with the preceding sentence, such Updated Liquidity Forecast shall be deemed to be an Approved Liquidity Forecast.

## 7.  NEGATIVE COVENANTS.

Each Loan Party covenants and agrees that, until payment in full of the Obligations, the Loan Parties will not and will not permit any of their Subsidiaries to do any of the following:

**7.1  Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

**7.2  Liens**. Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

**7.3  Restrictions on Fundamental Changes**.

(a)  Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock, except for (i) any merger between Loan Parties; provided, that, a Borrower must be the surviving entity of any such merger to which it is a party, (ii) any merger between Subsidiaries of a Borrower that are not Loan Parties and (iii) the One Transaction;

(b)  Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for (i) the liquidation or dissolution of Inactive Subsidiaries and non-operating Subsidiaries of any Borrower with nominal assets and nominal liabilities, (ii) the liquidation or dissolution of a Loan Party (other than a Borrower) or any of its wholly-owned Subsidiaries so long as all of the assets (including any interest in any Stock) of such liquidating or dissolving Loan Party or Subsidiary are transferred to a Loan Party that is not liquidating or dissolving, or (iii) the liquidation or dissolution of a Subsidiary of a Borrower that is not a Loan Party (other than any such Subsidiary the Stock of which (or any portion thereof) is subject to a Lien in favor of Agent) so long as all of the assets of such liquidating or dissolving Subsidiary are transferred to a Subsidiary of a Borrower that is not liquidating or dissolving;

(c)  Suspend or cease operation of a substantial portion of its or their business, except as permitted pursuant to Sections 7.3(a) or (b) above or in connection with the transactions permitted pursuant to Section 7.4; or

(d)  Form or acquire any direct or indirect Subsidiary.

**7.4  Disposal of Assets**. Other than Permitted Dispositions or transactions expressly permitted by Sections 7.3 or 7.12, Loan Parties shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral or any other asset except as expressly permitted by this Agreement; provided, that, notwithstanding anything to the contrary contained herein or in any other Loan Document, no Parts Manufacturer

Approvals owned by Brigadoon may be sold, assigned, transferred, or otherwise disposed of, or an option granted with respect thereto. Neither Agent nor Lenders shall be deemed to have consented to any sale or other disposition of any of the Collateral or any other asset except as expressly permitted in this Agreement or the other Loan Documents.

**7.5    Change Name**. Change any Loan Party's or any of its Subsidiaries' name, organizational identification number, state of organization, organizational identity or "location" for purposes of Section 9-307 of the Code.

**7.6    Nature of Business**.

(a)    Make any change in the nature of its or their business as conducted on the date of this Agreement or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, however, that, the foregoing shall not prevent any Loan Party or any of its Subsidiaries from engaging in any business that is reasonably related or ancillary to its or their business.

(b)    Permit any Inactive Subsidiary to engage in any business, operations or activity, or hold any property or incur any obligations, other than (i) paying taxes, (ii) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities required to maintain its separate corporate or other legal structure, (iii) preparing reports to, and preparing and making notices to and filings with, Governmental Authorities and to its holders of Stock, and (iv) activities required by this Agreement and the other Loan Documents.

**7.7    Prepayments and Amendments**.

(a)    Except in connection with Refinancing Indebtedness permitted by Section 7.1,

(i)    optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party or any of its Subsidiaries, other than (A) the Obligations in accordance with this Agreement, and (B) Permitted Intercompany Advances, or

(ii)    make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions, or

(b)    Directly or indirectly, amend, modify, or change (or permit the amendment, modification or change of) any of the terms or provisions of:

(i)    any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness other than (A) the Obligations in accordance with this Agreement, (B) Permitted Intercompany Advances, and (C) Indebtedness permitted under clauses (c), (e) and (f) of the definition of Permitted Indebtedness, and Loan Parties shall furnish to Lender all notices or demands in connection with such Permitted Indebtedness either received by any Loan Party or on its behalf, promptly after the receipt thereof, or sent by any Loan Party or on its behalf, concurrently with the sending thereof, as the case may be;

27

(ii)    any Material Contract except to the extent that such amendment, modification, or change could not, individually or in the aggregate, reasonably be expected to be materially adverse to the interests of Lender; or

(iii)    the Management Services Agreement, the Klapmeier Employment Agreement or the Governing Documents of any Loan Party or any of its Subsidiaries if the effect thereof, either individually or in the aggregate, could reasonably be expected to be materially adverse to the interests of Lender.

**7.8    Change of Control**. Cause, permit, or suffer, directly or indirectly, any Change of Control unless the Required Lenders shall have provided their prior written consent.

**7.9    Restricted Junior Payments**. Make any Restricted Junior Payment.

**7.10    Accounting Methods; Inventory Reporting**.

(a)    Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

(b)    Modify or change its standard cost of reporting of Inventory unless the Required Lenders shall have provided their prior written consent.

**7.11    Investments; Controlled Investments**.

(a)    Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

(b)    Other than (i) an aggregate amount of not more than $25,000 at any one time, in the case of each Loan Party and its Subsidiaries, and (ii) amounts deposited into Deposit Accounts identified on Schedule 5.15 to the Information Certificate which are specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for each Loan Party's or their Subsidiaries' employees, make, acquire, or permit to exist Permitted Investments consisting of cash, Cash Equivalents, or amounts credited to Deposit Accounts or Securities Accounts unless such Borrower and such other Loan Party or its Subsidiaries, as applicable, and the applicable bank (as permitted solely pursuant to Section 6.12(j)) or securities intermediary have entered into Control Agreements with Agent governing such Permitted Investments in order to perfect (and further establish) Agent's Liens in such Permitted Investments.

**7.12    Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Loan Party or any of their Subsidiaries except for:

(a)    transactions (other than the payment of management, consulting, monitoring, or advisory fees) between a Borrower or any other Loan Party or its Subsidiaries, on the one hand, and any Affiliate of a Borrower, any other Loan Party or its Subsidiaries, on the other hand, so long as such transactions (i) are fully disclosed to Agent and Lenders prior to the consummation thereof, if they involve one or more payments by a Borrower or a Loan Party or

its Subsidiaries in excess of $50,000 for any single transaction or series of related transactions, and (ii) are no less favorable, taken as a whole, to the Loan Parties or their Subsidiaries, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate;

(b) so long as it has been approved by a Loan Party's or its applicable Subsidiary's board of directors (or comparable governing body) in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) of such Loan Party or its applicable Subsidiary;

(c) so long as it has been approved by a Loan Party's or its applicable Subsidiary's board of directors (or comparable governing body) in accordance with applicable law, the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of a Loan Party and its Subsidiaries in the ordinary course of business and consistent with industry practice; and

(d) transactions permitted by Section 7.3 or Section 7.9, or any Permitted Intercompany Advance; and

(e) the Management Services Agreement and the Klapmeier Employment Agreement.

**7.13    Use of Proceeds**. Use the proceeds of any loan made hereunder for any purpose other than (a) on the Amendment No. 10 Effective Date, to pay fees, costs, and expenses, including Lender Expenses, incurred in connection with Amendment No. 10, the other Transaction Documents, and the transactions contemplated hereby and thereby, and to repay or retire all amounts outstanding under the A-4 Notes and AA-1 Subordinated Note (each as defined in the Credit Agreement as in effect immediately prior to the Amendment No. 10 Effective Date) and (b) thereafter, consistent with the terms and conditions hereof, general corporate and working capital purposes for their lawful and permitted purposes (provided, that, no part of the proceeds of the Term Loans will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System).

**7.14    Limitation on Issuance of Stock**. Except for the issuance or sale of common stock or Permitted Preferred Stock by the Loan Parties, issue or sell or enter into any agreement or arrangement for the issuance and sale of any of their Stock.

**7.15    Consignments**. Consign any of its Inventory or sell any of its Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale, except as set forth on Schedule 7.15 to the Information Certificate.

**7.16    Inventory and Equipment with Bailees**. Store the Inventory or Equipment of any Loan Party or any of its Subsidiaries at any time now or hereafter with a bailee, warehouseman, or similar party, except as set forth on Schedule 7.16 to the Information Certificate.

**7.17    Insider Transactions.** With respect to Borrower, sell any Aircraft to any Insiders (as that term is defined at Section 101(31) of the Bankruptcy Code) without the prior written consent of Agent (acting at the direction of Required Lenders). Any costs or expenses incurred by the Borrower in connection with servicing or modifying of any Aircraft owned or controlled by an Insider of the Borrower in excess of $150,000 in the aggregate shall require full and immediate repayment upon completion of said servicing or modification.

**7.18    No Additional Capital.** Without the prior written consent of the Required Lenders, receive any additional capital in the form of any cash proceeds or any other property from (i) issuances of Stock of Eclipse (or any direct or indirect parent company or any Subsidiary thereof) except for any Permitted Equity Issuance or (ii) the incurrence of any additional indebtedness or loans except for Permitted Indebtedness and Permitted Cure Term Loans.

**7.19    Chief Financial Officer.** Without the prior written consent of the Required Lenders (which consent shall not be unreasonably withheld), replace the chief financial officer of any Loan Party or hire any Person to do a job substantially similar to the job of the chief financial officer as of the Amendment No. 10 Effective Date.

## 8.    FINANCIAL COVENANTS.

Each Loan Party covenants and agrees that, until payment in full of the Obligations, the Loan Parties will comply with each of the following financial covenants and will not:

**8.1    [Reserved].**

**8.2    Minimum Liquidity.** As of each Testing Date, permit the amount of Liquidity to be less than the amount set forth under "Minimum Liquidity Amount" opposite the applicable Testing Date:

| Testing Date | Minimum Liquidity Amount |
|---|---|
| May 1, 2015 | $5,782,000 |
| May 15, 2015 | $4,097,000 |
| May 29, 2015 | $3,637,000 |
| June 12, 2015 | $2,393,000 |
| June 26, 2015 | $3,429,000 |
| July 10, 2015 | $4,698,000 |
| July 24, 2015 | $5,071,000 |
| August 7, 2015 | $4,338,000 |

| Testing Date | Minimum Liquidity Amount |
|---|---|
| August 21, 2015 | $4,061,000 |
| September 4, 2015 | $5,584,000 |
| September 18, 2015 | $5,584,000 |
| October 2, 2015 | $6,675,000 |
| October 16, 2015 | $6,675,000 |
| Every second Friday thereafter (commencing with October 30, 2015, for the avoidance of doubt) | The Approved Liquidity Amount |

## 9.    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under the Transaction Documents:

**9.1**    If any Borrower fails to pay when due and payable, or when declared due and payable, all or any portion of the Obligations consisting of principal, interest, fees, charges, premiums (including, without limitation, any Prepayment Premium) or other amounts due Agent or any Lender, reimbursement of Lender Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding);

**9.2**    If any Loan Party or any of its Subsidiaries:

(a)    fails to perform or observe any covenant or other agreement contained in any of (i) Sections 6.1, 6.2, 6.3 (solely if any Loan Party is not in good standing in its jurisdiction of organization), 6.5(a) (solely with respect to F.I.C.A., F.U.T.A., federal income taxes and any other taxes or assessments the non-payment of which may result in a Lien having priority over Agent's Liens), 6.5(b), 6.6, 6.7 (solely if any Loan Party refuses to allow Agent or Lenders or their respective representatives or agents to visit such Loan Party's properties, inspect its assets or books or records, examine and make copies of its books and records, or discuss such Loan Party's affairs, finances, and accounts with officers and employees of such Loan Party), 6.8, 6.11, 6.12, 6.13, 6.14, 6.16, 6.17, 6.18, 6.19 or 6.20 of this Agreement, (ii) Section 7 of this Agreement, or (iii) Section 8.2 of this Agreement; provided, that the Borrower may cure the covenant in Section 8.2 prior to the expiration of the applicable Cure Period (but only if the Borrower has the right to receive additional Permitted Cure Term Loans);

(b)    fails to perform or observe any covenant or other agreement contained in any of Sections 6.3 (other than if a Loan Party is not in good standing in its jurisdiction of

31

organization), <u>6.4</u>, <u>6.5(a)</u> (other than F.I.C.A., F.U.T.A., federal income taxes and any other taxes or assessments the non-payment of which may result in a Lien having priority over Agent's Liens), <u>6.7</u> (other than if any Loan Party or any of its Subsidiaries refuses to allow Agent or Lenders or their respective representatives or agents to visit its properties, inspect its assets or books or records, examine and make copies of its books or records or disclose it affairs, finances and accounts with its officers and employees), <u>6.9</u>, <u>6.10</u> and <u>6.15</u> of this Agreement and such failure continues for a period of fifteen (15) days after the earlier of (i) the date on which such failure shall first become known to or should have been known by any officer of such Loan Party or (ii) the date on which written notice thereof is given to such Loan Party by Agent or Lenders; or

(c)     fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Transaction Documents, in each case, other than any such covenant or agreement that is unable to be cured or is the subject of another provision of this <u>Section 9</u> (in which event such other provision of this <u>Section 9</u> shall govern), and such failure continues for a period of thirty (30) days after the earlier of (i) the date on which such failure shall first become known to or should have been known by any officer of such Loan Party or (ii) the date on which written notice thereof is given to such Loan Party by Agent or Lenders;

**9.3**     If one or more judgments, orders, or awards for the payment of money in an amount in excess of $100,000 in any one case or in excess of $200,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) is entered or filed against a Loan Party or any of its Subsidiaries, or with respect to any of their respective assets, and either (a) there is a period of thirty (30) consecutive days at any time after the entry of any such judgment, order, or award during which (1) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (2) a stay of enforcement thereof is not in effect, or (b) enforcement proceedings are commenced upon such judgment, order, or award;

**9.4**     If an Insolvency Proceeding is commenced by a Loan Party or any of its Subsidiaries;

**9.5**     If an Insolvency Proceeding is commenced against a Loan Party or any of its Subsidiaries and any of the following events occur: (a) such Loan Party or such Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party or its Subsidiary, or (e) an order for relief shall have been issued or entered therein; provided, that, Lender shall have no obligation to provide any extension of credit to Borrowers during such sixty (60) calendar day period;

**9.6**     If any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of such Loan Party and its Subsidiaries, taken as a whole;

9.7     If there is (a) a default under the Secured Subordinated Loan Documents, the Mann Subordinated Loan Documents, the A-5 Subordinated Loan Documents, the UT Loan Documents or in one or more agreements to which a Loan Party or any of its Subsidiaries is a party with one or more third Persons relative to a Loan Party's or any of its Subsidiaries' Indebtedness involving an aggregate amount of $100,000 or more, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's or its Subsidiary's obligations thereunder, or (b) a default in or an involuntary early termination of one or more Hedge Agreements to which a Loan Party or any of its Subsidiaries is a party involving an aggregate amount of $100,000 or more;

9.8     If any warranty, representation, certificate, statement, or Record made herein or in any other Transaction Document (including any representation made in any Borrowing Base Certificate) or delivered in writing to Agent or any Lender in connection with this Agreement or any other Transaction Document proves to be untrue in any material respect (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

9.9     If the obligation of any Guarantor under the Guaranty is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement), or if any Guarantor fails to perform any obligation under the Guaranty, or repudiates or revokes or purports to repudiate or revoke any obligation under the Guaranty, or any individual Guarantor dies or becomes incapacitated, or any other Guarantor ceases to exist for any reason;

9.10    If this Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent of Permitted Liens which are permitted purchase money Liens or the interests of lessors under Capital Leases, first priority Lien on the Collateral covered thereby, except (a) as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement, or (b) with respect to Collateral the aggregate value of which, for all such Collateral, does not exceed at any time, $100,000;

9.11    If any event or circumstance occurs that Agent or any Lender in good faith believes may impair the prospect of payment of all or part of the Obligations, or any Loan Party's or any of its Subsidiaries' ability to perform any of its material obligations under any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or there occurs any Material Adverse Change;

9.12    If any event or circumstance shall occur which, in the Permitted Discretion of the Required Lenders exercised in good faith, would be reasonably likely to cause Agent or any Lender to suspect that any Loan Party or any of its Subsidiaries has engaged in fraudulent activity with respect to the Collateral or other matters;

9.13    Any director, officer, or owner of at least twenty percent (20%) of the issued and outstanding ownership interests of a Loan Party is indicted for a felony offense under state or

33

federal law, or a Loan Party hires an officer or appoints a director who has been convicted of any such felony offense, or a Person becomes an owner of at least twenty percent (20%) of the issued and outstanding ownership interests of a Loan Party who has been convicted of any such felony offense;

**9.14**   The validity or enforceability of any Transaction Document shall at any time for any reason be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Transaction Document;

**9.15**   The failure of a Key Person to provide chief executive officer-type services to Eclipse (consistent with those services contemplated by the Management Services Agreement and the Klapmeier Employment Agreement).

**9.16**    (i) Eclipse shall fail to become a direct wholly-owned Subsidiary of a holding company or  (ii) Eclipse shall fail to duly execute and deliver a Pledge Agreement with respect to 100% of the issued and outstanding Stock of Eclipse on or prior to July 31, 2015; provided that such deadline may be extended by the Required Lenders (with notice to the Agent) (A) in their reasonable discretion to the date that is six (6) months following the Amendment No. 10 Effective Date and (B) in their sole discretion to a date after the date described in subclause (A) hereof.

## 10.   RIGHTS AND REMEDIES; AGENT.

**10.1**   **Rights and Remedies**. Upon the occurrence and during the continuation of an Event of Default, Agent, at the direction of Required Lenders, may (in each case under clauses (a) or (b) by written notice to Borrowers; provided, that, no such notice shall be required with respect to Events of Default under Section 9.4 or Section 9.5), in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, do any one or more of the following:

(a)    declare the Obligations (including, without limitation, any Prepayment Premium), whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrowers shall be obligated to repay all of such Obligations (including, without limitation, any Prepayment Premium) in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by each Loan Party;

(b)    [reserved];

(c)    give notice to an Account Debtor or other Person obligated to pay an Account, a General Intangible, Negotiable Collateral, or other amount due, notice that the Account, General Intangible, Negotiable Collateral or other amount due has been assigned to Lender for security and must be paid directly to Agent, for the benefit of itself and the Lenders, and Agent may collect the Accounts, General Intangible and Negotiable Collateral of each

34

Borrower and each other Loan Party directly, and any collection costs and expenses shall constitute part of the Obligations under the Loan Documents;

(d)     in Agent's name or in Borrowers' name, as Borrowers' agent and attorney-in-fact, notify the United States Postal Service to change the address for delivery of Borrowers' mail to any address designated by Agent, otherwise intercept Borrowers' mail, and receive, open and dispose of Borrowers' mail, applying all Collateral as permitted under this Agreement and holding all other mail for Borrowers' account or forwarding such mail to Borrowers' last known address;

(e)     without notice to or consent from any Borrower, and without any obligation to pay rent or other compensation, take exclusive possession of all locations where Borrowers conduct their business or have any rights of possession and use the locations to store, process, manufacture, sell, use, and liquidate or otherwise dispose of items that are Collateral, and for any other incidental purposes deemed appropriate by Agent (acting at the direction of the Required Lenders) in good faith; and

(f)     exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the Code or any other applicable law.

**10.2     Additional Rights and Remedies**. Without limiting the generality of the foregoing, each Borrower expressly agrees that upon the occurrence and during the continuance of an Event of Default:

(a)     Agent, without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any Borrower, any Loan Party or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code or any other applicable law), may (at the direction of Required Lenders), on behalf of Lenders, take immediate possession of all or any portion of the Collateral and (i) require Loan Parties to, and each Loan Party hereby agrees that it will at its own expense and upon request of Agent forthwith, assemble all or part of the Collateral as directed by Agent (acting at the direction of the Required Lenders) and make it available to Agent at one or more locations designated by Agent (acting at the direction of the Required Lenders) where such Borrower or Loan Party conducts business, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Agent's or Loan Party's offices or elsewhere, for cash, on credit, and upon such other terms as Agent (acting at the direction of the Required Lenders) may deem commercially reasonable, which sale may be conducted under the provisions of the UCC (including pursuant to Sections 9-610 and 9-620 of the UCC), the provisions of the Bankruptcy Code (including pursuant to Section 363 of the Bankruptcy Code) or at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with applicable laws. The Lenders hereby irrevocably authorize the Agent, upon the written consent of the Required Lenders to Credit Bid (in an amount and on such terms as may be directed by Required Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders (but not as agent for any individual

Lender or Lenders, unless the Required Lenders shall otherwise agree in writing). Each Loan Party agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to such Borrower or such other Loan Party of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and such notice shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the Code. Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Agent (acting at the direction of the Required Lenders) may adjourn any public or private sale from time to time, and such sale may be made at the time and place to which it was so adjourned. Each Loan Party agrees that the internet shall constitute a "place" for purposes of Section 9-610(b) of the Code. Each Loan Party agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and such Borrower or such Loan Party is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the Code;

(b)     Agent (acting at the direction of the Required Lenders) may, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it under applicable law and without the requirement of notice to or upon any Loan Party or any other Person (which notice is hereby expressly waived to the maximum extent permitted by the Code or any other applicable law), (i) with respect to any Loan Party's Deposit Accounts in which Agent's Liens are perfected by control under Section 9-104 of the Code, instruct the bank maintaining such Deposit Account for the applicable Loan Party to pay the balance of such Deposit Account to or for the benefit of Agent (for the benefit of itself and the Lenders), and (ii) with respect to any Loan Party's Securities Accounts in which Agent's Liens are perfected by control under Section 9-106 of the Code, instruct the securities intermediary maintaining such Securities Account for the applicable Loan Party to (A) transfer any cash in such Securities Account to or for the benefit of Agent (for the benefit of itself and the Lenders), or (B) liquidate any financial assets in such Securities Account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of Agent (for the benefit of itself and the Lenders);

(c)     any cash held by Agent as Collateral and all cash proceeds received by Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Obligations in the order set forth in <u>Section 10.5</u> of this Agreement. In the event the proceeds of Collateral are insufficient to satisfy all of the Obligations in full, each Borrower and each other Loan Party shall remain jointly and severally liable for any such deficiency; and

(d)     the Obligations arise out of a commercial transaction, and that if an Event of Default shall occur Agent (acting at the direction of the Required Lenders) shall have the right to an immediate writ of possession without notice of a hearing. Agent (acting at the direction of the Required Lenders) shall have the right to the appointment of a receiver for each Loan Party or for the properties and assets of each Loan Party, and each Loan Party hereby consents to such rights and such appointment and hereby waives any objection such Loan Party may have thereto or the right to have a bond or other security posted by Agent (acting at the direction of the Required Lenders).

Notwithstanding the foregoing or anything to the contrary contained in <u>Section 10.1</u>, upon the occurrence of any Default or Event of Default described in <u>Section 9.4</u> or <u>Section 9.5</u>, in addition to the remedies set forth above, without any notice to any Borrower or any other Person or any act by Agent, the Obligations (including any Prepayment Premium), inclusive of all accrued and unpaid interest thereon and all fees, premiums and all other amounts owing under this Agreement or under any of the other Loan Documents, shall automatically and immediately become due and payable and each Borrower shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by each Borrower.

**10.3    Agent Appointed Attorney in Fact**. Each Loan Party hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Loan Party and in the name of such Loan Party or otherwise, at such time as an Event of Default has occurred and is continuing, to take any action and to execute any instrument which Lender may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including:

(a)     to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Borrower or such other Loan Party;

(b)     to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or Chattel Paper;

(c)     to file any claims or take any action or institute any proceedings which Agent (acting at the direction of the Required Lenders) may deem necessary or desirable for the collection of any of the Collateral of such Borrower or such other Loan Party or otherwise to enforce the rights of Agent or Lenders with respect to any of the Collateral;

(d)     to repair, alter, or supply Goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to Borrower or such other Loan Party in respect of any Account of such Borrower or such other Loan Party;

(e)     to use any Intellectual Property or Intellectual Property Licenses of such Borrower or such other Loan Party including but not limited to any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, or advertising matter, in preparing for sale, advertising for sale, or selling Inventory or other Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of such Borrower or such other Loan Party;

(f)     to take exclusive possession of all locations where each Borrower or other Loan Party conducts its business or has rights of possession, without notice to or consent of any Borrower or any Loan Party and to use such locations to store, process, manufacture, sell, use, and liquidate or otherwise dispose of items that are Collateral, without obligation to pay rent or other compensation for the possession or use of any location;

(g)     Agent (acting at the direction of the Required Lenders) shall have the right, but shall not be obligated, to bring suit in its own name or in the applicable Loan Party's

37

name, to enforce the Intellectual Property and Intellectual Property Licenses and, if Agent shall commence any such suit, the appropriate Borrower or such other Loan Party shall, at the request of Agent (acting at the direction of the Required Lenders), do any and all lawful acts and execute any and all proper documents reasonably required by Agent (acting at the direction of the Required Lenders) in aid of such enforcement;

(h)     execute all agreements, documents, instruments of assignment, licenses or other papers for the purpose of transferring, licensing, assigning, selling or otherwise disposing of such Loan Party's right, title and interest in and to any Type Certificate, other FAA Certificate or Aircraft; and

(i)     to the extent permitted by law, such Loan Party hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated and all Obligations have been paid in full in cash.

**10.4    Remedies Cumulative**. The rights and remedies of Agent and Lenders under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Agent and Lenders shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity; provided, however, that notwithstanding anything to the contrary contained herein or under any other Loan Document, no Lender that is a Permitted Cure Party shall be permitted to exercise any right or remedy under this Agreement, the other Loan Documents or under the Code, by law, or in equity, without obtaining the prior written consent of the Required Lenders or as otherwise agreed to under any subordination arrangements contemplated by Section 2.2 hereof. No exercise by Agent or Lenders of one right or remedy shall be deemed an election, and no waiver by Agent or Lenders of any Event of Default shall be deemed a continuing waiver. No delay by Agent or Lenders shall constitute a waiver, election, or acquiescence by it.

**10.5    Crediting of Payments and Proceeds**. In the event that the Obligations (including any Prepayment Premium) have been accelerated pursuant to Section 10.1 or the Agent or any Lender has exercised any remedy set forth in this Agreement or any other Loan Document, all payments received by Agent upon the Obligations and all net proceeds from the enforcement of the Obligations shall be applied in the following order:

(i) First, to the payment of reasonable costs and expenses, including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability, indemnities and advances, including reasonable legal expenses and attorneys' fees, incurred, owed or made hereunder by Agent or Lenders (other than any Lender that is a Permitted Cure Party);

(ii) Second, to the payment to Lenders (other than any Lender that is a Permitted Cure Party) *pro rata* in accordance with the Loan Percentages of the interest then owing or unpaid on the Term Loans;

(iii) <u>Third</u>, to the payment to Lenders (other than any Lender that is a Permitted Cure Party) *pro rata* in accordance with the Loan Percentages of the premiums (including the Prepayment Premium) then owing or unpaid on the Term Loans;

(iv) <u>Fourth</u>, to the payment to Lenders (other than any Lender that is a Permitted Cure Party) *pro rata* in accordance with the Loan Percentages of the principal then owing or unpaid on the Term Loans;

(v) <u>Fifth</u>, to the payment of other amounts then payable to Agent or Lenders (other than any Lender that is a Permitted Cure Party) under any of the Loan Documents; and

(vi) <u>Sixth</u>, to the payment of reasonable costs and expenses, including fees, expenses, liability, indemnities and advances, including reasonable legal expenses and attorneys' fees incurred, owed or made hereunder by a Lender that is a Permitted Cure Party;

(vii) <u>Seventh</u>, to the payment to any Lender that is a Permitted Cure Party *pro rata* in accordance with the Loan Percentages of the interest then owing or unpaid on the Permitted Cure Term Loans;

(viii) <u>Eighth</u>, to the payment to any Lender that is a Permitted Cure Party *pro rata* in accordance with the Loan Percentages of the principal then owing or unpaid on the Permitted Cure Term Loans;

(ix) <u>Ninth</u>, to the payment of other amounts then payable to any Lender that is a Permitted Cure Party under any of the Loan Documents; and

(x) <u>Tenth</u>, to the payment of the surplus, if any, to Borrowers, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

In the event that, notwithstanding the foregoing, proceeds of the Collateral, shall be received by a Lender in excess of its ratable share, then the portion of such payment or distribution in excess of such Lender's ratable share shall be received by such Lender in trust for and shall be promptly paid over to the other Lenders ratably for application to the payments of amounts due to the other Lenders. For the avoidance of doubt, notwithstanding any other provision of any Loan Document, no amount received directly or indirectly from any Loan Party that is not a Qualified ECP Guarantor shall be applied directly or indirectly by the Agent or otherwise to the payment of any Excluded Swap Obligations and Obligations arising under secured cash management agreements and secured Swap Obligations shall be excluded from the application described above in clauses (i) - (iv) if the Agent has not received written notice thereof, together with such supporting documentation from the applicable bank product provider of such cash management agreements or Swap Obligations, as the case may be, as may be reasonably necessary to determine the amount of the Obligations owed thereunder.

**10.6   Marshaling**. Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in

addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, Borrower and each other Loan Party hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Agent's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Borrower hereby irrevocably waives the benefits of all such laws.

**10.7    License**. Each Loan Party hereby grants to Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property rights of such Loan Party for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by such Loan Party for its own manufacturing; and (b) selling, leasing or otherwise disposing of any or all Collateral following any Event of Default.

**10.8    Agency for Perfection**. Each Lender hereby appoints Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with the Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and Agent and each Lender hereby acknowledges that it holds possession or control of any such Collateral for the benefit of the Agent as secured party.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver possession or control of such Collateral to the Agent or in accordance with the Agent's instructions.  Each Borrower by its execution and delivery of this Agreement hereby consents to the foregoing.

**10.9    Appointment Powers and Immunities**.  Each Lender irrevocably designates, appoints and authorizes Crystal Financial SBIC LP to act as Agent hereunder and under the other Loan Documents with such powers as are specifically delegated to Agent by the terms of this Agreement and of the other Loan Documents, together with such other powers as are reasonably incidental thereto. Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents, and shall not by reason of this Agreement or any other Loan Document be a trustee or fiduciary for any Lender; and (b) shall not be responsible to Lenders for any recitals, statements, representations or warranties contained in this Agreement or in any of the other Loan Documents, or in any certificate or other document referred to or provided for in, or received by any of them under, this Agreement or any other Loan Document, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or any other document referred to or provided for herein or therein or for any failure by the Borrower or any Guarantor or any other Person to perform any of its obligations hereunder or thereunder. Agent may employ agents and attorneys in fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys in fact selected by it in good faith. Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until the assignment thereof pursuant to an agreement (if and to the extent permitted herein) in form and substance reasonably

40

satisfactory to Agent shall have been delivered to and acknowledged by Agent.  The provisions of this Article 10 are solely for the benefit of the Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

     **10.10   Reliance by Agent**. Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telex, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon the advice and statements of legal counsel, independent accountants and other experts selected by Agent. Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or under any Loan Document in accordance with instructions given by the Required Lenders (or such other percentage of Lenders as may be expressly set forth herein), and such instructions of such Agents and any action taken or failure to act pursuant thereto, shall be binding on all Lenders, and the Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Agent shall have received instructions in respect thereof from Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) and, upon receipt of such instructions from Required Lenders (or such other Lenders, as the case may be), the Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agent may consult with legal counsel, independent accountants and other experts selected by it.

     **10.11   Events of Default**.

        (a)   Agent shall not be deemed to have knowledge or notice of the occurrence of a Default or an Event of Default or other failure of a condition precedent to the Term Loans hereunder, unless and until Agent has received written notice from a Lender (other than a Lender that is a Permitted Cure Party), or the Borrower specifying such Event of Default or any unfulfilled condition precedent, and stating that such notice is a "Notice of Default or Failure of Condition". In the event that Agent receives such a Notice of Default or Failure of Condition, Agent shall give prompt notice thereof to the Lenders. Agent shall (subject to <u>Section 10.13</u>) take such action with respect to any such Event of Default or failure of condition precedent as shall be directed by the Required Lenders to the extent provided for herein; <u>provided</u>, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to or by reason of such Event of

41

Default or failure of condition precedent, as it shall deem advisable in the best interest of Lenders.

(b)     Except with the prior written consent of Agent and the Required Lenders, no Lender (other than DW or any of its Affiliates) may assert or exercise any enforcement right or remedy in respect of the Term Loans or other Obligations, as against any Loan Party or any of the Collateral or other property of any Loan Party.

**10.12   Indemnification**. Lenders agree to indemnify Agent (to the extent not reimbursed by Borrowers hereunder and without limiting any obligations of Borrowers hereunder), and its officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such Person being an "Agent Indemnitee") ratably, in accordance with their Loan Percentages, for any and all losses, claims, damages, liabilities, costs and expenses (including attorneys' fees and expenses) of any kind and nature whatsoever that may be imposed on, incurred by or asserted against any Agent Indemnitee (including by any Lender) arising out of, or by reason of any investigation in, or in any way relating to or arising out of this Agreement or any other Loan Document or any other documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby (including the costs and expenses that Agent is obligated to pay hereunder) or the enforcement of any of the terms hereof or thereof or of any such other documents; provided, that, no Lender shall be liable for any of the foregoing to the extent it arises from the gross negligence or willful misconduct of the party to be indemnified as determined by a final non-appealable judgment of a court of competent jurisdiction.  All amounts due under this Section 10.12 shall be payable on demand.  The foregoing indemnity shall survive the payment of the Obligations, the resignation or removal of the Agent and the termination of this Agreement.

**10.13   Non-Reliance on Agent and Other Lenders**. Each Lender agrees that it has, independently and without reliance on Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis of the Loan Parties and has made its own decision to enter into this Agreement and that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis and decisions in taking or not taking action under this Agreement or any of the other Loan Documents. Agent shall not be required to keep itself informed as to the performance or observance by any Loan Party of any term or provision of this Agreement or any of the other Loan Documents or any other document referred to or provided for herein or therein or to inspect the properties or Books of any Loan Party. Agent will use commercially reasonable efforts to provide Lenders with any information received by Agent from any Loan Party, which is required to be provided to Lenders hereunder or under the other Loan Documents and with a copy of any Notice of Default or Failure of Condition received by Agent from the Borrowers or any Lender; provided, that, Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Except for notices, reports and other documents expressly required to be furnished to Lenders by Agent pursuant to the terms of this Agreement or the other Loan Documents (whether upon request of a Lender or otherwise), Agent shall not have any duty or responsibility to provide any Lender with any other credit or other

information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of Agent.

**10.14  Failure to Act**. Prior to taking any action hereunder at the direction of any Lender, Agent may require further assurances from the Lenders (other than any Lender that is a Permitted Cure Party), satisfactory to Agent in its sole discretion, of their indemnification obligations under Section 10.11 hereof against any and all liability and expenses that may be incurred by it by reason of taking or continuing to take any such action.

**10.15  Successor Agent**. The Agent may resign as Agent upon thirty (30) days' notice to Lenders and the Borrower or may be replaced as the Agent by the Lenders at the direction of the Required Lenders upon five (5) Business Days prior written notice to the Agent, the other Lenders and the Administrative Borrower.  If Agent resigns or is replaced under this Agreement, the Required Lenders shall appoint a successor agent for Lenders whereupon such successor agent shall succeed to the rights, powers and duties of the retiring Agent, and the term "Agent" as used herein and in the other Loan Documents shall mean such successor agent effective upon its appointment, and the resigning or replaced Agent's appointment, rights, powers and duties as the Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. If no successor agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with Lenders and the Borrowers, a successor agent from among Lenders; provided, however, that for the avoidance of doubt, if the Agent is replaced by the Required Lenders, such Lenders shall not be required to consult with the Borrowers to replace such Agent. Upon the acceptance by the Lender so selected of its appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Agent and the term "Agent" as used herein and in the other Loan Documents shall mean such successor agent effective upon its appointment and the retiring Agent's appointment, rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. If no successor agent has accepted appointment as Agent by the date which is thirty (30) days after the date of a retiring Agent's notice of resignation, the retiring Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall deliver such collateral security to a Lender designated by the Required Lenders until such time as a successor Agent is appointed at which time such collateral security will be delivered to the successor Agent) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the retiring Agent's

36669659.2

resignation or replacement hereunder and under the other Loan Documents, the provisions of this Article 10 and Article 11 shall continue in effect for the benefit of such retiring or replaced Agent, its sub-agents and their respective related parties in respect of any actions taken or omitted to be taken by any of them while the retiring or replaced Agent was acting as Agent.

**10.16    Exculpatory Provisions**.

(a)    The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property in violation of any Debtor Relief Law; and

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

(b)    The Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent in writing by the Borrowers or a Lender.

(c)    The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity,

44

enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(d)     The Agent may consult with any of its attorneys, advisors, accountants or experts and, whether or not selected by it, any other attorneys, advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Loan Party) and shall have no liability for any action taken in good faith in reliance thereon.

(e)     Neither the Agent nor any of its directors, officers, employees or agents shall have any responsibility to the Borrower or any other Loan Party on account of the failure or delay in performance or breach by any of the Lenders of any of such Lender's obligations under this Agreement, the other Loan Documents or any related agreement or document or in connection herewith or therewith.

(f)     In no event shall Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Agent shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**10.17  Delegation of Duties**. The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article 10 shall apply to any such sub-agent and to the Affiliates of the Agent and any such sub-agent.

**10.18  Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent hereunder.

### 10.19   Collateral and Guaranty Matters.

(a)      The Lenders authorize the Agent to release any Lien on any property granted to or held by the Agent under any Loan Document (x) upon payment in full of all Obligations (including the Prepayment Premium) (other than contingent indemnification obligations), or (y) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents; and

(b)      The Lenders authorize the Agent to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary of the Borrowers as a result of a transaction permitted under the Loan Documents.

(c)      The Agent shall not be responsible to any Lender or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(d)      The Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral or the perfection of any security interest therein or for freedom of any Collateral from prior Liens or security interests.

(e)      The Agent shall not be responsible or liable for the environmental contamination of any property secured by any mortgage or deed of trust or for any diminution in value of any such property as a result of any contamination of the property by any hazardous substance, hazardous material, pollutant or contaminant.  The Agent shall not be liable for any claims by or on behalf of the Lenders or any other person or entity arising from contamination of the property by any hazardous substance, hazardous material, pollutant or contaminant, and shall have no duty or obligation to assess the environmental condition of any such property or with respect to compliance of any such property under state or federal laws pertaining to the transport, storage, treatment or disposal of, hazardous substances, hazardous materials, pollutants, or contaminants or regulations, permits or licenses issued under such laws.

(f)     The Agent shall not be under any obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Borrowers or any Loan Party, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made.

(g)     The Agent shall not be obligated to acquire possession of or take any action with respect to any property secured by a mortgage or deed of trust, if as a result of such action, the Agent would be considered to hold title to, to be a "mortgagee in possession of", or to be an "owner" or "operator" of such property within the meaning of the Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, as amended from time to time, unless the Agent has previously determined, based upon a report prepared by a person who regularly conducts environmental audits, that (i) such property is in compliance with applicable environmental laws or, if not, that it would be in the interest of the Lenders to take such actions as are necessary for such property to comply therewith and (ii) there are not circumstances present at such property relating to the use, management or disposal of any hazardous wastes for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation or that if any such materials are present for which such action could be required, that it would be in the economic interest of the Lenders to take such actions with respect to such property.  Notwithstanding the foregoing, before taking any such action, the Agent may require that a satisfactory indemnity bond or environmental impairment insurance be furnished to it for the payment or reimbursement of all expenses to which it may be put and to protect it against all liability resulting from any claims, judgments, damages, losses, fees, penalties or expenses which may result from such action.

## 11.   WAIVERS; INDEMNIFICATION.

**11.1     Demand; Protest; etc.** Each Borrower and each other Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lenders on which such Loan Party may in any way be liable.

**11.2     The Agent's Liability for Collateral**. Each Borrower and each other Loan Party hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code, Agent shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by each Borrower and such Loan Parties.

**11.3     Indemnification**. Each Loan Party shall pay, indemnify, defend, and hold the Agent, Lenders and each of their respective Related Persons and the permitted successors and assigns of the foregoing (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of

36669659.2

attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring, forbearance or workout with respect hereto) of this Agreement, any of the other Transaction Documents, or the transactions contemplated hereby or thereby or the monitoring of each Borrower and each other Loan Party's and its respective Subsidiaries' compliance with the terms of the Transaction Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Transaction Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, (c) in connection with the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral, including, without limitation, any Aircraft or Engine, in accordance with this Agreement and the other Transaction Documents, (d) with respect to the failure by any Borrower or any other Loan Party to perform or observe any of the provisions hereof or any other Transaction Document, (e) in connection with the exercise or enforcement of any of the rights of Lender hereunder or under any other Transaction Document, and (f) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by Borrower or any other Loan Party or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of such Loan Party or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Loan Party shall have any obligation to any Indemnified Person under this Section 11.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, or attorneys. This provision shall survive the termination of this Agreement, the resignation or removal of the Agent and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which a Loan Party was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Loan Party with respect thereto. WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.

## 12. NOTICES.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to Borrowers, any other

Loan Party or Lender, as the case may be, they shall be sent to the respective address set forth below:

| | |
|---|---|
| If to any Borrowers or Guarantors: | Eclipse Aerospace, Inc.<br>125 Fairchild Street, Suite 100<br>Charleston, South Carolina 29492<br>Telephone: (843) 284-1173<br>Fax No.: (843) 849-9298<br>Attn: Peter Cuneo<br>Email: peter.cuneo@eclipse.aero |
| with courtesy copies to (which shall not constitute Notice for purposes of this Section 12): | Buxton & Collie, LLC<br>1470 Ben Sawyer Boulevard, Suite B-8<br>Mt. Pleasant, South Carolina 29464<br>Attn: James Buxton, Esq.<br>Telephone: (843) 606-2397<br>Fax No.: (843) 284-8917<br>Email: jbuxton@buxtonandcollie.com |
| If to Agent: | Crystal Financial SBIC LP<br>Two International Place, 17th Floor<br>Boston, MA 02110<br>Attn: Matthew J. Governali, Managing Director<br>Telephone: 617-428-8777<br>Email: mgovernali@crystalfinco.com |
| with courtesy copies to (which shall not constitute Notice for purposes of this Section 12): | Riemer & Braunstein LLP<br>3 Center Plaza<br>Boston, Massachusetts 02108<br>Attn: Donald E. Rothman<br>Telephone: (617) 880-3556<br>Fax: (617) 880-3456<br>Email: drothman@riemerlaw.com |
| with courtesy copies to (which shall not constitute Notice for purposes of this Section 12): | DWC Pine Investments I, Ltd.<br>590 Madison Avenue, 9th Floor<br>New York, NY 10022<br>Attn: John Buck<br>Email: John.Buck@dwpartners.com |

49

with courtesy copies to                Kirkland & Ellis LLP
(which shall not constitute             333 South Hope Street, 29th Floor
Notice for purposes of this             Los Angeles, CA 90071
<u>Section 12</u>):                      Attn: David Nemecek
                                        Telephone: (213) 680-8111
                                        Fax: (213) 808-8107
                                        Email:  david.nemecek@kirkland.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Section 12</u>, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except, that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment). Any notice given by Agent or any Lender to any Loan Party as provided in this <u>Section 12</u> shall be deemed sufficient notice as to all Loan Parties, regardless of whether each Borrower is sent a separate copy of such notice or whether each Loan Party is specifically identified in such notice.

## 13.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER TRANSACTION DOCUMENT IN RESPECT OF SUCH OTHER TRANSACTION DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO AS WELL AS ALL CLAIMS, CONTROVERSIES OR DISPUTES ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS MAY BE TRIED AND LITIGATED IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; PROVIDED, HOWEVER, THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION (AS DIRECTED BY THE REQUIRED LENDERS), IN THE COURTS OF ANY JURISDICTION WHERE LENDERS ELECT TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH PARTY HERETO WAIVES, TO THE

50

EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 13(b).

(c)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE TRANSACTION DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH, A "CLAIM"). EACH PARTY HERETO REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)     NO CLAIM MAY BE MADE BY ANY LOAN PARTY AGAINST THE AGENT, ANY LENDER, OR ANY AFFILIATE OF LENDER OR ANY DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH LOAN PARTY HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

**14.     ASSIGNMENTS; SUCCESSORS.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that, no Borrower or any other Loan Party may assign this Agreement or any rights or duties hereunder without Agent and all Lenders' prior written consent and any prohibited assignment shall be absolutely *void ab initio*. No consent to assignment by the Agent and the Lenders shall release any Borrower or any other Loan Party from its Obligations. Lenders (other than Permitted Cure Parties) may assign this Agreement and the other Loan Documents in whole or in part and its rights and duties hereunder to any one or more financial institutions or funds or companies or an agent or trustee for such financial institutions, entities, persons or funds or companies (an "Assignee") or grant participations to any one or more financial institutions or funds or companies or an agent or trustee for such financial institutions, entities, persons or funds or companies (a "Participant") in the Obligations hereunder and thereunder; provided, however, any such assignment of interest in the Term Loans by any Lender shall be accomplished by Lender providing to Borrowers and Agent a duly executed Assignment and Assumption Agreement identifying the Assignee and the amount of the Term Loan being assigned, together with any existing Note (or a lost note affidavit in customary form) subject to such assignment, and payment of an assignment fee in the amount of $3,500 to the Agent (unless such fee is otherwise

51

waived or reduced by Agent in its reasonable discretion).  Upon such execution, delivery, acceptance and recording by the Agent, from and after the effective date specified in each Assignment and Assumption Agreement, the Assignee thereunder shall be a party hereto and to the other Loan Documents and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder and thereunder and the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption Agreement, relinquish its rights and be released from its obligations under this Agreement.  By execution and delivery of an Assignment and Assumption Agreement, the assignor and Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Assumption agreement, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any of the other Loan Documents or the execution, legality, enforceability, genuineness, sufficiency or value of this Agreement or any of the other Loan Documents furnished pursuant hereto, (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Loan Parties or any of their Subsidiaries or the performance or observance by any Loan Party of any of the Obligations; (iii) such Assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption Agreement, (iv) such Assignee will, independently and without reliance upon the assigning Lender, Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents, (v) such Assignee appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender. Agent and Lenders may furnish any information concerning any Loan Party in the possession of Agent or any Lender from time to time to Assignees and Participants.  The Loan Parties shall assist Agent or any Lender permitted to sell assignments or participations under this <u>Section 14</u> in whatever manner reasonably necessary in order to enable or effect any such assignment or participation, including (but not limited to) the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and the delivery of informational materials, appraisals or other documents for, and the participation of relevant management in meetings and conference calls with, potential Lenders or Participants. The Borrower shall certify the correctness, completeness and accuracy, in all material respects, of all descriptions of the Loan Parties and their affairs provided, prepared or reviewed by any Loan Party that are contained in any selling materials and all other information provided by it and included in such materials.  Agent and the Lenders may disclose the Loan Documents and any other financial or other information relating to Borrower or any Subsidiary to any potential Assignee or Participant, provided that such Assignee or Participant agrees to protect the confidentiality of such documents and information using the same measures that it uses to protect its own confidential information and otherwise conform to the requirements of <u>Section 17.8</u>.  The

Agent, acting for this purpose as an agent of the Borrowers, shall maintain at the Agent's office listed on a register for the recordation of the names and addresses of the Lenders and principal amounts (and stated interest) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The Register shall be available for inspection by the Borrower, and a redacted version of the Register showing the entries with respect to any Lender shall be available for inspection by such Lender, at any reasonable time and from time to time upon reasonable prior notice.  The entries in the Register shall be conclusive and binding absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect the Obligations in respect of any Term Loan.  The Borrower, the Agent and the Lenders shall treat each Person in whose name any Term Loan has been registered as the owner and the Lender thereof for all purposes hereof.  Each Lender that sells a participation shall, acting for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under the Loan Documents) to any Person except to the extent that such disclosure is necessary to establish such commitment, loan, letter of credit, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

## 15.    AMENDMENTS; WAIVERS.

(a)    Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by Agent and the Required Lenders or at Agent's option, by Agent with the authorization or consent of the Required Lenders, and as to amendments to any of the Loan Documents (other than with respect to any provision of Section 10.8 through 10.19 hereof), by the Borrowers, and such amendment, waiver, discharge or termination shall be effective and binding as to all Lenders only in the specific instance and for the specific purpose for which given; except, that, no such amendment, waiver, discharge or termination shall (provided, that, for purposes of this Section 15, the term "Lender" as used in any of the following sub-clauses shall not include a Permitted Cure Party as a Lender hereunder except with respect to a reduction in principal pursuant to clause (i)(b) below):

(i)    (a) reduce the interest rate or any fees or extend the time of payment of principal, interest or any fees without the consent of each Lender directly affected thereby or (b) reduce the principal amount of any Term Loan without the consent of each Lender directly affected thereby,

(ii)    increase the commitment of any Lender over the amount thereof then in effect or provided hereunder, in each case without the consent of the Lender directly affected thereby,

(iii)    release all or substantially all of the Collateral (except as expressly required hereunder or under any of the other Loan Document or applicable law and except as permitted under Section 10.19 hereof), without the consent of Agent and all of Lenders,

(iv)    release any Loan Party from obligations hereunder, without the consent of Agent and all of the Lenders,

(v)    reduce any percentage specified in the definition of Required Lenders, without the consent of Agent and all of Lenders,

(vi)    consent to the assignment or transfer by any Loan Party of any of their rights and obligations under this Agreement, without the consent of Agent and all of Lenders,

(vii)    amend, modify or waive any terms of this Section 11.3 hereof, without the consent of Agent and all of Lenders, or

(viii)    amend Section 10.5 without the consent of Agent and each Lender.

(b)    No failure by Agent or Lenders to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or Lenders in exercising the same, will operate as a waiver thereof. No waiver by Agent or Lenders will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Agent or Lenders on any occasion shall affect or diminish Agent's or such Lender's rights thereafter to require strict performance by Borrowers or any other Loan Party of any provision of this Agreement. Agent's and Lenders' rights under this Agreement and the other Transaction Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

## 16.    TAXES.

(a)    All payments made by any Borrower or any other Loan Party hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Taxes, and in the event any deduction or withholding of Taxes is required, each Borrower shall comply with the next sentence of this Section 16(a). If any Taxes are so levied or imposed, each Borrower and each other Loan Party agrees to pay the full amount of such Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 16(a) after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein; provided, however, that, Borrowers or Loan Parties shall not be required to increase any such amounts if the increase in such amount payable results from Agent's or such Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction). Each Borrower and each other Loan Party will furnish to Lender as promptly as possible after the date the payment of any

54

Tax is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by such Borrower.

(b)     Each Borrower agrees to pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made hereunder or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document.

## 17.     GENERAL PROVISIONS.

**17.1     Effectiveness**. This Agreement shall be binding and deemed effective when executed by each Borrower, each Loan Party, Agent and Lenders.

**17.2     Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**17.3     Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any party hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**17.4     Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**17.5     Debtor-Creditor Relationship**. The relationship between the Lenders, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor. Lenders shall not have (and shall not be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lenders, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

**17.6     Counterparts; Electronic Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**17.7     Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by any Borrower or any other Loan Party or the transfer to Agent or Lenders of any

property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lenders are required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lenders are required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto, the liability of such Borrower or such other Loan Party automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made and all of Agent's Liens in the Collateral shall be automatically reinstated without further action.

**17.8   Confidentiality**.

(a)     Agent and Lenders agree that material, non-public information regarding the Loan Parties and their Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and Lenders in a confidential manner, and shall not be disclosed by Agent or Lenders to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to Agent and Lenders and to employees, directors and officers of Agent and Lenders (the Persons in this clause (i), "Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of Agent and Lenders; provided, that, any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.8, (iii) as may be required by regulatory authorities, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided, that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrowers, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process; provided, that, (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrowers with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrowers pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent, Lenders or their respective Representatives), (viii) in connection with any assignment, participation or pledge of any Lenders' interest under this Agreement; provided, that, prior to receipt of Confidential Information any such assignee, participant, or pledgee shall have agreed in writing to receive such Confidential Information hereunder subject to the terms of this Section, (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding

involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents, (x) to equity owners of each Loan Party and (xi) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Loan Document.

(b)     Anything in this Agreement to the contrary notwithstanding, Agent and Lenders may use the name, logos, and other insignia of the Loan Parties and the amount of Term Loans provided hereunder in any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent or Lenders.

**17.9    Expenses**. Each Loan Party agrees to pay the Lender Expenses on the earlier of (a) the first (1st) day of the month following the date on which such Lender Expenses were first incurred, or (b) the date on which demand therefor is made by Lender or Agent and each Loan Party agrees that its obligations contained in this Section 17.9 shall survive payment or satisfaction in full of all other Obligations.

**17.10    Setoff**. Lenders (other than any Permitted Cure Party) may at any time, in its sole discretion and without demand or notice to anyone, setoff any liability owed to any Borrower or any Guarantor by Lenders against any of the Obligations, whether or not due.

**17.11    Survival**. All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lenders may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under this Agreement is outstanding and so long as the obligation of Lenders to provide extensions of credit hereunder has not expired or been terminated.

**17.12    Patriot Act**. Agent and Lenders hereby notify the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow Agent or such Lender to identify each Loan Party in accordance with the Patriot Act. In addition, if Agent or any Lender is required by law or regulation or internal policies to do so, it shall have the right to periodically conduct (a) Patriot Act searches, OFAC/PEP searches, and customary individual background checks for the Loan Parties, and (b) OFAC/PEP searches and customary individual background checks of the Loan Parties' senior management and key principals, and each Loan Party agrees to cooperate in respect of the conduct of such searches and further agrees that the reasonable costs and charges for such searches shall constitute Lender Expenses hereunder and be for the account of Borrowers.

**17.13    Integration**. This Agreement, together with the other Transaction Documents, reflects the entire understanding of the parties with respect to the transactions contemplated

hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the Amendment No. 10 Effective Date.

**17.14   Reimbursement by Lenders**. To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under Section 11.3 or 17.9 to be paid by it to the Agent (or any sub-agent thereof) or any Affiliate of Agent, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Affiliate of Agent, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Loan Percentage) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) in its capacity as such, or against any Affiliate of the Agent acting for the Agent (or any such sub-agent) in connection with such capacity.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]