# EXHIBIT 3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ONE AVIATION CORPORATION, *et al.*,[1] | Case No. 18-12309 (JKS) |
| Debtors. | Jointly Administered |

## STATEMENT OF AML GLOBAL ECLIPSE LLC REGARDING THE FILING OF NOTICE OF REMOVAL OF STATE COURT ACTION

AML Global Eclipse LLC ("AML Global"), by and through its undersigned counsel, hereby files this statement (this "Statement") in the above-captioned chapter 7 cases (the "Bankruptcy Cases") of the above-captioned debtors (the "Debtors").   In support of this Statement, AML Global respectfully states as follows:

1.        On November 17, 2023, Diligent Enterprise Management, LLC ("Diligent"), as successor in interest to Citiking International US LLC ("Citiking") pursuant to an alleged *Assignment of Claims and Causes of Action*, dated June 22, 2023, filed a complaint (the "Complaint") commencing an action (the "State Court Action") in the Supreme Court of the State of New York, County of New York (the "State Court") asserting claims against AML Global, DWC Pine Investments I, Ltd., Alan Klapmeier, James Carroll, Steve Serfling, RJ Siegle, Mike Wyse, and Carol Larotonda (collectively with AML Global, the "Defendants") under Index No. 653523/2023.   The Complaint alleges wrongdoing by the Defendants in connection with an asset sale that was conducted under the supervision of, and approved by, this

---

[1]  The Debtors in the Bankruptcy Cases, along with the last four digits of each Debtor's tax identification number, as applicable, are: ONE Aviation Corporation (9649); ACC Manufacturing, Inc. (1364); Aircraft Design Company (1364); Brigadoon Aircraft Maintenance, LLC (9000); DR Management, LLC (8703); Eclipse Aerospace, Inc. (9000); Innovatus Holding Company (9129); Kestrel Aircraft Company, Inc. (2053); Kestrel Brunswick Corporation (6741); Kestrel Manufacturing, LLC (1810); Kestrel Tooling Company (9439); and OAC Management, Inc. (9986). The Debtors' corporate headquarters is located at 3520 Spirit Drive SE, Albuquerque, NM 87106.

Court on November 20, 2020. Citiking's objections to, and appeals of, the foregoing asset sale were rejected by this Court and every subsequent court that considered them on multiple rounds of appeal. A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

2.　　Pursuant to 28 U.S.C. §§ 1334 and 1452 and Federal Rule of Bankruptcy Procedure 9027, on December 15, 2023, the Defendants filed in the United States District Court for the Southern District of New York a *Notice of Removal* (the "Removal Notice").[2]　As required by Federal Rule of Bankruptcy Procedure 9027(c), on December 15, 2023, a copy of the Removal Notice was also filed with the State Court. By operation of law, the State Court Action is now pending in the United States District Court for the Southern District of New York under Civil Action Number 23-CV-10924. A true and correct copy of the Removal Notice is attached hereto as **Exhibit C**.

3.　　In the event that the State Court Action is transferred to the United States District Court for the District of Delaware, it is likely that the State Court Action will be automatically referred to this Court in accordance with the *Amended Standing Order of Reference Re: Title 11 from the United States District Court for the District of Delaware*, dated February 29, 2012.

4.　　For the avoidance of doubt, AML Global does not object to the distributions contemplated by the *Notice of Trustee's Final Report and Applications for Compensation and Deadline to Object* [D.I. 1357] pending before this Court, but AML Global does wish to make this Court and all other parties in interest aware of the Removal Notice in connection with the

---

[2] If there was any doubt that Diligent's claims against the Defendants arise in or relate to the Bankruptcy Cases (which there is not), the Summons with Notice that accompanied the Complaint (the "Summons") conclusively resolves that doubt. The Summons provides that "[t]he nature of this action is for breach of contract, tortious interference, [and] civil conspiracy … relating to the defendants' wrongful and deceptive conduct **with respect to the bankruptcy and asset sale and purchase of One Aviation Corp.**" (emphasis added). A true and correct copy of the Summons is attached hereto as **Exhibit B**.

State Court Action insomuch as the transfer of the State Court Action to this Court may impact

the potential closure of the Bankruptcy Cases.

Dated: December 26, 2023   */s/ Laura Davis Jones*
Wilmington, Delaware     Laura Davis Jones (DE Bar No. 2436)
          Mary F. Caloway (DE Bar No. 3059)
          **PACHULSKI STANG ZIEHL & JONES LLP**
          919 North Market Street, 17th Floor
          P.O. Box 8705
          Wilmington, DE 19899-8705 (Courier 19801)
          Telephone: (302) 652-4100
          Facsimile: (302) 652-4400
          Email:  ljones@pszjlaw.com
              mcaloway@pszjlaw.com

           - and -

          **FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**
          Peter B. Siroka
          Ryan A. Berger
          One New York Plaza
          New York, NY 10004
          Telephone: (212) 859-8000
          Facsimile: (212) 859-4000
          Email: peter.siroka@friedfrank.com
            ryan.berger@friedfrank.com

          *Counsel to AML Global Eclipse LLC*

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DILIGENT ENTERPRISE MANAGEMENT, LLC,

        Plaintiff,

        -against-

AML GLOBAL ECLIPSE, LLC, DWC PINE
INVESTMENTS I, LTD., ALAN KLAPMEIER,
JAMES CARROLL, STEVE SERFLING, RJ
SIEGLE, MIKE WYSE, and CAROL
LAROTONDA,

        Defendants.

Index No.: 653523/2023

**COMPLAINT**

Plaintiff, Diligent Enterprise Management, LLC (the "Plaintiff"), by and through its counsel, Akerman LLP, for its complaint against defendants, AML Global Eclipse, LLC ("AML"), DWC Pine Investments I, Ltd., ("DW") Alan Klapmeier, James Carroll, Steve Serfling, RJ Siegle, Mike Wyse, and Carol LaRotonda individually (collectively the "Defendants") alleges as follows:

## THE PARTIES

1.     Plaintiff, Diligent Enterprise Management LLC, is a limited liability company organized and existing under the laws of Delaware with offices at 257 Old Churchmans Road, New Castle, DE 19720. The Plaintiff is the proper party in interest and has standing to bring these claims pursuant to the Assignment of Claims and Causes of Action dated June 22, 2023 from Citiking International US LLC ("Citiking") as assignor to the Plaintiff as assignee

2.     Defendant, AML, is a limited liability company organized and existing under the laws of Delaware. AML transacts business in the State of New York and committed a tort within the State and regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state.

73632052;7

INDEX NO. 653523/2023
RECEIVED NYSCEF: 11/17/2023

3. Defendant, DW, is a limited liability partnership organized and existing under the laws of the Cayman Islands. DW transacts business in the State of New York and committed a tort within the State and regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state.

4. Defendant, Alan Klapmeier ("Klapmeier"), is a resident of the state of Wisconsin and transacts business in the State of New York and is over the age of 18 and *sui juris.* Klapmeier is the former CEO of One Aviation Corp, serving as CEO from approximately April 2015 until February 2021.

5. Defendant, James Carroll ("Carroll"), is a resident of the state of Florida and transacts business in New York and is over the age of 18 as *sui juris.* Carroll is a former board member of One Aviation Corp. who served as an Independent Director for One Aviation from approximately 2018 to 2020.

6. Defendant, Steve Serfling ("Serfling"), is a resident of the state of Minnesota and transacts business in the State of New York and is over the age of 18 and *sui juris.* Serfling is the former COO and Executive Vice President of One Aviation Corp., serving as COO from approximately July 2010 to December 2020.

7. Defendant, RJ Siegle ("Siegle"), is a resident of the state of Wisconsin and transacts business in the State of New York and is over the age of 18 and *sui juris.* Siegle is a former board member of One Aviation Corp., and served as an Independent Director for One Aviation Corp, from approximately November 2012 to October 2021.

8. Defendant, Mike Wyse ("Wyse" and together with Alan Klapmeier, James Carroll, Steve Serfling, RJ Siegle, and Mike Wyse the "D & O Defendants"), is a resident of the state of

2

New Jersey and transacts business in the State of New York and is over the age of 18 and *sui juris.* Wyse is a former board member of One Aviation Corp., who served as an Independent Director for One Aviation Corp. from approximately September 2017 to February 2021.

9.      Defendant, Carol LaRotonda ("LaRotonda"), is a resident of the state of New Mexico and transacts business in the State of New York and is over the age of 18 and *sui juris.* LaRotonda is the former Controller of One Aviation Corp., serving as Controller from approximately May 2018 until October 2021.

## JURISDICTION AND VENUE

10.     Importantly, Citiking and DW agreed in multiple agreements that DW and Citiking submit to jurisdiction in New York County and agreed that venue is appropriate, and can only be brought, in New York County.

11.     Additionally, this Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302 because Defendants regularly transact business within the State of New York.

12.     Further, the Court has subject matter jurisdiction over Defendants because the events that gave rise to this matter occurred in the State of New York.

13.     Venue is proper because a substantial part of the events that gave rise to this matter occurred New York County.

## FACTUAL BACKGROUND

**Third Party One Aviation Corp.**

14.     Third party, One Aviation Corp. ("One Aviation"), was formed in 2015 and maintained its principal place of business in Albuquerque, New Mexico. The operations of One Aviation and its affiliates was focused on aircraft service and upgrades, aircraft remanufacturing, and new aircraft manufacturing and sales. One Aviation was an Original Equipment Manufacturer

of twin-engine light jet aircraft, primarily serving the owner/operator, corporate, and aircraft charter markets as well as international markets.

**Citiking's Purchase of  the First Tranche Loans from DW.**

15.     On or about November 10, 2017, Citiking and DW entered into a Purchase and Sale Agreement for Distressed Trades (the "First PSA"), pursuant to which DW sold and assigned loans in the approximate amount of $21,000,000 to Citiking (the "First Tranche Loans"). A true and correct copy of the First PSA is attached hereto and incorporated herein as **Exhibit 1.**

16.     The First Tranche Loans consisted of loan obligations due to DW from borrowers, Eclipse Aerospace, Inc. ("Eclipse") and Brigadoon Aircraft Maintenance. LLC ("Brigadoon"), affiliates of One Aviation (Eclipse and Brigadoon are collectively referred to as "Affiliates"). The First Tranche Loans were secured by a blanket lien against the assets of the Affiliates and One Aviation and was guaranteed by One Aviation.

17.     It is undisputed that Citiking made the payments to DW required under the First PSA and is the owner of the First Tranche Loans.  A true and correct copy of the Assignment and Assumption Agreement assigning the First Tranche Loans to Citiking is attached hereto and incorporated herein as **Exhibit 2**.

**The Intercreditor Agreement and Citiking's Right of First Refusal**

18.     At the time of the closing of the sale of the First Tranche Loans to Citiking, DW continued to own other loan obligations due to DW from the Affiliates (the "Second Tranche Loans").  The Second Tranche Loans were also secured by a blanket lien against the assets of the Affiliates and One Aviation and was guaranteed by One Aviation

19.     At the time of the closing of the sale of the First Tranche Loans, DW and Citiking entered into an Intercreditor Agreement that governed their relationship. A true and correct copy of the Intercreditor Agreement is attached hereto and incorporated herein as **Exhibit 3.**

20.     The Intercreditor Agreement provides, among other items, both DW and Citiking with a Right of First Refusal requiring that in the event either DW or Citiking accepts an offer from a third party for the purchase and sale of any rights title and interests in the First Tranche Loans or the Second Tranche Loans, the other party shall have the opportunity to enter into the same agreement stating:

> [E]ach lender agrees that in the event that it receives an offer for the purchase and sale of any or all of its right, title and interest in and to the Obligations or the Loan Documents from an unaffiliated third party…*prior to accepting the Third Party Purchase Offer, the receiving Lender shall make an offer in writing to the other Loan Party (the "ROFR") to enter into the same purchase and sale transaction on the same terms as the Third Party Purchase Offer.*

Intercreditor Agreement at ¶ 5 (emphasis supplied).

**Citiking's First Purchase of the Second Tranche Loans From DW**

21.     On or about July 10, 2018, Citiking and DW entered into a second Purchase and Sale Agreement for Distressed Trades (the "Second PSA"), pursuant to which DW sold and assigned the Second Tranche Loans in the amount of $26,105,837.10 to Citiking (the First Tranche Loans and Second Tranche Loans are collectively referred to as the "Loans"). A true and correct copy of the July 10, 2018 Purchase and Sale Agreement for Distressed Trades for the Second Tranche Loans is attached hereto and incorporated herein as **Exhibit 4**.

22.     The Second PSA defines the "Settlement Date" as "the date on which Seller [DW] received the First Installment."

23.     Pursuant to the Second PSA, Citiking made the first installment payment to DW in the amount of $2,000,000 on or about July 10, 2018, and on the Settlement Date, the Second

Tranche Loans were assigned by DW to Citiking.  A true and correct copy of the Assignment and Assumption Agreement assigning the Second Tranche Loans to Citiking is attached hereto and incorporated herein as **Exhibit 5**

**The Continuing Obligations Agreement and the Repurchase Obligation.**

24.     Contemporaneously with the purchase and sale of the Second Tranche Loans, on or about July 10, 2018, Citiking and DW entered into a Continuing Obligations Agreement (the "COA").  A true and correct copy of the COA is attached as **Exhibit 6**.

25.     The COA provided DW with remedies in the event of a default by Citiking under the Second PSA.

26.     Specifically, if Citiking defaulted by failing to make the second or third installment payments under the Second PSA, then DW would have the right, after delivery of a default notice, to repurchase from Citiking the Second Tranche Loans (the "Repurchase").

27.     Pursuant to the COA, DW could repurchase the Second Tranche Loans by directing the agent to record an Escrowed Assignment of the Second Tranche Loans to DW, making DW the owner of the Second Tranche Loans.

28.     Because Citiking was the owner of the First Tranche Loans, even if DW exercised its right to Repurchase the Second Tranche Loans under the COA, DW and the Second Tranche Loans remained subject to and bound by the Intercreditor Agreement.

29.     The Repurchase required DW to pay Citiking an amount equal to the sum of (1) any portion of the purchase price previously paid by Citiking, minus (2) any default interest and other amounts owing or payable by Citiking to DW under the Second PSA, minus (3) $1,000,000.

30.     Additionally, under the COA, Citiking agreed that in the event of default following the Repurchase, any indebtedness of the One Aviation and Affiliates  Debtors to Citiking,

FILED: NEW YORK COUNTY CLERK 11/17/2023 02:05 PM
NYSCEF DOC. NO. 2

INDEX NO. 653523/2023
RECEIVED NYSCEF: 11/17/2023

Case 1:18-12809-JKS  Document 115  Filed 12/26/23 Page 6 of 42

Case 18-12809-JKS  Doc 1062-11  Filed 02/26/23  Page 6 of 126 of 42

including for DIP Loans, that exceeded the amount of the loans obtained by DW in the Repurchase, would be subordinate to any and all obligations of the Debtors to DW with respect to the obligations repurchased.

**The Escrow Agreement**

31.    On July 10, 2018, contemporaneously with the execution of the Second PSA, Citiking and DW entered into an Escrow Agreement.  A true and correct copy of the Escrow Agreement is attached as **Exhibit 7.**

32.    Pursuant to the Escrow Agreement, Citiking delivered to Cantor Fitzgerald Securities (the "Escrow Agent"), an executed Assignment and Assumption Agreement (the "DW Assignment"), wherein Citiking assigned the Second Tranche loans it was purchasing from DW back to DW.

33.    The obligation of the Escrow Agent to release from escrow and deliver the DW Assignment could be triggered by one of two events. In the first instance, the Escrow Agreement provided that the Escrow Agent would release the DW Assignment from escrow and deliver it to DW upon DW certifying its right to Repurchase the Second Tranche.  In the second instance, the Escrow Agent would release the DW Assignment  from escrow and deliver it to Citiking upon notice from DW that it was fully paid, **or the passage of 120 days without a default notice from Selle**r.  The Escrow Agreement provides in pertinent part:

> Escrow Agent shall deliver the Assignment Agreement to Buyer or to the Administrative Agent to effect the assignment for Seller's benefit, as the case may be, as follows:
>
> (a) to the Administrative Agent to effect the assignment for Seller's benefit, after receipt by the Escrow Agent of a notice from Seller certifying that it is entitled to Repurchase the Loans pursuant to Section 6(b) of the Agreement (a "Default Notice"); or

(b) to the Buyer upon (i) receipt by the Escrow Agent of a notice from
Seller that the Purchase Price has been paid in full or (ii) upon the passage of 120 days from the execution of this agreement if no Default Notice has been delivered to the Escrow Agent by Seller.

**DW Declarations of Default Under the Second PSA and DW's Repurchase of the Second Tranche Loans.**

34.     DW issued Default Notices to Citiking on August 24, 2018, September 10, 2018, September 24, 2018 and October 10, 2018, though it appears that these notices were not copied on the Escrow Agent.

35.     On January 18, 2019, **more than 184 days after execution of the Escrow Agreement**, DW provided a Default Notice to the Escrow Agent, certifying that Citiking was entitled to Repurchase from Citiking the Second Tranche loans.  A true and correct copy of the Default Notice is attached as **Exhibit 8.**  DW further stated that the Escrow Agent was "now obligated to deliver" the DW Assignment to DW's administrative agent.

36.     Attached to the January 18, 2019 Default Notice to the Escrow Agent, is a Repurchase Notice of even date to Citiking wherein DW, citing the Second PSA and the COA, declares itself the "sole owner" of the Second Tranche.  The Repurchase Notice refers to the return of $316,500 to Citiking allegedly on account of the Repurchase. The $316,500 paid to CK allegedly represented return of the $2,000,000 payment made by Citiking under the Second PSA, less a $1,000,000 (the "Default Penalty") and Default Interest allegedly in the amount of $683,500.

**The Letter Agreement and Citiking's Second Purchase of the Second Tranche Loans.**

37.     On July 25, 2019, Citiking and DW entered into a Letter Agreement (the "Letter Agreement"), whereby Citiking agreed to purchase, for the second time, the Second Tranche Loans

73632052;7

8

that were now held by DW pursuant to the Repurchase. A true and correct copy of the Letter Agreement is attached hereto and incorporated herein as **Exhibit 7**.

38.     Pursuant to the Letter Agreement, the purchase price for Citiking's second purchase of the Second Tranche was $16,150,000 (the "Purchase Price") with interest accruing on unpaid installments at the per annum rate of 12%. The Letter Agreement provides Citiking a credit in the total amount of $1,683,500 representing the default penalty and default interest DW had previously charged Citiking in connection with the previous Repurchase of the Second Tranche.

39.     The Letter Agreement incorporates the terms of the Second PSA requiring DW to deliver the Second Tranche Loans to Citiking on the Settlement Date.

40.     The Second PSA defines the Settlement Date as the date that DW receives the first installment payment from Citiking.

41.     On July 25, 2019, Citiking made the first installment payment to DW in the amount of $4,000,000, making the Settlement Date July 25, 2019.

42.     The Letter Agreement required Citiking to make an additional payment of $2,500,000 on or before October 31, 2019, which payment Citiking remitted to DW on October 31, 2019.

43.     In total, Citiking paid DW approximately $6,500,000 in principal payments toward of the $16,150,000 purchase price for its second purchase of the Second Tranche Loans. Citiking also paid DW monthly interest payments in the amount of 12% per annum.

44.     To date, DW has failed to deliver the Second Tranche Loans to Citiking notwithstanding DW's receipt of the first installment payment of $4,000,000 and the subsequent installment payment of $2,500,000.

**One Aviation Debtors' Chapter 11s**

45.     On October 9, 2018, One Aviation and the Affiliates filed voluntary petitions under

Chapter 11 of the Bankruptcy Code, 11 U.S.C. section 101 *et seq.* in the United States Bankruptcy

Court for the District of Delaware, Case No. 18-12309 (CSS) (the "Bankruptcy Case").

46.     Other affiliates of One Aviation also filed for relief under Chapter 11 in the District

of Delaware, including ACC Manufacturing, Inc., Aircraft Design Company, DR Management,

LLC, Innovatus Holding Company, Kestrel Aircraft Company, Inc., Kestrel Brunswick

Corporation, Kestrel Manufacturing, LLC, Kestrel Tooling Company, and OAC Management, Inc.

(collectively the "Additional Affiliates" and together with One Aviation and the Affiliates the

"One Aviation Debtors"). The chapter 11s of the One Aviation Debtors were jointly administered

in the Bankruptcy Court.

**Citiking's DIP Loan to the One Aviation Debtors' and Additional Amounts Funded by
Citiking**

47.     On October 10, 2018, the Debtors filed a motion in the Bankruptcy Case for

approval of debtor in possession financing pursuant to the terms and conditions of the Senior

Secured Superpriority Debtor in Possession Credit and Security Agreement dated October 9, 2018,

among Citiking as the debtor in possession lender, the Affiliates as borrowers and guaranteed by

One Aviation as guarantor.

48.     On November 27, 2018, the Bankruptcy Court entered the Final Order (I)

Authorizing Debtor Borrowers to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§

105, 361, 362, 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority

Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II)

Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362,

363, and 364; and (III) Granting Related Relief ("Final DIP Order"), approving the DIP Loan and granting Citiking a senior lien and super priority administrative status.

49.     Pursuant to the Final DIP Order:

A.      The Affiliates, One Aviation and related debtors were granted permission to enter into a senior secured super priority revolving loan facility with Citiking (the "DIP Loan"), with commitments to lend up to approximately $19.1 million, and such other financial accommodations, allocated as follows: (i) a superpriority priming *new money* revolving facility with commitments to lend up to approximately $8.0 million (the "DIP New Money") and (ii) roll up loans in the amount of approximately $11.13 million.

B.      Citiking's lien securing the DIP Loan was deemed senior and had priority over competing liens against the assets of the Affiliates, One Aviation and related debtors, including the First Tranche Loans and the Second Tranche Loans; and,

C.      the DIP Loan was deemed an administrative expense claim with priority over all other administrative expense claims, including the administrative expense claims.

50.     D & O Defendants Klapmeier, Carroll, Serfling, Siegle, and Wyse were integral in obtaining the DIP Loan from Citiking, including negotiating the terms and documentation of the DIP Loan, preparing the restructuring budget related to the use of the DIP Loan, requesting the DIP Loan include monies to purchase parts even though the purchase of the parts was prepaid, and providing "critical vendor" status to the company owned by Klapmeier and holding Klapmeier's personal plane to ensure that the company was paid as a critical vendor from the DIP Loan provided by Citiking.

51.     Citiking funded $19.1 million, the full amount of the DIP Loan, plus approximately $7 million post-confirmation pursuant to the One Aviation Debtors' Second Amended Joint

Prepackaged Plan of Reorganization (the "Plan"). Citiking had no obligation to fund the $7 Million under the DIP Loan.

52.    The $7 million payment included $1.7 million earmarked for distribution to the unsecured creditors (the "$1.7 Million"). The $1.7 Million was required to be placed in an escrow account for the benefit of the unsecured creditors.

53.    The D & O Defendants promised Citiking that the $1.7 Million would be placed in an existing escrow account for the protection of Citiking (the "Escrow Account"). As grantor of the $1.7 Million into escrow, Citiking was entitled to the return of the escrowed $1.7 Million if the order confirming the Plan was vacated which subsequently occurred.

54.    The D & O Defendants advised Citiking that the wire instructions provided to Citiking for delivery of the $1.7 Million were to the Escrow Account.

**The Debtors' Motions to Sell Their Assets Free and Clear of Liens and the Elimination of Citiking's Right to Credit Bid**

55.    On June 17, 2019, the One Aviation Debtors filed in their Bankruptcy Case a motion for entry of an order approving, among other things, the sale of the One Aviation Debtors' assets free and clear of liens, bidding procedures and a Stalking Horse Agreement with Citiking as the Stalking Horse Buyer (The "First Sale Motion").

56.    The terms of the bidding procedures in the First Sale Motion allowed credit bidding and permitted Citiking to credit bid the amounts due and owing to Citiking by the One Aviation Debtors. Utilizing its credit bid meant that Citiking did not need to come out of its pocket and bid cash at the sale. Rather, by credit bidding under the Bankruptcy Code, Citiking could "credit" bid up to the amount it was owed by the One Aviation debtors. If it were outbid, Citiking would walk away with the cash from the sale to the successful bidder in satisfaction of the amounts owed to Citiking.

73632052;7

12

57.     Citiking always intended to exercise its right to credit bid at the sale of the Debtors' assets.

58.     The bidding procedures in the First Sale Motion did not provide for a "good faith deposit" or require any deposit on the part of Citiking as the Stalking Horse Buyer.

59.     A few weeks later, on July 10, 2019, the One Aviation Debtors filed a notice of withdrawal of the First Sale Motion.

60.     On August 28, 2020, the Debtors filed their second motion to approve the sale of assets (the "Second Sale Motion").  This time the stalking horse buyer was SEF OA LLC ("SE Falcon").  Importantly, the Second Sale Motion continued to allow credit bidding by Citiking.

61.     On October 8, 2020, the Debtors filed a notice of withdrawal of the Second Sale Motion which appeared to be a sham.

62.     Twelve days later, on October 20, 2020, the Debtors filed their third motion for approval of sale, this time to AML Global Eclipse LLC ("AML") as the Stalking Horse Bidder (the "Third Sale Motion").

63.     AML was undeniably an integral part of the Bankruptcy Case and was fully aware of the obligations and rights retained by DW and Citiking with respect to the Second Tranche Loans and the ROFR associated with the Loans in their entirety.

64.     Debtors' Third Sale Motion provided that AML, as Stalking Horse Bidder, would purchase the One Aviation Debtors' assets for $5,250,000, subject to higher and better offers, and the proceeds would be used to pay "Administrative Expense Claims."

65.     In the Third Sale Motion the One Aviation Debtors acknowledged that DW intended to exercise its alleged right to credit bid against AML stating that "DW has informed the

Debtors that it may submit a competing offer in the form of a credit bid up to and/or at the Sale Hearing."

66.     On November 5, 2020, the One Aviation Debtors filed yet another Notice of Bidding Procedures, providing that a qualifying bid "shall…generally contain terms no less favorable (in the Debtors' reasonable business judgment) than the Stalking Horse Agreement" with AML.

67.     On or about November 10, 2020, AML voluntarily increased its cash deposit to the full amount of the purchase price which remained subject to higher and better offers at auction.

68.     Inexplicably, on November 10, 2020, after AML deposited the full purchase price, the Debtors filed a Notice of Revised Bidding Procedures that effectively barred credit bidding by requiring bidders to make a cash deposit in an escrow account for the full price of the bid.

69.     The effect of the November 5, 2020 Bidding Procedures, coupled with AML's deposit of the full cash purchase price, was to require that all bidders, including Citiking,  deposit cash in the full amount of the purchase price of $5,250,000 to qualify as a bidder. This change in the bidding procedures completely thwarted and eliminated the ability for Citiking to credit bid the amount of the First Tranche Loans it owned in the approximate amount of $21,000,000.

70.     On November 20, 2020, the Bankruptcy Court approved the sale of the One Aviation Debtors' assets to AML for a cash price of $5,250,000, free and clear of all liens, claims, encumbrances, and other interests, other than permitted encumbrances as defined in the purchase agreement.

71.     Citiking was completely and unjustly deprived of the opportunity to credit bid causing Citiking significant harm and providing a windfall to AML.

**The Sale Hearing and AML's Alleged Purchase of the Second Tranche Loans from DW**

72.     On November 20, 2020, at the outset of the sale hearing to AML as stalking horse, counsel for DW boldly stated that AML had a deal with DW to purchase DW's secured debt consisting of the Second Tranche Loans conditioned upon entry of the order approving of the sale of the assets to AML.

73.     AML's counsel advised the Bankruptcy Court that "just within the last hour or so [DW was] able to document our sale of our debt to AML subject to closing of subject to entry of a sale order."

74.     At the same time, DW's counsel announced DW's support for the sale of the Debtors' assets to AML, which was a stark change in position from DW's prior representation that it would submit a competing offer for the purchase of the assets in the form of a credit bid.

75.     This was the first time that Citiking, and seemingly the other creditors and the Bankruptcy Court, were made aware of DW's alleged sale of the Second Tranche Loans to AML. Clearly, this purchase and sale of the Second Tranche Loans was negotiated during the One Aviation Debtors' sale process and outside the purview of Citiking and the Bankruptcy Court.

76.     Notably, at the time of DW's alleged sale of the Second Tranche Loans to AML, DW had already sold the Second Tranche Loans to Citiking and  DW was in default of the Second PSA and Letter Agreement by failing to deliver the Second Tranche Loans to Citiking on the Settlement Date.

77.     Even if DW had not sold the Second Tranche Loans to Citiking, which it did, DW was required to provide Citiking with a ROFR under the Intercreditor Agreement before selling the Second Tranche Loans to AML.

78. DW failed to provide Citiking with the ROFR to purchase the Second Tranche Loans.

79. Notably, neither DW nor AML filed a notice of transfer of DW's secured claim.

80. By allegedly selling the Second Tranche Loans to AML, DW was able to obtain value in the form of a cash payment from AML eliminating the need for DW to protect its loans and collateral by credit bidding at the sale.

81. To be clear, there was no valid business reason for AML to acquire the Second Tranche Loans from DW unless there was an undisclosed, side deal between DW and AML.

82. Upon information and belief, while AML and the One Aviation Debtors were negotiating the bidding procedures, AML was also negotiating with DW to acquire the Second Tranche Loans.

83. This multi-layer conspiracy between AML and DW was designed to freeze Citiking out by stripping it of its ability to credit bid, satisfy the claim of DW on the Second Tranche Loans and allow AML to purchase the Debtors' assets at a theoretical "face value" far below market value.

84. This conspiracy enabled AML and DW, with the assistance and cooperation of the D&O Defendants, the elimination of credit bidding, paving the way for AML to purchase the One Aviation Debtors' assets without competition from Citiking.

85. The end result of AML and DW's secret purchase and sale of the Second Tranche Loans in breach of the ROFR and in violation of Citiking's ownership rights, left Citiking holding the proverbial bag. AML was able to purchase the One Aviation Debtors' assets for pennies on the dollar in an amount much lower than what AML would have, and should have, paid.

86.     The discounted sale to AML also enabled the D&O Defendants to achieve their

goal of selling the assets to AML instead of Citiking.  Importantly, during this time there was

friction between the D&O Defendants and Citiking.  Indeed, Citiking was demanding financial

information and accountability from the D&O Defendants concerning the tens of millions of

dollars Citiking had funded the One Aviation Debtors from 2018 to 2020 and the D&O Defendants

were not providing Citiking with any information.

**One Aviation Debtors Conversion to Chapter 7**

87.     On February 18, 2021, One Aviation Debtor's Bankruptcy Cases were converted

to Chapter 7.  George L. Miller was appointed as the chapter 7 Trustee.

88.     The One Aviation Debtors' were left with little money from the sale proceeds and

were unable to satisfy the debts owed to creditors, including Citiking.

89.     As a result of Defendants' improper and concealed tactics, Citiking suffered

damages exceeding millions of dollars.

**COUNT I**
**(Breach of Intercreditor Agreement Against DW)**

90.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 89 as if fully

set forth herein.

91.     On or about November 10, 2017, DW and Citiking executed the Intercreditor

Agreement.

92.     The Intercreditor Agreement is a valid and enforceable contract that was supported

by adequate consideration.

93.     The Intercreditor Agreement required, among other terms, that DW and Citiking

are entitled to a ROFR to match the third-party offer. Specifically, the entity that receives a third-

party purchase offer shall make an offer in writing to the other loan party enabling that other party to enter into the same purchase and sale transactions as the third-party, the ROFR. *See* Exhibit 3.

94.     To the extent that DW had the right to sell the Second Tranche Loans to AML (which Citiking denies), DW breached the terms of the Intercreditor Agreement by failing to provide Citiking the required ROFR prior to allegedly selling the Second Tranche Loans to AML.

95.     As a result of DW's breach of the Intercreditor Agreement and refusal to honor Citiking's ROFR, Citiking has been damaged.

## COUNT II
### (Breach of the Letter Agreement Against DW)

96.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 96 as if fully set forth herein.

97.     DW breached the Letter Agreement by failing to deliver and assign to Citiking the Second Tranche Loans.

98.     As a result of DW's breach of the Letter Agreement, Citiking has been damaged.

## COUNT III
### (Breach of COA Against DW)

99.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 98 as if fully set forth herein.

100.     DW breached the COA by failing to transfer and assign the Second Tranche Loans back to Citiking, in direct violation of the COA.

101.     The COA required DW to Repurchase the Second Tranche Loans from Citiking upon Citiking's default.

102.     But, because DW breached the Second Tranche Loans purchase agreement by not assigning Citiking the loans, because DW still possessed the Second Tranche Loans, DW did not Repurchase the loans and refund Citiking its principal paid as required under the COA.

18

73632052;7

103.    DW breached its obligations under the COA by failing to refund to Citiking the principal Citiking paid to DW .

104.    Citiking has been damaged in the amount that Citiking paid for the purchase of the Second Tranche Loans, $7,500,000 plus interest and related professional fees.

## COUNT IV
### (Tortious Interference with Contract Against AML)

105.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 105 as if set forth fully here.

106.    The Intercreditor Agreement was a valid contract and in effect at all material times.

107.    AML was aware and had knowledge of the Intercreditor Agreement and the ROFR set forth therein.

108.    AML is the proximate and direct cause of DW's breach of the Intercreditor Agreement.

109.    Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement.

110.    As a result of AML's misconduct, Citiking has been damaged in an amount exceeding $7,500,000, the amount that Citiking paid for the purchase of the Second Tranche Loans plus interest and related professional fees.

## COUNT V
### (Civil Conspiracy Against AML and DW)

111.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 110 as if fully set forth herein.

112.     DW and AML conspired together to eliminate credit bidding at the bankruptcy auction in One Aviation's bankruptcy case for the purpose of enabling AML to purchase the One Aviation Debtors' assets at far below market value and DW to recover on the Second Tranche Loans through the sale of these loans to AML.

113.     DW and AML unlawfully conspired together to tortiously interfere with Citiking's rights under the Intercreditor Agreement.

114.     Specifically, DW was well aware of its obligations owed to Citiking pursuant to the Intercreditor Agreement.

115.     AML was also aware of the obligations owed to Citiking based upon AML's involvement in the Bankruptcy proceeding and DW's express mention of the Intercreditor Agreement and the rights provided to Citiking thereunder.

116.     Upon information and belief, DW and AML devised a scheme whereby they sought to eliminate Citiking's right to credit bid and did so by violating the rights owed to Citiking under the Intercreditor Agreement.

117.     The conspiracy between AML and DW is evidenced by AML's inexplicable and nonsensical purchase of the Second Tranche Loans and the elimination of the credit bid, without objection from DW.

118.     AML purchased the Debtors' assets at a fraction of their value while DW received cash for its debt and avoided a priority dispute with Citiking concerning the priority of payment for the sale proceeds.

119.     Citiking was damaged in an amount to be proven at trial as a result of the conspiracy between AML and DW.

73632052;7

<u>COUNT VI</u>
**(Fraudulent Inducement Against Debtors' Directors and Officers)**

120.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 119 as if set forth fully here.

121.     In the state of New York, the "trust fund doctrine" provides that officers and directors of an insolvent corporation hold the remaining corporate assets in trust for the benefit of its creditors.

122.     At all material times, Citiking was a creditor of the Debtor.

123.     Therefore, the Debtors' directors and officers owe Citiking a duty not to engage in misconduct and to act in the best interest of Citiking and its fellow creditors.

124.     The D&O Defendants served as officers and directors of the Debtor at all material times hereto.

125.     As Debtors' directors and officers, the D&O Defendants owed Citiking a duty to act in the best interest of Citiking and its fellow creditors, and to share all material information truthfully and without reservation.

126.     The D&O Defendants made misrepresentations of material fact with respect to (i) the One Aviation restructuring budget, (ii) inventory funding requests for customer parts, (iii) the $1.7 Million payment earmarked for the unsecured creditors and to be held in the Escrow Account and (iv) payments for Klapmeier's personal plane.

127.     The D&O Defendants misrepresented to Citiking: (a) the amount of the One Aviation Debtors' restructuring budget to be $6 to $7 million less than the actual budget, (b) that inventory funding was necessary for  customers' parts notwithstanding that the customers had prepaid for the parts, (c) that the Escrow Account was in place and the wire transfer instructions provided to Citiking for delivery of the $1.7 Million were to the Escrow Account, and, (d) the

company owned by Klapmeier and holding Klapmeier's personal plane was a "critical vendor" to be paid from the DIP Loan provided by Citiking.

128.     The D&O Defendants knew at the time of making their misrepresentations that the misrepresentations were false.

129.     The D&O Defendants intentionally made the misrepresentations with the intent that Citiking rely on the misrepresentations to hits detriment.

130.     Citiking justifiably relied upon the D&O Defendants' misrepresentations.

## .COUNT VII
### Fraudulent Inducement Against Klapmeier and Siegle)

131.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 130 as if set forth fully here.

132.     Defendants Klapmeier and Sieglemade misrepresentations of material fact to Citiking with respect to the alleged need to retain all of Mr. Klapmeier's incumbent team of directors and officers and provide them with large and unwarranted compensation packages (the "Klapmeier D&Os") in order to successfully reorganize the One Aviation Debtors and (ii) deliberately failed to disclose material information regarding credible allegations as to director R.J. Siegle's criminal and fraudulent conduct while serving as a director on the board of another company.

133.     Defendants Klapmeier and Siegle knew at the time of making their misrepresentations that the misrepresentations were false regarding the need to retain the Klapmeier D&O's with the large and unwarranted compensation packages.

134.     Defendants Klapameier and Siegle intentionally made the misrepresentations and intentionally and knowingly concealed the highly-relevant information regarding Mr. Siegle's sullied history on corporate boards.

135.     These misrepresentations were made with the intent to induce Citiking to rely upon the misrepresentations for the ultimate purpose of inducing Citiking into funding tens of millions of dollars into the One Aviation Debtors' bankruptcy case and purchasing from DW the First and Second Tranches of the One Aviation Debtor's loan obligations.

136.     Citiking justifiably relied upon Defendants', Klapmeier and Siegle's intentional misrepresentations and knowing omissions of material facts and as a result Citiking has suffered damages.

### COUNT VIII
### (Fraudulent Misrepresentation Against Klapmeier)

137.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 136 as if set forth fully here.

138.     Defendant Klapmeier made misrepresentations of material fact in offering to sell Citiking the "real Kestrel intellectual property assets" through a "side deal" he offered outside the One Aviation Debtors' bankruptcy cases.   Klapmeier misrepresented the true ownership structure of Kestrel IP assets, stating falsely that they were under his exclusive control and separate from the assets governed by the One Aviation Debtors' bankruptcy case, and thus he could freely transfer these assets to Citiking via a separate transaction which Klapmeier would arrange.

139.     Defendant, Klapmeier, made the misrepresentations intentionally and with knowledge of their falsity.

140.     Such representations with respect to the Kestrel IP assets were intended to induce Citiking to act in reliance thereon, As a result of Klapmeier's misrepresentations, Citiking missed the opportunity to obtain the assets through a sale in the One Aviation Debtors' bankruptcy case at a more opportune time and price.

73632052;7

141.    Citiking justifiably relied upon Defendant, Klapmeier's, misrepresentations and as a result has suffered damages.

**COUNT IX**
**(Fraudulent Misrepresentation Against Klapmeier, Siegel, and Serfling)**

142.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 141 as if set forth fully here.

143.    Defendants Klapmeier, Siegel, and Serfling made misrepresentations of material fact regarding an opportunity for One Aviation and Citiking to form a joint venture with Israel Aerospace Industries ("IAI") on the premise that such a collaboration would be extremely beneficial to both Citiking and the reorganized One Aviation. Defendants Klapmeier, Siegle, and Serfling traveled to Israel for the purported purpose of negotiating the business deal with IAI. However, after paying for all the expenses of the trip, Citiking later learned that the Defendants misrepresented both the "business opportunity" with IAI and the premise of their trip as a pretext to get Citiking to pay for an all-expense-paid vacation for themselves and their families to Israel and Europe.

144.    Defendants Klapmeier, Siegel, and Serfling made the misrepresentations intentionally and with knowledge of their falsity.

145.    Such representations with respect to the IAI "business opportunity" and trip to Israel were intended to induce Citiking to act in reliance thereon, As a result of Klapmeier's, Siegel's, and Serfling's misrepresentations, Citiking wasted precious economic resources and missed any opportunity to achieve a business deal with IAI.

146.    Citiking justifiably relied upon Defendant, Klapmeier's, Siegle's, and Serfling's misrepresentations and as a result has suffered damages.

73632052;7

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief and demands:

a)   Entry of a judgment in favor of Plaintiff and against DW awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

b)   Entry of a judgment in favor of Plaintiff and against AML awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

c)   Entry of a judgment in favor of Plaintiff and against the D and O Defendants, Klapmeier, Carroll, Serfling, Siegle, and Wyse, awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

d)   Entry of a judgment in favor of Plaintiff and against Klapmeier and Siegle awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

e)   Entry of a judgment in favor of Plaintiff and against Klapmeier awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

f)   Awarding the Plaintiff such further and additional relief as the Court deems just and proper, including prejudgment interest.

Dated: New York, New York
          November 16, 2023                    **AKERMAN LLP**

                                               By:___*/s/Darryl R. Graham*
                                                       Darryl R. Graham, Esq.
                                                       1251 Avenue of the Americas, 37th Floor
                                                       New York, New York 10020
                                                       Tel: (212) 880-3800
                                                       Fax: (212) 880-8965

                                               *Attorneys for Plaintiff*

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DILIGENT ENTERPRISE MANAGEMENT, LLC,

                           Plaintiff,

-against-

AML GLOBAL ECLIPSE, LLC, DWC PINE
INVESTMENTS I, LTD., ALAN KLAPMEIER,
JAMES CARROLL, STEVE SERFLING, RJ
SIEGLE, MIKE WYSE, JON HANSON, and
CAROL LAROTONDA,

                           Defendants.

Index No.:

**SUMMONS WITH NOTICE**

Date Index No. Purchased:
July 20, 2023

To the Persons Named as Defendants above:

PLEASE TAKE NOTICE THAT YOU ARE SUMMONED and required to serve upon
Plaintiff, at the address stated below, a notice of appearance or demand for a complaint within 20
days after service of this Summons (not counting the day of service itself), or within 30 days after
service is complete if the Summons is not delivered personally to you within the State of New
York.

YOU ARE HEREBY NOTIFIED THAT, should you fail to serve a notice of appearance
or demand for a complaint, a judgment will be entered against you by default for the relief
demanded herein, with prejudgment and post-judgment interest.

Dated: July 20, 2023

                           **AKERMAN LLP**


                           By: */s/ Darryl R. Graham*
                                Darryl R. Graham, Esq.
                                1251 Avenue of the Americas, 37th Floor
                                New York, New York 10020
                                Tel: (212) 880-3800
                                Fax: (212) 880-8965
                                *Attorneys for Plaintiff*


Defendants:                AML Global Eclipse, LLC
                           1201 Orange St, Ste 600
                           Wilmington, DE 19801

DWC Pine Investments I, LTD.
590 Madison Avenue, 13th Floor
New York, NY 10022

Alan Klapmeier
69655 Fire Tower Road
Iron River, WI 54847

James Carroll
19680 Marino Circle
Miromar Lakes, Florida 33913

Steve Serfling
3520 Spirit Drive SE
Albuquerque, NM 87106

RJ Siegle
9620 N Pelham Pkwy.
Milwaukee, WI 53217

Mike Wyse
85 Broad Street, 18th Floor
New York, NY 10004

Jon Hanson

Carol LaRotonda
105 Sherwood Blvd.
Los Alamos, NM 87547

Notice: The nature of this action is for breach of contract, tortious interference, civil conspiracy and breach of fiduciary duty, relating to the defendants' wrongful and deceptive conduct with respect to the bankruptcy and asset sale and purchase of One Aviation Corp.

Relief Sought: The relief sought is money damages in an amount to be determined at trial, but no less than $7,500,000.00, attorney's fees, costs and disbursements incurred in connection with this action, with prejudgment and post-judgment interest.

Venue: The basis of venue is CPLR § 503(a) because (i) a substantial part of the events or omissions giving rise to the claims occurred in the County of New York, and (ii) one of the parties resided in the County of New York when this action was commenced.

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DILIGENT ENTERPRISE MANAGEMENT, LLC,<br><br>                               Plaintiff,<br><br>          - against -<br><br>AML GLOBAL ECLIPSE, LLC, DWC PINE INVESTMENTS I, LTD., ALAN KLAPMEIER, JAMES CARROLL, STEVE SERFLING, RJ SIEGLE, MIKE WYSE, and CAROL LAROTONDA,<br><br>                            Defendants. | 23-cv-10924<br><br>Removed from:<br><br>Supreme Court of the State of New York, County of New York<br><br>Index No. 653523/2023<br><br>**NOTICE OF REMOVAL** |

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1334, 1452, and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9027, Defendants AML Global Eclipse, LLC ("AML Global"), DWC Pine Investments I, Ltd. ("DWC Pine"), Alan Klapmeier, James Carroll, Steve Serfling, and RJ Siegle, Mike Wyse, and Carol Larotonda (together with AML Global and DWC Pine, the "Defendants"), by and through their respective undersigned counsel, hereby remove to this Court the claims asserted by Diligent Enterprise Management, LLC ("Diligent") in the pending action captioned *Diligent Enterprise Management, LLC v. AML Global Eclipse, LLC, et al.*, Index No. 653523/2023, filed and pending in the Supreme Court of the State of New York, County of New York (the "Removed Action").

**Facts Demonstrating Entitlement to Removal**

1. On October 9, 2018, ONE Aviation Corporation ("One Aviation") and eleven affiliated entities (together, "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et. seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). Debtors' petitions were consolidated for procedural purposes and jointly administered in the case styled *In*

*re: ONE Aviation Corporation, et. al.*, Case No. 18-12309 (CSS) (the "Bankruptcy Case"). The Bankruptcy Case remains pending in the Delaware Bankruptcy Court before the Honorable J. Kate Stickles.

2.      On October 18, 2018, Debtors filed a Joint Prepackaged Plan of Reorganization for ONE Aviation and Its Debtor Affiliates (the "Plan") with the Delaware Bankruptcy Court. The Plan was amended twice—on January 18, 2019 and March 1, 2019—and finally confirmed (as amended) by the Delaware Bankruptcy Court on September 18, 2019 (the "Confirmation Order").

3.      The Plan contemplated that Debtors' pre-petition senior lender, an entity called Citiking International US LLC ("Citiking"), would own 100% of the reorganized Debtors upon emergence from Chapter 11 proceedings. In order for the Plan to become effective, Citiking was required to fund various settlements and distributions; reach agreement with other parties involved in the Bankruptcy Case on exit financing; and provide exit financing funding. Further, pursuant to the Confirmation Order, the Plan had to become effective by December 1, 2019.

4.      Citiking failed to fully fund the various settlements and distributions, as required by the Plan; refused to engage or cooperate in exit financing discussions; and, consequently, did not provide any exit financing. As a result of Citiking's failures, the Plan did not become effective by December 1, 2019, nor did it ever become effective thereafter.

5.      Debtors did not have access to financing in the absence of a consummated reorganization plan and, in March 2020, Citiking ceased funding Debtors' ongoing operations.

6.      On August 28, 2020, due to Citiking's failure to fulfill its obligations under the Plan and provide funding for the Debtors' operations, the Debtors filed an emergency motion with the Delaware Bankruptcy Court to seek alternative funding (the "August 28 Emergency Motion").

7.     At a September 3, 2020 hearing to consider the August 28 Emergency Motion, the Delaware Bankruptcy Court acknowledged the difficulties Debtors faced due to Citiking's failure to facilitate the Plan going effective nearly a year after confirmation. The Delaware Bankruptcy Court found that "Citiking ha[d] insufficient cash to close, [and] they are unwilling to close … There is no path forward with Citiking." Transcript of Telephonic Continued Hearing Before Honorable Christopher Sontchi at 38:1–5, *In Re: One Aviation Corporation, et al.*, No. 18-12309 (Sept. 3, 2020), ECF No. 912. The Delaware Bankruptcy Court granted Debtors' August 28 Emergency Motion.

8.     During a subsequent November 17, 2020 hearing on a separate motion, the Delaware Bankruptcy Court observed:

> I do think there was some inequitable conduct by Citiking. I do think the case went along longer than it should have, being sort of fed by drip feed to stay alive, when it became clear probably at least nine months ago […] that this thing was never going to close and that the case should pivot in some way to a different resolution.

Transcript of Telephonic Hearing Before Honorable Christopher Sontchi at 106:22–25, 107:1–4, *In Re: One Aviation Corporation, et al.*, No. 18-12309 (Nov. 17, 2020), ECF No. 1060.

9.     In line with the Delaware Bankruptcy Court's recommendation, Debtors indeed pivoted to identify a different resolution to the Bankruptcy Case—a resolution that did not depend on Citiking. Specifically, in light of Citiking's repeated failures to fulfill its various contractual obligations, Debtors pursued a sale transaction with another entity for the benefit of the Debtors' estates.

10.     On October 20, 2020, Debtors and AML Global entered into an Asset Purchase Agreement through which AML Global would acquire substantially all of Debtors' assets related to the Eclipse 500/550 twin engine light jet aircraft program (the "AML Eclipse APA").

3

11.     On the same day, Debtors filed a motion in the Bankruptcy Case seeking court approval for a sale to AML Global or any bidder that submitted a higher and better offer (the "AML Eclipse Sale Motion"). Citiking objected to the AML Eclipse Sale Motion.

12.     On November 20, 2020, the Delaware Bankruptcy Court held a hearing to consider the AML Eclipse Sale Motion. The Delaware Bankruptcy Court found that the assets subject to the AML Eclipse APA could be sold free and clear under Sections 363(f)(4), and (5) of the Bankruptcy Code. Accordingly, the Delaware Bankruptcy Court entered an order approving the AML Eclipse APA; authorizing the sale free and clear of all liens, claims, encumbrances, and other interests; and granting related relief (the "AML Eclipse Sale Order").

13.     On November 22, 2020, Citiking filed a Notice of Appeal of the AML Eclipse Sale Order with the United States District Court for the District of Delaware (the "District Court Appeal"), and an emergency motion to stay the AML Eclipse Sale Order pending the District Court Appeal. The district court denied the emergency motion to stay on November 24, 2020.

14.     On November 25, 2020, Citiking filed a Notice of Appeal to the United States Court of Appeals for the Third Circuit (the "Third Circuit Appeal"), and an emergency stay motion. The Third Circuit summarily denied the emergency stay motion on November 27, 2020.

15.     The sale closed on November 30, 2020. In connection with closing, AML Global made a cash payment to Debtors totaling $5,250,000, subject to certain adjustments, assumed over 200 of Debtors' contracts and leases, and paid over $1,400,000 in cure costs.

16.     On January 29, 2021, Citiking stipulated to the voluntary dismissal of the Third Circuit Appeal. On January 27, 2022, the district court dismissed the District Court Appeal for failure to prosecute.

17.     On February 18, 2021, the Bankruptcy Case was converted by the Delaware Bankruptcy Court to cases under chapter 7 of the Bankruptcy Code.

18.     On November 17, 2023, Diligent filed its complaint in the action captioned *Diligent Enterprise Management, LLC v. AML Global Eclipse, LLC, et al.*, Index No. 653523/2023 (the "Complaint" or "Compl."). The same day, Diligent served the Complaint on AML Global. Diligent did not properly serve DWC Pine or Mr. Wyse.

19.     Diligent asserted claims against AML Global, DWC Pine, and other defendants "pursuant to the Assignment of Claims and Causes of Action dated June 22, 2023 from Citiking International US LLC ('Citiking') as assignor to the Plaintiff as assignee." Compl. ¶ 1.

20.     The allegations in the Complaint against AML Global, DWC Pine, and other defendants (i.e., the directors, officers, and employees of Debtor) arise directly from, and are related to, the Bankruptcy Case. Indeed, Diligent has simply re-packaged the arguments that Citiking advanced in the Bankruptcy Case and which were rejected by the district court and the Third Circuit.

21.     *First*, the Complaint charges AML Global with tortious interference of contract for supposedly colluding with DWC Pine to "effectively freeze Citiking out of the bidding process" for Debtors' assets in connection with the AML Eclipse Sale Motion. *See* Compl. ¶¶ 105-110.

22.     *Second*, the Complaint alleges that AML Global and DWC Pine engaged in a civil conspiracy "for the purpose of enabling AML to purchase the One Aviation Debtors' assets [through the bankruptcy process] at far below market value[.]" Compl. ¶¶ 111-119.

23.     *Third*, the Complaint alleges that DWC Pine breached various contractual obligations to Citiking in connection with certain loans related to One Aviation. *See* Compl. ¶¶ 18, 90-104 (alleging that DWC Pine breached its intercreditor agreement and letter agreement in

connection with "Second Tranche Loans," which Diligent alleges are "loan obligations due to [DWC Pine] from the Affiliates" that were also allegedly "secured by a blanket lien against the assets of the Affiliates and One Aviation and [were] guaranteed by One Aviation").

24.     If there was any doubt Diligent's claims against AML Global, DWC Pine, and other defendants arise in or relate to the Bankruptcy Case (there is not), the Summons with Notice conclusively resolves that doubt. It provides, "The nature of this action is for breach of contract, tortious interference, [and] civil conspiracy … relating to the defendants' wrongful and deceptive conduct **with respect to the bankruptcy and asset sale and purchase of One Aviation Corp.**" Summons with Notice at 2 (emphasis added).

25.     Therefore, removal of the Removed Action is proper and appropriate pursuant to 28 U.S.C. § 1452(a), which provides that "[a] party may remove any claim or cause of action in a civil action … to the district court for the district where such civil action is pending," because this Court has jurisdiction under the "arising in or related to" prong of 28 U.S.C. § 1334(b).

26.     Given the Delaware Bankruptcy Court's familiarity with the events underlying the Removed Action, Defendants will seek to transfer the Removed Action to the District of Delaware under 28 U.S.C. § 1406 (for automatic referral to the Delaware Bankruptcy Court by operation of Amended Standing Order of Reference Re: Title 11 from the United States District Court for the District Court of Delaware, dated February 29, 2012).

### Other Procedural Requirements

27.     Defendants consent to the entry of a final order or judgment by the bankruptcy court.

28.     Copies of all process and pleadings filed in *Diligent Enterprise Management, LLC v. AML Global Eclipse, LLC, et al.*, Index No. 653523/2023, are being filed contemporaneously

6

with the filing of this Notice of Removal in accordance with 28 U.S.C. § 1446 and Bankruptcy

Rule 9027(a)(1), and are attached hereto as **Exhibit A**.

29.     A copy of the Notice of Removal will be filed with the Clerk of the Court for the

Supreme Court of the State of New York, County of New York, and will be served upon counsel

for all parties to the Removed Action pursuant to Bankruptcy Rule 9027(b) and (c).

WHEREFORE, Defendants remove the Removed Action from the Supreme Court of the

State of New York, County of New York, to the United States District Court for the Southern

District of New York.


Dated:   New York, New York
         December 15, 2023

                                        FRIED, FRANK, HARRIS, SHRIVER
                                          & JACOBSON LLP

                                        By: _____*/s/ Michael C. Keats*_____
                                                Michael C. Keats
                                                Peter B. Siroka

                                        One New York Plaza
                                        New York, New York 10004-1980
                                        (212) 859-8000
                                        michael.keats@friedfrank.com
                                        peter.siroka@friedfrank.com

                                        Attorneys for Defendant
                                          AML Global Eclipse, LLC

BAKER & HOSTETLER LLP

By: ___/s/ Dmitriy Tishyevich___

By: ___/s/ Erica Barrow___
Daniel J. Buzzetta
Erica Barrow

Dmitriy Tishyevich
Chelsea Cosillos
**MCDERMOTT WILL & EMERY LLP**
One Vanderbilt Avenue
New York, NY 10017-3852
Tel: (212) 547-5400 | F: (212) 547-5444
dtishyevich@mwe.com
ccosillos@mwe.com

45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200
dbuzzetta@bakerlaw.com
ebarrow@bakerlaw.com

*Counsel for DWC Pine Investments I, Ltd.*

Attorneys for Defendant
  Alan Klapmeier, James Carroll, Steve
  Serfling, and RJ Siegle, Mike Wyse, and
  Carol Larotonda

8