# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

DILIGENT ENTERPRISE MANAGEMENT, LLC,

                Plaintiff,

      -against-

AML GLOBAL ECLIPSE, LLC, DWC PINE
INVESTMENTS I, LTD., ALAN KLAPMEIER,
JAMES CARROLL, STEVE SERFLING, RJ
SIEGLE, and MIKE WYSE,

            Defendants.

---

Index No.:

**SUMMONS**

Date Index No. Purchased:
March 15, 2024

TO THE ABOVE-NAMED DEFENDANTS:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

      The basis of venue is CPLR § 503(a) because New York County is where one of the parties resided when this action was commenced.

Dated: New York, New York
       March 15, 2024

                      **AKERMAN LLP**

                      *s/ Darryl. R. Graham*
                      Darryl R. Graham
                      1251 Avenue of the Americas, 37th Floor
                      New York, NY 10020
                      Phone: (212) 880-3800
                      Fax: (212) 880-8965
                      darryl.graham@akerman.com

                      *Attorneys for Plaintiff*

1

Case 1:23-cv-10924-VEC    Document 27-1    Filed 03/19/24    Page 3 of 28

DEFENDANTS NAME AND ADDRESS:

AML Global Eclipse, LLC
1201 Orange St, Ste 600
Wilmington, DE 19801

DWC Pine Investments I, LTD.
590 Madison Avenue, 13th Floor
New York, NY 10022

Alan Klapmeier
69655 Fire Tower Road
Iron River, WI 54847

James Carroll
19680 Marino Circle, Apt. 403
Miromar Lakes, Florida 33913

Steve Serfling
42828 County Road 48
Deer River, MN 56636

RJ Siegle
9260 N Pelham Pkwy.
Milwaukee, WI 53217

Mike Wyse
946 Lawrence Avenue
Westfiled, NJ 07090

2

Case 1:23-cv-10924-VEC   Document 27-1   Filed 03/19/24   Page 4 of 28

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

DILIGENT ENTERPRISE MANAGEMENT, LLC,

               Plaintiff,

      -against-

AML GLOBAL ECLIPSE, LLC, DWC PINE
INVESTMENTS I, LTD., ALAN KLAPMEIER,
JAMES CARROLL, STEVE SERFLING, RJ
SIEGLE, and MIKE WYSE,

               Defendants.

Index No.:

**COMPLAINT**

---

Plaintiff, Diligent Enterprise Management, LLC (the "Plaintiff"), by and through its counsel, Akerman LLP, for its complaint against defendants, AML Global Eclipse, LLC ("AML"), DWC Pine Investments I, Ltd., ("DW"), Alan Klapmeier ("Klapmeier"), James Carroll (Carroll"), Steve Serfling ("Serfling"), RJ Siegle ("Siegle"), and Mike Wyse ("Wyse") individually (collectively, the "Defendants") alleges as follows:

## THE PARTIES

1.    Plaintiff Diligent Enterprise Management LLC is a limited liability company organized and existing under the laws of Delaware with offices at 257 Old Churchmans Road, New Castle, DE 19720.  The Plaintiff is the proper party in interest and has standing to bring these claims pursuant to the Assignment of Claims and Causes of Action dated June 23, 2023 from Citiking International US LLC ("Citiking") as assignor to the Plaintiff as assignee.

2.    Defendant AML is a limited liability company organized and existing under the laws of Delaware.  AML transacts business in the State of New York and committed a tort within

this state and regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state.

3.      Defendant DW is a limited liability partnership organized and existing under the laws of the Cayman Islands.  DW transacts business in New York and committed a tort within this state and regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state.

4.      Defendant Klapmeier is a resident of Wisconsin and transacts business in New York and is over the age of 18 and *sui juris*.  Klapmeier is the former CEO of One Aviation Corp. ("One Aviation"), serving as CEO from approximately April 2015 until February 2021.

5.      Defendant Carroll is a resident of Florida and transacts business in New York and is over the age of 18 as *sui juris*.  Carroll is a former board member of One Aviation who served as an Independent Director for One Aviation from approximately 2018 to 2020.

6.      Defendant Serfling is a resident of the Minnesota and transacts business in New York and is over the age of 18 and *sui juris*.  Serfling is the former COO and Executive Vice President of One Aviation who served as COO from approximately July 2010 to December 2020.

7.      Defendant Siegle is a resident of Wisconsin and transacts business in New York and is over the age of 18 and *sui juris*.  Siegle is a former board member of One Aviation who served as an Independent Director for One Aviation from approximately November 2012 to October 2021.

8.      Defendant Wyse (together with Klapmeier, Carroll, Serfling, and Siegle, the "D&O Defendants") is a resident of New Jersey and transacts business in New York, and is over the age of 18 and *sui juris*.  Wyse is a former board member of One Aviation who served as an Independent Director for One Aviation from approximately September 2017 to February 2021.

## JURISDICTION AND VENUE

9.      Importantly, Citiking and DW agreed in multiple agreements that DW and Citiking submit to jurisdiction in New York County and agreed that venue is appropriate, and can only be brought, in New York County.

10.     Additionally, this Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302 because Defendants regularly transact business within the State of New York.

11.     Further, the Court retains subject matter jurisdiction over Defendants because the events that gave rise to this matter occurred in the State of New York.

12.     Venue is proper because a substantial part of the events that gave rise to this matter occurred in New York County.

## FACTUAL BACKGROUND

**One Aviation Corporation**

13.     One Aviation was formed in 2015 and maintained its principal place of business in Albuquerque, New Mexico.  The operations of One Aviation and its affiliates was focused on aircraft service and upgrades, aircraft remanufacturing, and new aircraft manufacturing and sales. One Aviation was an Original Equipment Manufacturer of twin-engine light jet aircraft, primarily serving the owner/operator, corporate, and aircraft charter markets as well as international markets.

**Citiking's Purchase of the First Tranche Loans from DW**

14.     On or about November 10, 2017, Citiking and DW entered into a Purchase and Sale Agreement for Distressed Trades (the "First PSA"), pursuant to which DW sold and assigned loans in the approximate amount of $21,000,000 to Citiking (the "First Tranche Loans"). A true and correct copy of the First PSA is attached hereto as **Exhibit 1**.

15.     The First Tranche Loans consisted of loan obligations due to DW from borrowers, Eclipse Aerospace, Inc. ("Eclipse") and Brigadoon Aircraft Maintenance. LLC ("Brigadoon"), affiliates of One Aviation (Eclipse and Brigadoon are collectively referred to as "Affiliates").  The First Tranche Loans were secured by a blanket lien against the assets of the Affiliates and One Aviation and was guaranteed by One Aviation.

16.     Citiking made the payments to DW required under the First PSA and is the owner of the First Tranche Loans.  A true and correct copy of the Assignment and Assumption Agreement assigning the First Tranche Loans to Citiking is attached hereto as **Exhibit 2**.

**The Intercreditor Agreement and Citiking's Right of First Refusal**

17.     At the time of the closing of the sale of the First Tranche Loans to Citiking, DW continued to own other loan obligations due to DW from the Affiliates (the "Second Tranche Loans").  The Second Tranche Loans were also secured by a blanket lien against the assets of the Affiliates and One Aviation and was guaranteed by One Aviation.

18.     At the time of the closing of the sale of the First Tranche Loans, DW and Citiking entered into an Intercreditor Agreement that governed their relationship. A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit 3**.

19.     The Intercreditor Agreement provides, among other items, both DW and Citiking with a Right of First Refusal requiring that in the event that either DW or Citiking accepts an offer from a third party for the purchase and sale of any rights, title, and interests in the First Tranche Loans or the Second Tranche Loans, the other party shall have the opportunity to enter into the same agreement stating:

> [E]ach lender agrees that in the event that it receives an offer for the purchase and sale of any or all of its right, title and interest in and to the Obligations or the Loan Documents from an unaffiliated third party…*prior to accepting the Third Party Purchase Offer, the*

71809983;2

4

> *receiving Lender shall make an offer in writing to the other Loan*
> *Party (the "ROFR") to enter into the same purchase and sale*
> *transaction on the same terms as the Third Party Purchase Offer.*

Intercreditor Agreement at ¶ 5 (emphasis supplied).

**Citiking's First Purchase of the Second Tranche Loans From DW**

20.    On or about July 10, 2018, Citiking and DW entered into a second Purchase and Sale Agreement for Distressed Trades (the "Second PSA"), pursuant to which DW sold and assigned the Second Tranche Loans in the amount of $26,105,837.10 to Citiking (the First Tranche Loans and the Second Tranche Loans are collectively referred to as the "Loans"). A true and correct copy of the July 10, 2018 Purchase and Sale Agreement for Distressed Trades for the Second Tranche Loans is attached hereto as **Exhibit 4**.

21.    The Second PSA defines the "Settlement Date" as "the date on which [DW] receives the First Installment."

22.    In accordance with the Second PSA, Citiking made the first installment payment to DW in the amount of $2,000,000 on or about July 10, 2018. As such, on the Settlement Date, the Second Tranche Loans were assigned by DW to Citiking. A true and correct copy of the Assignment and Assumption Agreement assigning the Second Tranche Loans from DW to Citiking is attached hereto as **Exhibit 5**.

**The Continuing Obligations Agreement and the Repurchase Obligation**

23.    Contemporaneously with the purchase and sale of the Second Tranche Loans, on or about July 10, 2018, Citiking and DW entered into a Continuing Obligations Agreement (the "COA"). A true and correct copy of the COA is attached hereto as **Exhibit 6**.

24.    The COA provided DW with remedies in the event of a default by Citiking under the Second PSA.

25.     Specifically, if Citiking defaulted by failing to make the second or third installment payments under the Second PSA, then DW would have the right, after delivery of a default notice, to repurchase from Citiking the Second Tranche Loans (the "Repurchase").

26.     Pursuant to the COA, DW could repurchase the Second Tranche Loans by "directing the Agent to record the Escrowed Assignment" of the Second Tranche Loans to DW, making DW the owner of the Second Tranche Loans.

27.     Because Citiking was the owner of the First Tranche Loans, even if DW exercised its right to Repurchase the Second Tranche Loans under the COA, DW and the Second Tranche Loans remained subject to and bound by the Intercreditor Agreement.

28.     The Repurchase required DW to pay Citiking an amount equal to the sum of (1) any portion of the purchase price previously paid by Citiking, minus (2) any default interest and other amounts owing or payable by Citiking to DW under the Second PSA, minus (3) $1,000,000.

29.     Additionally, under the COA, Citiking agreed that in the event of default following the Repurchase, any indebtedness of One Aviation and its Affiliates to Citiking that exceeded the amount of the loans obtained by DW in the Repurchase, would be subordinate to any and all obligations of One Aviation and its Affiliates to DW with respect to the obligations repurchased.

**The Escrow Agreement**

30.     On July 10, 2018, contemporaneously with the execution of the Second PSA, Citiking and DW entered into an Escrow Agreement.  A true and correct copy of the Escrow Agreement is attached hereto as **Exhibit 7**.

31.     Pursuant to the Escrow Agreement, Citiking delivered to Cantor Fitzgerald Securities (the "Escrow Agent"), an executed Assignment and Assumption Agreement (the "DW

Assignment"), wherein Citiking assigned the Second Tranche Loans it was purchasing from DW back to DW.

32.     The obligation of the Escrow Agent to release from escrow and deliver the DW Assignment could be triggered by one of two events. In the first instance, the Escrow Agreement provided that the Escrow Agent would release the DW Assignment from escrow and deliver it to DW upon DW certifying its right to Repurchase the Second Tranche Loans. In the second instance, the Escrow Agent would release the DW Assignment from escrow and deliver it to Citiking upon notice from DW that it was fully paid, **or the passage of 120 days without a default notice from Seller DW**. Paragraph 2 of the Escrow Agreement provides in pertinent part:

> Escrow Agent shall deliver the Assignment Agreement to Buyer or to the Administrative Agent to effect the assignment for Seller's benefit, as the case may be, as follows:
>
> (a) to the Administrative Agent to effect the assignment for Seller's benefit, after receipt by the Escrow Agent of a notice from Seller certifying that it is entitled to Repurchase the Loans pursuant to Section 6(b) of the Agreement (a "<u>Default Notice</u>"); or
>
> (b) to the Buyer upon (i) receipt by the Escrow Agent of a notice from Seller that the Purchase Price has been paid in full or (ii) upon the passage of 120 days from the execution of this agreement if no Default Notice has been delivered to the Escrow Agent by Seller.

*See* Ex. 7 (emphasis in original).

**DW Declarations of Default Under the Second PSA and DW's Repurchase of the Second Tranche Loans**

33.     DW issued Default Notices to Citiking on August 24, 2018, September 10, 2018, September 24, 2018 and October 10, 2018, though it appears that these notices were not copied on the Escrow Agent.

Case 1:23-cv-10924-VEC  Document 27-1  Filed 03/19/24  Page 11 of 28

34.     On January 18, 2019, **more than 184 days after execution of the Escrow Agreement**, DW provided a Default Notice to the Escrow Agent, certifying that DW was entitled to Repurchase from Citiking the Second Tranche Loans.  A true and correct copy of the Default Notice is attached as **Exhibit 8**.  DW further stated that the Escrow Agent was "now obligated to deliver" the DW Assignment to DW's administrative agent.

35.     DW's Default Notice attached a Repurchase Notice to Citiking, also dated January 18, 2019, in which DW, citing the Second PSA and the COA, declares itself the "sole owner" of the Second Tranche Loans.  The Repurchase Notice refers to the return of $316,500.00 to Citiking allegedly on account of the Repurchase.  The $316,500.00 paid to Citiking allegedly represented the return of the $2,000,000 that Citiking paid under the Second PSA, less a charge of $1,000,000 (the "Default Penalty") and Default Interest allegedly in the aggregate amount of $683,500.00.

**The Letter Agreement and Citiking's Second Purchase of the Second Tranche Loans**

36.     On July 25, 2019, Citiking and DW entered into a Letter Agreement (the "Letter Agreement"), whereby Citiking agreed to purchase, for the second time, the Second Tranche Loans that were now held by DW pursuant to the Repurchase. A true and correct copy of the Letter Agreement is attached hereto and incorporated herein as **Exhibit 9**.

37.     Pursuant to the Letter Agreement, the purchase price for Citiking's second purchase of the Second Tranche Loans was $16,150,000 (the "Purchase Price") with interest accruing on unpaid installments at the per annum rate of 12%.  The Letter Agreement provides Citiking a credit in the total amount of $1,683,500 representing the Default Penalty and Default Interest that DW had previously charged Citiking in connection with the Repurchase of the Second Tranche Loans.

38.     The Letter Agreement incorporates the terms of the Second PSA requiring DW to deliver the Second Tranche Loans to Citiking on the Settlement Date.

39.    The Second PSA defines the Settlement Date as the date that DW receives the first installment payment from Citiking.

40.    On July 25, 2019, Citiking made the first installment payment to DW in the amount of $4,000,000, making the Settlement Date July 25, 2019.

41.    The Letter Agreement required Citiking to make an additional payment of $2,500,000 on or before October 31, 2019, which payment Citiking remitted to DW on October 31, 2019.

42.    In total, Citiking paid DW approximately $6,500,000 in principal payments towards the $16,150,000 purchase price for its second purchase of the Second Tranche Loans. Citiking also paid DW monthly interest payments in the amount of 12% per annum.

43.    To date, DW has failed to deliver the Second Tranche Loans to Citiking notwithstanding DW's receipt of the first installment payment of $4,000,000 and the subsequent installment payment of $2,500,000.

**One Aviation Debtors' Chapter 11s**

44.    On October 9, 2018, One Aviation and the Affiliates filed voluntary petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. section 101 *et seq.* in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), Case No. 18-12309 (CSS) (the "Bankruptcy Case").

45.    Other affiliates of One Aviation also filed for relief under Chapter 11 in the District of Delaware, including ACC Manufacturing, Inc., Aircraft Design Company, DR Management, LLC, Innovatus Holding Company, Kestrel Aircraft Company, Inc., Kestrel Brunswick Corporation, Kestrel Manufacturing, LLC, Kestrel Tooling Company, and OAC Management, Inc. (collectively the "Additional Affiliates" and together with One Aviation and the Affiliates the

Case 1:23-cv-10924-VEC   Document 27-1   Filed 03/19/24   Page 13 of 28

"Debtors").  The chapter 11s of the One Aviation Debtors were jointly administered in the Bankruptcy Court.

**Citiking's DIP Loan to the Debtors and Additional Amounts Citiking Funded**

46.     On October 10, 2018, the Debtors filed a motion in the Bankruptcy Case for approval of debtor in possession financing (the "DIP Loan") pursuant to the terms and conditions of the Senior Secured Superpriority Debtor in Possession Credit and Security Agreement dated October 9, 2018, among Citiking as the debtor in possession lender, the Affiliates as borrowers and guaranteed by One Aviation as guarantor.

47.     On November 27, 2018, the Bankruptcy Court entered the Final Order (I) Authorizing Debtor Borrowers to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (III) Granting Related Relief ("Final DIP Order"), approving the DIP Loan and granting Citiking a senior lien and super priority administrative status.

48.     Pursuant to the Final DIP Order:

A.      The Affiliates, One Aviation and related debtors were granted permission to enter into a senior secured super priority revolving loan facility with Citiking (the "DIP Loan"), with commitments to lend up to approximately $19.1 million, and such other financial accommodations, allocated as follows: (i) a superpriority priming *new money* revolving facility with commitments to lend up to approximately $8.0 million (the "DIP New Money") and (ii) roll up loans in the amount of approximately $11.13 million (the "DIP Roll-Up");

B.      Citiking's lien securing the DIP Loan was deemed senior and had priority over competing liens against the assets of the Affiliates, One Aviation and related debtors, including the First Tranche Loans and the Second Tranche Loans; and,

71809983;2

        C.    the DIP Loan was deemed an administrative expense claim with priority over all other administrative expense claims, including the administrative expense claims.

49.    D&O Defendants were integral in obtaining the DIP Loan from Citiking, including negotiating the terms and documentation of the DIP Loan, preparing the restructuring budget related to the use of the DIP Loan, requesting the DIP Loan include monies to purchase parts even through the purchase of the parts was prepaid, and providing "critical vendor" status to the company owned by Klapmeier and holding Klapmeier's personal plane to ensure that the company was paid as a critical vendor from the DIP Loan provided by Citiking.

50.    Citiking funded $19.1 million, the full amount of the DIP Loan, plus approximately $7 million post-confirmation pursuant to the Debtors' Second Amended Joint Prepackaged Plan of Reorganization (the "Plan"). Citiking had no obligation to fund the $7 million under the DIP Loan.

51.    The $7 million payment included #1.7 million earmarked for distribution to the unsecured creditors (the "$1.7 Million"). The $1.7 Million was required to be placed in an escrow account for the benefit of the unsecured creditors.

52.    The D&O Defendants promised Citiking that the $1.7 Million would be placed in an existing escrow account for the protection of Citiking (the "Escrow Account"). As grantor of the $1.7 Million into escrow, Citiking was entitled to the return of the escrowed $1.7 Million if the order confirming the Plan was vacated which subsequently occurred.

53.    The D&O Defendants promised advised that the wire instructions provided to Citiking for delivery of the $1.7 Million were to the Escrow Account.

**The Debtors' Motions to Sell Their Assets Free and Clear of Liens and the Elimination of Citiking's Right to Credit Bid**

54.    On June 17, 2019, the Debtors filed in the Bankruptcy Case a motion for entry of an order approving, among other things, the sale of the Debtors' assets free and clear of liens, bidding procedures and a Stalking Horse Agreement with Citiking as the Stalking Horse Buyer (The "First Sale Motion").

55.    The terms of the bidding procedures in the First Sale Motion allowed credit bidding and permitted Citiking to credit bid the amounts due and owing Citiking by the Debtors.  Utilizing its credit bid meant that Citiking did not need to come out of pocket and bid cash at the sale. Rather, by credit bidding, Citiking could "credit" bid up to the amount it was owed by the Debtors. If it were outbid, Citiking would walk away with the cash from the sale to the successful bidder in satisfaction of the amounts owed to Citiking.

56.    Citiking always intended to exercise its right to credit bid at the sale of the Debtors' assets.

57.    The bidding procedures in the First Sale Motion did not provide for a "good faith deposit" or require any deposit on the part of Citiking as the Stalking Horse Buyer.

58.    A few weeks later, on July 10, 2019, the Debtors filed a notice of withdrawal of the First Sale Motion.

59.    On August 28, 2020, the Debtors filed their second motion to approve the sale of assets (the "Second Sale Motion").  This time the stalking horse buyer was SEF OA LLC ("SE Falcon").  Importantly, the Second Sale Motion continued to allow credit bidding by Citiking.

60.    On October 8, 2020, the Debtors filed a notice of withdrawal of the Second Sale Motion, which appeared to be a sham.

61.     Twelve days later, on October 20, 2020, the Debtors filed their third motion for approval of sale, this time to AML Global Eclipse LLC ("AML") as the Stalking Horse Bidder (the "Third Sale Motion").

62.     AML was undeniably an integral part of the Bankruptcy Case and was fully aware of the obligations and rights retained by DW and Citiking with respect to the Second Tranche Loans and the ROFR associated with the Loans in their entirety.

63.     Debtors' Third Sale Motion provided that AML, as Stalking Horse Bidder, would purchase the Debtors' assets for $5,250,000, subject to higher and better offers, and the proceeds would be used to pay "Administrative Expense Claims."

64.     In the Third Sale Motion, the Debtors acknowledged that DW intended to exercise its alleged right to credit bid against AML stating that "DW has informed the Debtors that it may submit a competing offer in the form of a credit bid up to and/or at the Sale Hearing."

65.     On November 5, 2020, the Debtors filed yet another Notice of Bidding Procedures, providing that a qualifying bid "shall…generally contain terms no less favorable (in the Debtors' reasonable business judgment) than the Stalking Horse Agreement" with AML.

66.     On or about November 10, 2020, AML voluntarily increased its cash deposit to the full amount of the purchase price which remained subject to higher and better offers at auction.

67.     Inexplicably, on November 10, 2020, after AML deposited the full purchase price, the Debtors filed a Notice of Revised Bidding Procedures that effectively barred credit bidding by requiring bidders to make a cash deposit in an escrow account for the full price of the bid.

68.     The effect of the November 5, 2020 Bidding Procedures, coupled with AML's deposit of the full cash purchase price, was to require that all bidders, including Citiking, deposit cash in the amount of the entire purchase price of $5,250,000 to qualify as a bidder. This change

in the bidding procedures completely thwarted and eliminated the ability for Citiking to credit bid the amount of the First Tranche Loans it owned in the approximate amount of $21,000,000.

69.     On November 20, 2020, the Bankruptcy Court approved the sale of the Debtors' assets to AML for a cash price of $5,250,000, free and clear of all liens, claims, encumbrances, and other interests, other than permitted encumbrances as defined in the purchase agreement.

70.     Citiking was completely and unjustly deprived of the opportunity to credit bid causing Citiking significant harm and providing a windfall to AML.

**The Sale Hearing and AML's Alleged Purchase of the Second Tranche Loans from DW**

71.     On November 20, 2020, at the outset of the sale hearing to AML as stalking horse, counsel for DW boldly stated that AML had a deal with DW to purchase DW's secured debt consisting of the Second Tranche Loans conditioned upon entry of the order approving of the sale of the assets to AML.

72.     AML's counsel advised the Bankruptcy Court that "just within the last hour or so [DW was] able to document our sale of our debt to AML subject to closing of – subject to entry of a sale order."

73.     At the same time, DW's counsel announced DW's support for the sale of the Debtors' assets to AML, which was a stark change in position from DW's prior representation that it would submit a competing offer for the purchase of the assets in the form of a credit bid.

74.     This was the first time that Citiking, and seemingly the other creditors and the Bankruptcy Court, were made aware of DW's alleged sale of the Second Tranche Loans to AML. Clearly, this purchase and sale of the Second Tranche Loans was negotiated during the Debtors' sale process and outside the purview of Citiking and the Bankruptcy Court.

Case 1:23-cv-10924-VEC   Document 27-1   Filed 03/19/24   Page 18 of 28

75.     Notably, at the time of DW's alleged sale of the Second Tranche Loans to AML, DW had already sold the Second Tranche Loans to Citiking and DW was in default of the Second PSA and Letter Agreement by failing to deliver the Second Tranche Loans to Citiking on the Settlement Date.

76.     Even if DW had not sold the Second Tranche Loans to Citiking, which it did, DW was required to provide Citiking with a ROFR under the Intercreditor Agreement before selling the Second Tranche Loans to AML.

77.     DW failed to provide Citiking with the ROFR to purchase the Second Tranche Loans.

78.     Notably, neither DW nor AML filed a notice of transfer of DW's secured claim.

79.     By allegedly selling the Second Tranche Loans to AML, DW was able to obtain value in the form of a cash payment from AML eliminating the need for DW to protect its loans and collateral by credit bidding at the sale.

80.     To be clear, there was no valid business reason for AML to acquire the secured indebtedness from DW unless there was an undisclosed side deal between DW and AML.

81.     Upon information and belief, while AML and the Debtors were negotiating the bidding procedures, AML was also negotiating with DW to acquire the Second Tranche Loans.

82.     This multi-layer conspiracy between AML and DW was designed to freeze Citiking out by stripping it of its ability to credit bid, satisfy the claim of DW on the Second Tranche Loans and allow AML to purchase the Debtors' assets at a theoretical "face value" far below market value.

71809983;2

83.     This conspiracy enabled AML and DW, with the assistance and cooperation of the D&O Defendants, to eliminate Citiking's credit bidding, paving the way for AML to purchase the Debtors' assets without competition from Citiking.

84.     The end result of AML and DW's secret purchase and sale of the Second Tranche Loans in breach of the ROFR and in violation of Citiking's ownership rights, left Citiking holding the proverbial bag.  AML was able to purchase the Debtors' assets for pennies on the dollar in an amount much lower than what AML would have, and should have, paid.

85.     The discontinued sale to AML also enabled the D&O Defendants to achieve their goal of selling the assets to AML instead of Citiking.  Importantly, during this time there was friction between the D&O Defendants and Citiking.  Indeed, Citking was demanding financial information and accountability from the D&O Defendants concerning the tens of millions of dollars that Citiking had funded to the Debtors from 2018 to 2020 but the D&O Defendants were not providing Citiking with that information.

**Debtors Conversion to Chapter 7**

86.     On February 18, 2021, Debtors' Bankruptcy Cases were converted to Chapter 7. George L. Miller was appointed as the chapter 7 Trustee.

87.     The Debtors were left with little money from the sale proceeds and were unable to satisfy the debts owed to creditors, including Citiking.

88.     As a result of Defendants' improper and concealed tactics, Citiking suffered millions of dollars.

<u>**COUNT I**</u>
**(Breach of Intercreditor Agreement Against DW)**

89.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 88 as if fully set forth herein.

16

71809983;2

90.     On or about November 10, 2017, DW and Citiking executed the Intercreditor Agreement.

91.     The Intercreditor Agreement is a valid and enforceable contract that was supported by adequate consideration.

92.     The Intercreditor Agreement required, among other terms, that DW and Citiking are entitled to a ROFR to match the third-party offer. Specifically, the entity that receives a third-party purchase offer shall make an offer in writing to the other loan party enabling that other party to enter into the same purchase and sale transactions as the third-party, the ROFR. *See* Exhibit 3.

93.     To the extent that DW had the right to sell the Second Tranche Loans to AML (which Citiking denies), DW breached the terms of the Intercreditor Agreement by failing to provide Citiking the required ROFR prior to allegedly selling the Second Tranche Loans to AML.

94.     As a result of DW's breach of the Intercreditor Agreement and refusal to honor Citiking's ROFR, Citiking has been damaged.

## <u>COUNT II</u>
### (Breach of the Letter Agreement Against DW)

95.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 94 as if fully set forth herein.

96.     On or about July 25, 2019, DW and Citiking entered into the Letter Agreement. *See* Exhibit 9.

97.     The Letter Agreement is a valid and enforceable contract that was supported by adequate consideration.

98.     DW breached the Letter Agreement by failing to deliver and assign to Citiking the Second Tranche Loans.

99.     As a result of DW's breach of the Letter Agreement, Citiking has been damaged.

## COUNT III
### (Breach of COA Against DW)

100.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 99 as if fully set forth herein.

101.    On or about July 10, 2018, DW and Citiking entered into the COA. *See* Exhibit 6.

102.    The COA is a valid and enforceable contract that was supported by adequate consideration.

103.    DW breached the COA by failing to transfer and assign the Second Tranche Loans back to Citiking, in direct violation of the COA.

104.    The COA required DW to Repurchase the Second Tranche Loans from Citiking upon Citiking's default.

105.    But, because DW breached the Second PSA by not assigning Citiking the loans, because DW still possessed the Second Tranche Loans, DW did not Repurchase the loans and refund Citiking its principal paid as required under the COA.

106.    DW breached its obligations under the COA by failing to refund to Citiking the principal Citiking paid to DW .

107.    Citiking has been damaged in the amount that Citiking paid for the purchase of the Second Tranche Loans, $7,500,000 plus interest, reasonable attorneys' fees, and costs.

## COUNT IV
### (Tortious Interference with Contract Against AML)

108.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 107 as if fully set forth herein.

109.    The Intercreditor Agreement was a valid contract and in effect at all material times.

110.    AML was aware and had knowledge of the Intercreditor Agreement and the ROFR set forth therein.

18

71809983;2

111.     AML is the proximate and direct cause of DW's breach of the Intercreditor Agreement.

112.     Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement.

113.     As a result of AML's misconduct, Citiking has been damaged in an amount exceeding $7,500,000, the amount that Citiking paid for the purchase of the Second Tranche Loans, $7,500,000 plus interest, reasonable attorneys' fees, and costs.

### COUNT V
### (Civil Conspiracy Against AML and DW)

114.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 113 as if fully set forth herein.

115.     DW and AML conspired together to eliminate credit bidding at the auction in the Debtors' Bankruptcy Case for the purpose of enabling AML to purchase the Debtors' assets at far below market value and DW to recover on the Second Tranche Loans through the sale of the loans to AML

116.     DW and AML unlawfully conspired together to tortiously interfere with Citiking's rights under the Intercreditor Agreement.

117.     Specifically, DW was well aware of its obligations owed to Citiking pursuant to the Intercreditor Agreement.

118.     AML was also aware of the obligations owed to Citiking based upon AML's involvement in the Bankruptcy Case and DW's express mention of the Intercreditor Agreement and the rights provided to Citiking thereunder.

119.    Upon information and belief, DW and AML devised a scheme whereby they sought to eliminate Citiking's right to credit bid and did so by violating the rights owed to Citiking under the Intercreditor Agreement.

120.    The conspiracy between AML and DW is evidenced by AML's inexplicable and nonsensical purchase of the Second Tranche Loans and the elimination of the credit bid, without objection from DW.

121.    AML purchased the Debtors' assets at a fraction of their value while DW received cash for its debt and avoided a priority dispute with Citiking concerning the priority of payment for the sale proceeds.

122.    Citiking was damaged in an amount to be proven at trial as a result of the conspiracy between AML and DW.

## <u>COUNT VI</u>
### (Fraudulent Inducement Against D&O Defendants)

123.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 122 as if fully set forth herein.

124.    In the state of New York, the "trust fund doctrine" provides that officers and directors of an insolvent corporation hold the remaining corporate assets in trust for the benefit of its creditors.

125.    At all material times, Citiking was a creditor of the Debtors.

126.    Therefore, the D&O Defendants (i.e., the Debtors' directors and officers) owed Citiking a duty not to engage in misconduct and to act in the best interest of Citiking and its fellow creditors.

127.    The D&O Defendants served as officers and directors of the Debtors at all material times hereto.

128.    As Debtors' directors and officers, the D&O Defendants owed Citiking a duty to act in the best interest of Citiking and its fellow creditors, and to share all material information truthfully and without reservation.

129.    The D&O Defendants made misrepresentations of material fact with respect to (i) the One Aviation restructuring budget, (ii) inventory funding requests for customer parts, (iii) the $1.7 Million payment earmarked for the unsecured creditors and to be held in the Escrow Account and (iv) payments for Klapmeier's personal plane.

130.    The D&O Defendants misrepresented to Citiking: (a) the amount of the Debtors' restructuring budget to be $6 to $7 million less than the actual budget, (b) that inventory funding was necessary for  customers' parts notwithstanding that the customers had prepaid for the parts, (c) that the Escrow Account was in place and the wire transfer instructions provided to Citiking for delivery of the $1.7 Million were to the Escrow Account, and, (d) the company owned by Klapmeier and holding Klapmeier's personal plane was a "critical vendor" to be paid from the DIP Loan provided by Citiking.

131.    The D&O Defendants knew at the time of making their misrepresentations that the misrepresentations were false.

132.    The D&O Defendants knowingly made the misrepresentations with the intention that Citiking would rely on the misrepresentations to its detriment.

133.    Citiking justifiably relied upon the D&O Defendants' misrepresentations.

134.    As a result of these misrepresentations, Citiking was damaged in an amount to be determined at trial.

## COUNT VII
### (Fraudulent Inducement Against Klapmeier and Siegle)

135.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 134 as if

fully set forth herein.

136.     Defendants Klapmeier and Siegle made misrepresentations of material fact to Citiking with respect to the alleged need to retain all of Klapmeier's incumbent team of directors and officers and provide them with large and unwarranted compensation packages (the "Klapmeier Team") in order to successfully reorganize the One Aviation Debtors and (ii) deliberately failed to disclose material information regarding credible allegations as to director Siegle's criminal and fraudulent conduct while serving as a director on the board of another company.

137.     Defendants Klapmeier and Siegle knew at the time of making their misrepresentations that the misrepresentations were false regarding the need to retain the Klapmeier Team with the large and unwarranted compensation packages.

138.     Defendants Klapmeier and Siegle intentionally made the misrepresentations and intentionally and knowingly concealed the highly-relevant information regarding Siegle's sullied history on corporate boards.

139.     These misrepresentations were made with the intent to induce Citiking to rely upon the misrepresentations for the ultimate purpose of inducing Citiking into funding tens of millions of dollars into the Debtors' Bankruptcy Case and purchasing from DW the First and Second Tranches of the Debtors' loan obligations.

140.     Citiking justifiably relied upon the intentional misrepresentations and/or knowing omissions of material fact by Klapmeier and Siegle, and as a result Citiking has suffered damages in an amount to be determined at trial..

## COUNT VIII
### (Fraudulent Misrepresentation Against Klapmeier)

141.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 140 as if fully set forth herein.

71809983;2

142.    Defendant Klapmeier made misrepresentations of material fact in offering to sell Citiking the "real Kestrel intellectual property assets" through a "side deal" he offered outside the Debtors' Bankruptcy Case.  Klapmeier misrepresented the true ownership structure of Kestrel IP assets, stating falsely that they were under his exclusive control and separate from the assets governed by the Debtors' Bankruptcy Case, and thus he could freely transfer these assets to Citiking via a separate transaction that Klapmeier would arrange.

143.    Klapmeier made the misrepresentations intentionally and with knowledge of their falsity.

144.    Such representations with respect to the Kestrel IP assets were intended to induce Citiking to act in reliance thereon.

145.    As a result of Klapmeier's misrepresentations, Citiking missed the opportunity to obtain the assets through a sale in the Debtors' Bankruptcy Case at a more opportune time and price.

146.    Citiking justifiably relied upon Klapmeier's misrepresentations and was damaged as a result in an amount to be determined at trial.

## <u>COUNT IX</u>
**(Fraudulent Misrepresentation Against Klapmeier, Siegel, and Serfling)**

147.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 146 as if fully set forth herein.

148.    Defendants Klapmeier, Siegel, and Serfling made misrepresentations of material fact regarding an opportunity for One Aviation and Citiking to form a joint venture with Israel Aerospace Industries ("IAI") on the premise that such a collaboration would be extremely beneficial to both Citiking and the reorganized One Aviation.  Defendants Klapmeier, Siegle, and Serfling traveled to Israel for the purported purpose of negotiating the business deal with IAI.

71809983;2

However, after paying for all the expenses of the trip, Citiking later learned that these D&O Defendants misrepresented both the "business opportunity" with IAI and the premise of their trip as a pretext to get Citiking to pay for an all-expense-paid vacation for themselves and their families to Israel and Europe.

149.    Defendants Klapmeier, Siegel, and Serfling made the misrepresentations intentionally and with knowledge of their falsity.

150.    Such representations with respect to the IAI "business opportunity" and trip to Israel were intended to induce Citiking to act in reliance thereon.

151.    As a result of their misrepresentations, Citiking wasted precious economic resources and missed any opportunity to achieve a business deal with IAI.

152.    Citiking justifiably relied on the misrepresentations of D&O Defendants Klapmeier, Siegle, and Serfling and as a result has suffered damages in an amount to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief and demands:

a)    Entry of a judgment in favor of Plaintiff and against DW awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

b)    Entry of a judgment in favor of Plaintiff and against AML awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

c)    Entry of a judgment in favor of Plaintiff and against the D&O Defendants Klapmeier, Carroll, Serfling, Siegle, and Wyse, awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

24

d) Entry of a judgment in favor of Plaintiff and against Klapmeier and Siegle awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

e) Entry of a judgment in favor of Plaintiff and against Klapmeier awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

f) Awarding the Plaintiff such further and additional relief as the Court deems just and proper, including prejudgment interest.

Dated: New York, New York
March 15, 2024

**AKERMAN LLP**

By: */s/Darryl R. Graham*
Darryl R. Graham, Esq.
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Tel: (212) 880-3800
Fax: (212) 880-8965

*Attorneys for Plaintiff*

25